# EXHIBIT A

## TO

# NOTICE OF REMOVAL

Electronically Filed
9/12/2018 4:19 PM
Steven D. Grierson
CLERK OF THE COURT

1  Steven J. Parsons
   Nevada Bar No. 363
2  LAW OFFICES OF STEVEN J. PARSONS
   10091 Park Run Dr Ste 200
3  Las Vegas, NV 89145-8868
   (702) 384-9900
4  (702) 384-5900 – (fax)
   Steve@SJPlawyer.com
5
   Attorney for Plaintiff
6  **NEVADA TITLE COMPANY**

7                          DISTRICT COURT

8                    CLARK COUNTY, NEVADA        A-18-780965-C

9  **NEVADA TITLE COMPANY**, a Nevada       Case No.:
   corporation,
10                                           Dept. No.:        Department 25
            Plaintiff,
11                                           **COMPLAINT**
   vs.
12                                           **JURY DEMAND**
   **ACE AMERICAN INSURANCE COMPANY**, a
13 Pennsylvania corporation,                 **EXEMPT FROM ARBITRATION**
                                             **(NAR 3(A) - Declaratory Relief; and**
14          Defendant.                       **NAR 3(A) - Value Exceeds $50,000)**
   _____/
15

16    1.    Declaratory Relief;
      2.    Breach of Contract;
17    3.    Tortious Breach of the Duty of Good Faith and Fair Dealing; and
      4.    Breach of Statutory Duties (Nev. Rev. Stat. § 686A.310)
18

19        Plaintiff, **NEVADA TITLE COMPANY**, a Nevada corporation, by its attorney, Steven J.

20 Parsons, of LAW OFFICES OF STEVEN J. PARSONS, hereby complains against Defendant, **ACE**

21 **AMERICAN INSURANCE COMPANY**, a Pennsylvania corporation, and as causes of action

22 against Defendant alleges and sets forth its Complaint as follows:

23                    <u>**INTRODUCTION AND THE PARTIES**</u>

24    1.    Plaintiff, **NEVADA TITLE COMPANY,** a Nevada corporation (hereinafter referred

25 to simply as "Plaintiff", the "Insured", or "NTC"), was at the times relevant hereto a domiciliary

26 of Clark County, Nevada, doing its business primarily within Clark County, Nevada.

27    2.    Defendant, **ACE AMERICAN INSURANCE COMPANY** ("Defendant", "Insurer", or



*10091 Park Run Drive, Suite 200*
*Las Vegas, Nevada 89145-8868*
*(702)384-9900; fax (702)384-5900*
*Info@SJPlawyer.com*

Page 1 of  19

Case Number: A-18-780965-C

1    "ACE") was at all relevant times a Pennsylvania corporation, authorized and doing business in

2    Nevada as an insurance carrier licensed and admitted to do business in Nevada, including

3    offering for sale insurance products, such as the policy of insurance sold by ACE at issue

4    herein, to provide defense and indemnity of two (2) third-party lawsuits as more fully set-forth,

5    *infra*.

6         3.     On information and belief Plaintiff alleges on or around January 14, 2016 ACE

7    was purchased by the Chubb Corporation ("Chubb").  In the time since, Chubb has been and

8    is now in the relationship between NTC and ACE in some capacity.  ACE employees, agents,

9    and attorneys for ACE have referred in correspondence to "Insurer: Chubb on behalf of ACE

10    American Insurance Company ("Chubb")".

11         4.     NTC's Complaint states a controversy over which this Court has jurisdiction, and

12    venue is properly in this Court as during the relevant time frame NTC was and is a domiciliary

13    of and doing business primarily in Clark County, Nevada; the relevant policy of insurance was

14    procured by and delivered to NTC in Clark County, Nevada; the relevant policy of insurance was

15    written to insure, *inter alia*, against loss to NTC in Clark County, Nevada; the damages incurred

16    by NTC for which NTC seeks recovery from ACE were and are being incurred in Clark County,

17    Nevada; and benefits due from the policy of insurance and damages claimed by NTC were due

18    and payable in Clark County, Nevada.

19         5.     The matter in controversy exceeds, exclusive of interest and costs, the minimum

20    jurisdictional amount of the Court, of an amount in excess of Fifteen Thousand Dollars

21    ($15,000.00).

22                             **FACTS OF THE DISPUTE**

23         6.     On or about October 7, 2010, NTC Global Holding Group purchased an ACE

24    Advantage Miscellaneous Professional Liability Policy, Policy No. EON G23638344 002 issued

25    by ACE (the "Policy").  Endorsement No. 5 to the Policy added NTC as an additional Insured.

26         7.     The Policy's declarations provide coverage on a "claims made and reported"

27    basis for "professional liability."  The Declarations further provide Limits of Liability (including



1   Claims Expenses) of $10,000,000 "Each Claim" and as an "Aggregate Limit."  The Policy has

2   a Retention of $250,000 for each non-construction services claim.

3        8.    The Policy expressly provides that ACE "will pay on behalf of the Insured all sums

4   in excess of the Retention that the Insured shall become legally obligated to pay as Damages

5   and Claims Expenses because of a Claim first made against the Insured and reported to the

6   Company during the Policy Period by reason of a Wrongful Act committed on or subsequent

7   to the Retroactive Date and before the end of the Policy Period."

8        9.    The Policy was purchased to insure against, *inter alia*, damages incurred by NTC

9   in conducting its business services, including acting as a title agent; to indemnify against the

10   expenses and damages incurred because of any negligence or wrongful act of NTC; and to

11   defend and indemnify NTC from the claims of third-parties, including claims of NTC's clients

12   against NTC, which result from NTC's business services.  A copy of the Policy in force at the

13   time the subject lawsuits were filed against NTC, is attached hereto and incorporated herein

14   as Exhibit "1."

15       10.    Based upon the purchase and sale of the Policy, NTC became ACE's Insured,

16   as that term was defined by the Policy, and as provided for in Nevada law.

17       11.    As an Insured, within the duties of the Policy, as set forth in the common law

18   of Nevada, and within Nev. Rev. Stat. §686A.310, *inter alia*, ACE owed NTC the highest of

19   duties to fairly consider NTC's claims, and claims made against NTC in third-party lawsuits, for

20   which the Policy was to provide defense and indemnity of such claims.

21       12.    Among other duties, ACE owed duties to NTC of the timely consideration and

22   prompt payment of NTC's claims and those claims of NTC's clients for which the Policy

23   provides defense of NTC and indemnity of any damages for which NTC may be liable, with at

24   least regard equal to ACE's own interests.

25       13.    Established in 1979, NTC was a successful title and escrow agency that

26   facilitated numerous complicated and substantial real estate transactions in the southern

27   Nevada community during its over thirty-nine (39) year history.  NTC prided itself on its



*10091 Park Run Drive, Suite 200*
*Las Vegas, Nevada 89145-8868*
*(702)384-9900; fax (702)384-5900*
*Info@SJPlawyer.com*

1  reputation among its clients and competitors for its superior client-services and satisfaction.

2  As prudent operators of a client-services business that contemplated complex transactions,

3  NTC always purchased and maintained appropriate insurance coverage, including the ACE

4  Policy at issue here.

5        14.    In November of 2010, Branch Banking and Trust Company ("BB&T") initiated

6  a lawsuit against NTC and Commonwealth Land Title Insurance Company ("Commonwealth"),

7  captioned *Branch Banking and Trust Company v. Nevada Title Company, Commonwealth Land*

8  *Title Insurance Company*, in the United States District Court for the District of Nevada, Case

9  Number 2:10-cv-1970-JCM-(RJJ) (the "BB&T Lawsuit").  A copy of the operative complaint

10  in the BB&T Lawsuit is attached hereto and incorporated herein as Exhibit "2."

11        15.    In March of 2011, Commonwealth initiated a lawsuit against NTC, captioned

12  *Commonwealth Land Title Insurance Company v. Nevada Title Company, et al*., in the United

13  States District Court for the District of Nevada, Case Number 2:11-cv-380-KJD-(GWF) (the

14  "Commonwealth Lawsuit").  A copy of the operative complaint in the Commonwealth Lawsuit

15  is attached hereto and incorporated herein as Exhibit "3."

16        16.    The circumstances that led to the filing of both the BB&T Lawsuit and the

17  Commonwealth Lawsuit arose several years earlier.  On August 26, 2005, Colonial Bank, as

18  predecessor in interest to BB&T, made a loan in the approximate amount of $29 million (the

19  "Purchase Money Loan") to an entity, R&S St. Rose, LLC ("R&S"), for the acquisition of certain

20  real property in Henderson, Clark County, Nevada (the "Real Property"). Colonial Bank's

21  Purchase Money Loan was secured by a deed of trust recorded in first priority lien position

22  against the Real Property (the "Purchase Money DOT").

23        17.    Upon information and belief, Plaintiff alleges that approximately one month later,

24  in September 2005, R&S acquired an additional $12 million loan from an affiliated entity, R&S

25  St. Rose Lenders, LLC ("R&S Lenders"), which loan was secured by a deed of trust (the

26  "Lenders DOT") recorded in second lien position behind the Purchase Money DOT.

27        18.    In or about July of 2007, R&S sought to obtain a construction loan from Colonial



*10091 Park Run Drive, Suite 200*
*Las Vegas, Nevada 89145-8868*
*(702)384-9900; fax (702)384-5900*
Info@SJPlawyer.com

1  Bank in the approximate amount of $44 million (the "Construction Loan").  The Construction
2  Loan was to be secured by a deed of trust recorded against the Real Property (the
3  "Construction DOT").  A portion of the Construction Loan proceeds were to be used to satisfy
4  the Purchase Money Loan and the Purchase Money DOT would thereafter be reconveyed.  NTC
5  acted as the title and escrow agent for the Construction Loan transaction.  On July 27, 2007,
6  NTC issued a preliminary title report to Colonial Bank concerning the Real Property, which
7  report disclosed the Lenders DOT.

8       19.    By escrow instructions dated July 27, 2007, Colonial Bank instructed NTC to not
9  close the transaction or release the Construction Loan funds unless Colonial Bank was
10 provided with a title insurance policy insuring the priority of the Construction DOT subject only
11 to allowed exceptions from coverage.

12      20.    In order to remove the Lenders DOT, which would be in first priority position upon
13 the reconveyance of the Purchase Money DOT, NTC's escrow agent contacted the principals
14 of R&S Lenders, who were also the same principals of R&S, who represented to NTC that R&S
15 Lenders would reconvey the Lenders DOT in order for R&S to obtain the Construction Loan,
16 thereby placing the Construction DOT in first priority position.

17      21.    On July 31, 2007, the Construction Loan transaction closed, NTC recorded the
18 Construction Loan DOT, and it released the escrow money for the $44 million loan. NTC, as
19 a title agent for Commonwealth, then issued to Colonial Bank a Commonwealth title insurance
20 policy insuring the priority of the $44 million Construction Loan.  In reliance upon R&S
21 Lenders' representations that it would provide the reconveyance of the Lenders DOT necessary
22 to put the Construction Loan DOT in first priority position, the title policy did not list the $12
23 million Lenders DOT as an exclusion from coverage.

24      22.    Despite their representations to NTC, R&S Lenders' did not record the
25 reconveyance of the Lenders DOT, and consequently, the Lenders DOT remained recorded
26 against the Real Property in first priority position.

27      23.    Beginning in or about November 2008, Colonial Bank, and later its successor



1   BB&T, were named in multiple lawsuits concerning the Bank's ability to foreclose against the

2   Property and the priorities of the $44 million Construction Loan DOT and the $12 million

3   Lenders DOT.

4      24.    On April 28, 2009, Colonial Bank filed a notice of default with respect to the

5   $44 million Construction Loan.

6      25.    On or about June 11, 2009, Colonial Bank submitted a title insurance claim to

7   its title insurer, Commonwealth, based upon R&S Lenders' assertion that its deed of trust had

8   priority over the Construction Loan DOT.  Commonwealth retained counsel and defended its

9   insured.

10     26.    In or about August of 2009, the Federal Deposit Insurance Company took over

11  Colonial Bank as receiver, and subsequently executed a Purchase and Assumption Agreement

12  conveying Colonial Bank's assets, which purportedly also included the Construction Loan, to

13  BB&T.

14     27.    In October of 2009, all of the state court lawsuits were consolidated into one

15  state court proceeding filed by private lenders Robert E. Murdock and Eckley M. Keach against,

16  *inter alia*, R&S, and Colonial Bank (the "State Court Litigation").

17     28.    NTC was never named as a party in any of the cases involved in the State Court

18  Litigation.

19     29.    Following a trial in the State Court Litigation that lasted ten (10) days over four

20  (4) months, on June 24, 2010 the Nevada state court issued Findings of Fact and

21  Conclusions of Law determining, in pertinent part, that the $12 million Lenders DOT had

22  priority over BB&T's $44 million Construction DOT.

23     30.    On October 21, 2010, counsel to BB&T, as successor to Colonial Bank, sent

24  correspondence to NTC demanding, for the first time, that NTC "promptly reimburse BB&T for

25  all losses, costs, and other damages incurred as a result of your breach of the Escrow

26  Instructions." According to BB&T's demand letter, NTC's alleged breach of the escrow

27  instructions caused BB&T's $44 million Construction DOT to be subordinate to the $12 million



*10091 Park Run Drive, Suite 200*
*Las Vegas, Nevada 89145-8868*
*(702)384-9900; fax (702)384-5900*
Info@SJPlawyer.com

1   Lenders DOT.

2       31.     Less than a month later, on November 10, 2010, BB&T filed a lawsuit in the

3   United States District Court for the District of Nevada (the "BB&T Lawsuit") naming NTC and

4   Commonwealth as defendants.  The BB&T Lawsuit included causes of action for breach of

5   contract, breach of the implied covenant of good faith and fair dealing, bad faith denial of an

6   insurance claim, detrimental reliance, declaratory relief, and negligence.

7       32.     On November 30, 2010, NTC tendered BB&T's October 21, 2010 demand

8   correspondence to ACE.  On December 7, 2010, NTC tendered the BB&T Lawsuit to ACE.

9       33.     On December 21, 2010, ACE acknowledged receipt of NTC's tender of the

10  demand correspondence and the BB&T Lawsuit and extended a defense through insurer-

11  appointed defense counsel, subject to a formulaic reservation of rights.

12      34.     The December 21, 2010 correspondence from ACE simply recited multiple

13  provisions of the Policy without any application or analysis to the demand correspondence or

14  the BB&T Lawsuit.  The December 21, 2010 letter did not provide any analysis regarding the

15  coverage available under the Policy and noted ACE was continuing its investigation of the

16  claim.  A copy of the December 21, 2010 letter is attached hereto and incorporated herein

17  as "Exhibit 4."

18      35.     On March 10, 2011, Commonwealth initiated its lawsuit against NTC.  In the

19  Commonwealth Lawsuit, Commonwealth asserted causes of action for contractual indemnity,

20  breach of the implied covenant of good faith and fair dealing, implied contractual indemnity,

21  and declaratory relief, all of which Commonwealth alleged stemmed from NTC's actions as the

22  title agent for the Construction Loan transaction.  NTC tendered the Commonwealth Lawsuit

23  to ACE.

24      36.     On April 8, 2011, defense counsel retained by ACE accepted service of the

25  Commonwealth Complaint on behalf of NTC.

26      37.     R&S and R&S Lenders filed bankruptcies in April 2011.  Extensive litigation

27  thereafter commenced and is ongoing in the bankruptcy proceedings between BB&T,



1    Commonwealth, R&S, and R&S Lenders concerning the priorities of their respective deeds of

2    trusts and/or the parties' interests related thereto (the "Underlying Litigation").

3        38.    On April 13, 2011, an Order dismissing the BB&T Lawsuit against NTC was

4    entered.

5        39.    On June 10, 2011, over six months after NTC's tender, ACE finally provided an

6    initial detailed coverage determination and reservation of rights ("Reservation of Rights") with

7    respect to the BB&T and Commonwealth Lawsuits.  A copy of the June 10, 2011 Reservation

8    of Rights is attached hereto and incorporated herein as "Exhibit 5."

9        40.    In the June 10, 2011 Reservation of Rights, ACE determined that the BB&T

10   Lawsuit and Commonwealth Lawsuit concerned a "Wrongful Act" as defined by the Policy, but

11   notified NTC, for the first time, that "coverage for this matter appears to be very limited and

12   may be wholly precluded by the Policy's terms."

13       41.    In the June 10, 2011 Reservation of Rights, ACE notified NTC for the first time

14   that it reserved its rights to "limit or deny coverage entirely" or to "withdraw the defense" on

15   multiple bases including several Policy exclusions, ACE's conclusion that the BB&T and

16   Commonwealth Lawsuits constituted a claim arising before the Policy's October 7, 2010

17   inception date, and ACE's accusation that NTC made material misrepresentations in its 2010

18   application for insurance entitling ACE to rescind the Policy.

19       42.    In the June 10, 2011 Reservation of Rights, ACE misstates the applicable Policy

20   language and unreasonably concludes that it is "undeniable" NTC "fully knew before October

21   7, 2010 that Nevada Title's actions surrounding the reconveyance of the $12,000,000 Deed

22   of Trust not only could, but likely would give rise to a claim," but fails to identify any particular

23   communication, correspondence or document that demonstrates such "full" knowledge by

24   NTC.

25       43.    In its June 10, 2011 Reservation of Rights, without citing any particular evidence

26   or document in support, ACE accuses NTC, its Insured, of improper conduct stating

27   "[p]resently we are extremely skeptical that Nevada Title did not receive a Professional Services



*10091 Park Run Drive, Suite 200*
*Las Vegas, Nevada 89145-8868*
*(702)384-9900; fax (702)384-5900*
*Info@SJPlawyer.com*
Page 8 of  19

1  Claim prior to October 7, 2010 regarding this wrongful act." ACE further wrote that "[w]e have

2  reservations about Nevada Title's representations that it did not receive a direct demand based

3  on the timetable of events."

4       44.     In its June 10, 2011 Reservation of Rights ACE continued to indicate that it was

5  "still investigating" coverage.

6       45.     Apparently, as no further communication from ACE to NTC has commented on

7  the conclusion to any such investigation of coverage, the investigation into coverage of NTC's

8  claims and the claims made against NTC has unreasonably never concluded.   Despite

9  repeated requests NTC has not been informed of any claims decisions by ACE regarding NTC's

10  claims and the claims made against NTC.

11       46.     On February 6, 2012, ACE and NTC entered into a "Tolling Agreement".  The

12  Tolling Agreement permitted the parties to postpone litigation of claims within their relationship

13  and within the Policy of Insurance without regard to deadlines or the defense of limitations of

14  time.   However, the Tolling Agreement did not toll, excuse, abate, or otherwise modify the

15  duties ACE had to NTC, its insured within the Policy and as expressed in Nevada statutory and

16  case law.  A copy of the Tolling Agreement is attached hereto and incorporated herein as

17  "Exhibit 6."

18       47.     The Tolling Agreement was terminated by NTC on July 5, 2018, by express

19  invocation of the terms of the Tolling Agreement in a letter to ACE's counsel.  ACE did not

20  acknowledge the termination of the Tolling Agreement.

21       48.     ACE continued to defend NTC through insurer-appointed counsel, but ACE

22  contended that the $250,000 retention under the Policy had not been exhausted through

23  such defense until June, 2018.  As a result, for nearly eight (8) years NTC has exclusively

24  shouldered and paid the defense of the BB&T and Commonwealth Lawsuits through insurer-

25  appointed counsel as well as its own personal, monitoring counsel, Terry A. Moore of MARQUIS

26  AURBACH & COFFING, of Las Vegas. To date, NTC has unreasonably not received a full accounting

27  of the exhaustion of its retention and has unreasonably not received any reimbursement from



1    ACE for defense fees and costs incurred in excess of the retention.

2         49.    During the eight (8) years between ACE's first cursory acceptance of a defense

3    through ACE's belated Reservation of Rights to the present time, the BB&T Lawsuit, the

4    Commonwealth Lawsuit and the Underlying Lawsuits have been actively litigated. The litigation

5    of the Underlying Lawsuits and their interrelation to the damages sought by Commonwealth

6    in the Commonwealth Lawsuit have demonstrated that such litigation constitutes substantial

7    potential exposure to NTC being liable to others for damages others incurred, including

8    damage claims against NTC in excess of many millions of dollars.

9         50.    On January 3, 2018, and in advance of a three-day mediation scheduled to try

10   and resolve the Underlying Litigation and the Commonwealth Lawsuit, ACE wrote NTC in

11   correspondence identified as a "Continued Reservation of Rights."  A copy of the so-called

12   "Continued Reservation of Rights" is attached hereto and incorporated herein as "Exhibit 7."

13        51.    In the Continued Reservation of Rights, without determining or declaring to NTC

14   the definitive status of NTC's coverage of the claims, ACE unreasonably sought to foist the

15   obligation for resolution of the Commonwealth Lawsuit and the interrelated Underlying

16   Litigation on NTC and to "remind" NTC that a resolution of those matters "may very well require

17   substantial participation on Nevada Title's part."

18        52.    While ACE expressed an intention to work toward a settlement "along with

19   Nevada Title," ACE unreasonably disagreed with the offers and demands being considered by

20   the parties to the mediation.  During the mediation ACE also reiterated that ACE and NTC

21   "have serious and significant differences regarding the availability of insurance coverage for

22   this matter, particularly when it comes to Nevada Title's procurement of coverage in the face

23   of this claim." After reiterating its belief that coverage appears to be "very limited or wholly

24   precluded," and that protracted coverage litigation might ensue, ACE "implore[d] Nevada Title

25   to take our client's coverage positions seriously and come to the mediation prepared to

26   participate meaningfully in the negotiations and settlement."

27        53.    NTC had reasonably expected ACE would meaningfully and in good faith



*10091 Park Run Drive, Suite 200*
*Las Vegas, Nevada 89145-8868*
*(702)384-9900; fax (702)384-5900*
Info@SJPlawyer.com

1   participate in the January, 2018 mediation of the Commonwealth Lawsuit and the Underlying
2   Litigation.   NTC was discouraged and disappointed by ACE's unreasonable pre-mediation
3   position.

4       54.    The parties to the Commonwealth Lawsuit and the Underlying Litigation
5   participated in the mediation on January 9-11, 2018, but the matters did not settle.

6       55.    On information and belief, Plaintiff alleges that ACE on NTC's behalf
7   unreasonably did not attempt to engage in any meaningful settlement discussions with the
8   parties to the Commonwealth Lawsuit or the Underlying Litigation, either in the January 2018
9   mediation or in the months following the mediation. ACE's failure to reach a settlement of the
10  claims in the mediation or thereafter was unreasonable.

11      56.    On April 23, 2018, Commonwealth made a demand on NTC to settle the
12  Commonwealth Lawsuit and the interrelated Underlying Litigation (hereinafter "the Demand").

13      57.    On information and belief Plaintiff alleges that the Demand was sent to ACE on
14  May 2, 2018 by Sheri Thome, of WILSON ELSER, the insurer-appointed defense counsel for NTC.
15  The Demand from Commonwealth included a proposal for a global resolution of the claims in
16  the Commonwealth Lawsuit arising from the Underlying Litigation.

17      58.    For many years NTC had repeatedly advised ACE that settlement of the
18  Underlying Litigation was a goal of NTC as it would resolve the claims of Commonwealth
19  against NTC in the Commonwealth Lawsuit.  Acceptance of the Demand from Commonwealth
20  would allow NTC to be free of the threat of further consequences, damages, and exposure to
21  the ongoing costs of litigation and the uncertainty of a final judgment of the Commonwealth
22  Lawsuit.

23      59.    Unreasonably, ACE did not communicate with NTC in response to the May 2,
24  2018 transmission of the Demand, nor did ACE acknowledge the Demand.

25      60.    Having received no response or direction from ACE with respect to the Demand,
26  coverage counsel to NTC transmitted the Demand directly to ACE on May 22, 2018 and
27  requested ACE review the Demand, issue a claims decision, and accept the Demand, in full,



1  which was within the ACE Policy limits (the "Policy Limits Demand").  A copy of the Policy

2  Limits Demand is attached hereto and incorporated herein as "Exhibit 8."

3    61.   In its May 22, 2018 Policy Limits Demand, NTC advised ACE that:

4    "A failure to accept this extraordinarily compelling Demand and
     settle the Underlying Lawsuit would be extremely damaging to my
5    clients.  If it is allowed to lapse or if the Demand is otherwise
     rejected, the consequences to NTC would quite literally adversely
6    alter its long-term fate.  In addition, other assets of NTC and its
     owners are at an increased and genuine danger and risk in the
7    event the Demand is not accepted. In truth, as prudent operators
     of their business, ACE's Insureds always purchased and
8    maintained coverage, such as ACE provided to ameliorate that
     very risk."

9

10   62.   In its May 22, 2018 Policy Limits Demand, NTC also advised ACE that:

11   "We believe it is a significant discount of the possible liability and
     settling the Underlying Lawsuit upon the terms of the Demand is
12   an opportunity that should be immediately taken. Moreover, the
     Demand would fully extinguish your client's Insureds' obligations
13   in the Underlying Lawsuit well within the Insureds' available
     coverage with ACE.  We submit that accepting the Demand is in
14   the very best interests of my clients, your client's Insureds.
     Please accept this as my clients' demand that ACE accept the
15   Demand in full as to the Insureds and settle the adverse claims."

16   63.   Unreasonably, ACE did not respond to NTC's Policy Limits Demand, nor did it

17  acknowledge the communication and the Demand.

18   64.   On June 11, 2018, coverage counsel to NTC again wrote ACE regarding the

19  Demand.  NTC advised that Commonwealth had set a July 1, 2018 deadline for a response

20  to the Demand.  In its June 11, 2018 letter to ACE, NTC advised that:

21   "Accepting the Demand will fully and finally allow NTC to be free
     of the threat of further consequences and damages in its
22   exposure to the ongoing costs of litigation and the uncertainty of
     a final judgment of the Underlying Lawsuit. A failure to accept this
23   extraordinarily compelling Demand and settle the Underlying
     Lawsuit would be extremely damaging to my clients. If it is
24   allowed to lapse or if the Demand is otherwise rejected, the
     consequences to NTC would adversely alter its long-term fate.
25   Other assets of NTC and its owners are at an increased risk in the
     event the Demand is not accepted. As prudent operators of its
26   business, and to ameliorate that very risk, ACE's Insured always
     purchased and maintained appropriate insurance coverage, such
27   as the ACE Policy. Settling the Underlying Lawsuit upon the terms



LAW OFFICES OF
STEVEN J. PARSONS

10091 Park Run Drive, Suite 200
Las Vegas, Nevada 89145-8868
(702)384-9900; fax (702)384-5900
Info@SJPlawyer.com

Page 12 of 19

1          of the Demand provides a significant discount of the possible liability facing my clients. It is an opportunity that should be taken

2          immediately."

3       65.    Unreasonably, ACE apparently declined to respond to NTC, did not respond to

4  Commonwealth, or accept the Demand in full so by its terms, the Demand lapsed.  The

5  Commonwealth Lawsuit and the Underlying Litigation remain pending.

6       66.    NTC had and still has a reasonable expectation the Policy provides coverage,

7  including a defense and indemnity for the damages incurred and to be incurred by NTC as a

8  result of the Commonwealth Lawsuit and the interrelated Underlying Litigation, as herein

9  alleged.

10      67.    ACE engaged in unreasonable delay in not ever providing NTC its coverage

11  determination, and during that period of delay, ACE was unreasonably not conducting a fair

12  and proper investigation of the claims, as was its duty, but instead ACE merely used the time

13  unreasonably to seek ways to bolster its arguments for limiting coverage and denying

14  reasonable settlement opportunities.

15      68.    ACE consistently but unreasonably represented that it was "still investigating"

16  coverage, but ACE's coverage communications demonstrate a failure to timely and reasonably

17  consider all the facts and the Policy provisions.  Instead, ACE has utilized its own lens to view

18  the facts and the Policy, and to that end has unreasonably threatened to rescind the Policy

19  without proper basis and while underlying litigation is pending.

20      69.    Perceiving ACE's demonstrated practice of unreasonable delay, distortion, and

21  unreasonable failure to make claims decisions and decisions upon its so-called reservation of

22  rights, and failures to reasonably settle the Commonwealth Lawsuit despite opportunities to

23  do so, NTC understands that any further appeal of the claims would be futile, and given the

24  significant exposure presented by the Commonwealth Lawsuit and its damage exposure in the

25  Underlying Litigation, NTC was forced to retain counsel and prepare and file the instant

26  Complaint.

27  ...




## FIRST CLAIM FOR RELIEF

### (Declaratory Relief)

70.   NTC incorporates by reference the balance of the Complaint as though set-forth fully in this claim for relief.

71.   An actual controversy exists between NTC on the one hand and ACE on the other hand, arising out of the events alleged herein.  Specifically, NTC contends that ACE has no legal basis for refusing to honor the claims and fully pay the benefits due NTC and claimants against NTC—both defense and indemnity—in accordance with the terms of the Policy and within Nevada law.

72.   NTC is informed and believes and based thereon alleges that ACE disputes its contentions, as evidenced by ACE's communications, as attached hereto as Exhibits 1 through 8, inclusive.

73.   NTC seeks a declaration from this Court with respect to said controversies, and a judicial determination of the rights and responsibilities of the parties and of all appropriate remedies available to NTC.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

74.   NTC incorporates by reference the balance of the Complaint as though set-forth fully in this claim for relief.

75.   At all relevant times, NTC paid all premiums due and fulfilled all contractual duties and obligations required of it within the Policy.

76.   Despite NTC's full and complete performance within the Policy, ACE failed to timely and adequately investigate NTC's claims and now refuses to pay benefits due to NTC related to NTC's damages, instead asserting limitations on coverage based on plainly incorrect and self-serving interpretations of certain provisions of the Policy and a biased view of the events and circumstances of the Commonwealth Lawsuit and the interrelated Underlying Litigation.



77.     As a direct and proximate result of ACE's conduct and material breach of the Policy, NTC was compelled to retain counsel to obtain the benefits of the bargain negotiated by the parties within the Policy.

78.     ACE is liable to NTC for the attorney's fees and costs incurred by it in bringing this Complaint to enforce the terms of the Policy.

**THIRD CLAIM FOR RELIEF**

**(Tortious Breach of the Duty of Good Faith and Fair Dealing)**

79.     NTC incorporates by reference the balance of the Complaint as though set-forth fully in this claim for relief.

80.     ACE tortiously breached the duty of good faith and fair dealing owed to NTC in at least the following respects:

a.     Unreasonably misrepresenting to NTC pertinent facts and insurance Policy provisions in relation to the insurance coverage at issue;

b.     Unreasonably failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the Policy;

c.     Bad faith failure to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies;

d.     Bad faith failure to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured;

e.     Not attempting in good faith to effectuate a prompt, fair and equitable resolution of the claims against NTC at a time when liability was reasonably clear;

f.     Maintaining and enforcing a practice of forcing claimants such as NTC to initiate litigation in order to enforce rights owed under ACE's policies;

g.     Bad faith failure to provide a reasonable explanation of the basis relied upon in the Policy, in relation to the applicable facts and laws, for its refusal to make a claims decision and pay fully the benefits due under the Policy;

h.     Accusing its own Insured of dishonesty and misrepresentations in its



10091 Park Run Drive, Suite 200
Las Vegas, Nevada 89145-8868
(702)384-9900; fax (702)384-5900
Info@SJPlawyer.com

1  communications and disclosures without a reasonable good faith basis for same;

2          i.      Threatening to rescind the Policy without a reasonable, good faith basis

3  for same and during the pendency of third-party lawsuits against the Insured;

4          j.      Coercing the Insured to contribute equally toward potential settlements

5  by unreasonably threatening rescission and coverage litigation;

6          k.      Extending the duration of its reservation of rights and the pendency of the

7  Underlying Lawsuits to allow ACE to develop additional, unreasonable grounds for limiting

8  coverage; and

9          l.      Failing to consider the Insured's interests at least as much as the

10  Insurer's interests.

11      81.     NTC is informed and believes and thereon alleges that ACE breached its duty of

12  good faith and fair dealing owed to NTC by other acts or omissions of which NTC is presently

13  unaware.  NTC will seek leave of the Court to amend this Complaint at such times as it

14  discovers the other acts or omissions of ACE constituting such breach and to name such

15  additional Defendants as may be identified during discovery.

16      82.     As a proximate result of the wrongful conduct of ACE, NTC suffered, and will

17  continue to suffer in the future, damages under the Policy, plus interest, for a total amount

18  to be shown at the time of trial, in excess of Fifteen thousand dollars ($15,000.00).

19      83.     As a further proximate result of the wrongful conduct of ACE and the wrongful

20  denial of benefits due toward NTC's claims, NTC was compelled to retain legal counsel to

21  obtain benefits due under the Policy.  ACE is liable to NTC for attorney's fees and costs

22  reasonably necessary and incurred by NTC to enforce the terms of the Policy, in a sum to be

23  determined at the time of trial.

24      84.     ACE's unreasonable conduct described herein was intended to cause injury to

25  NTC, and was despicable conduct carried on by ACE with a willful and conscious disregard of

26  NTC's rights, subjected NTC to cruel and unjust hardship in conscious disregard of its rights

27  and was an intentional misrepresentation, deceit, or concealment of material facts known to



10091 Park Run Drive, Suite 200
Las Vegas, Nevada 89145-8868
(702)384-9900; fax (702)384-5900
Info@SJPlawyer.com

1    ACE with the intention, implied or in fact, to deprive NTC of property, property rights, legal

2    rights, or to otherwise oppress and/or cause injury, such as to constitute malice, oppression,

3    or fraud within Nev. Rev. Stat. §42.005, entitling NTC to punitive and/or exemplary damages

4    in an amount appropriate to punish and/or set an example of ACE.

5                                   **FOURTH CLAIM FOR RELIEF**

6                  **(Breach of Statutory Duties (Nev. Rev. Stat. §686A.310))**

7          85.    NTC incorporates by reference the balance of the Complaint as though set-forth

8    fully in this claim for relief.

9          86.    As an entity engaged in the business of providing insurance in Nevada, ACE is,

10   and at all relevant times was, an entity whose business was and is regulated by Nevada law,

11   as set forth within Nev. Rev. Stat. §686A, *inter alia*.

12         87.    As an insured under the Policy with ACE, NTC was an entity protected from

13   certain prohibited practices by ACE as set-forth within Nev. Rev. Stat. §686A.310, which law

14   also provides NTC a private cause of action against ACE.

15         88.    By the acts and omissions as alleged herein, ACE has violated its duties set forth

16   in Nev. Rev. Stat. §686A.310, in the following particulars:

17                a.    Misrepresenting to NTC pertinent facts or insurance policy provisions

18   relating to the coverage at issue;

19                b.    Un reasonably failing to acknowledge and act reasonably promptly upon

20   communications with respect to claims arising under the Policy;

21                c.    Failing to adopt and implement reasonable standards for the prompt

22   investigation and processing of claims arising under insurance policies;

23                d.    Failing to affirm or deny coverage of claims within a reasonable time after

24   proof of loss requirements have been completed and submitted by the insured;

25                e.    Un reasonably failing to effectuate prompt, fair and equitable settlements

26   of claims in which liability of the insurer has become reasonably clear;

27                f.    Compelling insureds to litigate to recover benefits due under policies;



10091 Park Run Drive, Suite 200
Las Vegas, Nevada 89145-8868
(702)384-9900; fax (702)384-5900
Info@SJPlawyer.com

g.      Failing to provide promptly to an insured a reasonable explanation of the basis in the insurance policy, with respect to the facts of the insured's claim and the applicable Nevada law, in making a claims decision for the denial or limitations of the claim or for an offer to settle or compromise the claim;

89.    As a further proximate result of the wrongful conduct of ACE and its wrongful denial and limitation of NTC's claims, NTC was compelled to retain legal counsel to obtain the benefits due under the Policy.  ACE is liable to NTC for attorney's fees and costs reasonably necessary and incurred by NTC to enforce the terms of the Policy, in a sum to be determined at the time of trial.

90.    ACE's conduct described herein was intended to cause injury to NTC, and was despicable conduct carried on by ACE with a willful and conscious disregard of NTC's rights, subjected NTC to cruel and unjust hardship in conscious disregard of its rights and was an intentional misrepresentation, deceit or concealment of material facts known to ACE with the intention, implied or in fact, to deprive NTC of property, property rights, legal rights, or to otherwise oppress and/or cause injury, such as to constitute malice, oppression, or fraud within Nev. Rev. Stat. §42.005, entitling NTC to punitive and/or exemplary damages in an amount appropriate to punish and/or set an example of ACE.

**WHEREFORE**, Plaintiff, **NEVADA TITLE COMPANY**, prays for judgment against Defendant, **ACE AMERICAN INSURANCE COMPANY**, for all relief available to NTC within the Policy and under Nevada law, as follows:

1.    For a declaration and Order that ACE's refusal to pay benefits due NTC and others their claims against NTC, due under the Policy is unreasonable, unlawful, and wrongful, and that such declarations and Order set forth the duties and rights of the parties (First Claim for Relief);

2.    Damages as provided for as benefits due from the Policy, including, but not limited to, damages for loss of property; consequential and compensatory damages that have foreseeably resulted therefrom, including any damages from loss of business reputation and



1  damages for ACE's failure to timely honor the terms of the Policy and other consequential

2  damages; plus, all interest as provided by law, including prejudgment and statutory interest,

3  in sums to be determined at trial (Second and Third Claims for Relief);

4    3.    Consequential and compensatory damages that have foreseeably resulted from

5  the conduct and actions of ACE, in accord with proof adduced at the time of trial, along with

6  punitive and/or exemplary damages pursuant to Nev. Rev. Stat. §42.005 in an amount

7  appropriate to punish and/or set an example of ACE (Third and Fourth Claims for Relief);

8    4.    Attorney's fees reasonably incurred to enforce NTC's rights within the Policy and

9  at law, in a sum to be determined at the time of trial pursuant to applicable law, including Nev.

10  Rev. Stat. §18.010;

11    5.    For all interest as provided for in Nevada law, including pre-judgment interest;

12    6.    Costs of suit incurred herein; and,

13    7.    For such other further relief as the Court may deem appropriate.

14  <u>JURY DEMAND</u>

15  Plaintiff, **NEVADA TITLE COMPANY**, hereby demands a jury trial as provided by the U.S.

16  Constitution, the Nevada Constitution, Nev. R. Civ. P., Rule 38(a), or as otherwise may be

17  provided for by law.

18  Dated: Wednesday, September 12, 2018.

19  LAW OFFICES OF STEVEN J. PARSONS

20  /s/ Steven J. Parsons
    STEVEN J. PARSONS
21  Nevada Bar No. 363

22  Attorney for Plaintiff
    **NEVADA TITLE COMPANY**

23

24

25

26

27



# EXHIBIT "1"

# EXHIBIT "1"



☒ ACE American Insurance Company
☐ Illinois Union Insurance Company
☐ Westchester Fire Insurance Company
☐ Westchester Surplus Lines Insurance Company

**ACE Advantage®**
**Miscellaneous Professional Liability**
**Policy**
**Declarations**

### This Policy is issued by the stock insurance company listed above.

THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIMS EXPENSES. FURTHER NOTE THAT AMOUNTS INCURRED FOR DAMAGES AND CLAIMS EXPENSES SHALL ALSO BE APPLIED AGAINST THE RETENTION AMOUNT.

TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO SECTION II, DEFINITIONS.

| | |
|---|---|
| **Policy No. EON G23638344 002** | |
| Item 1. **Named Insured:**<br>**Principal Address:** | NTC Global Holding Group<br>2500 N. Buffalo Drive<br>Suite 150<br>Las Vegas, NV 89128 |
| Item 2. **Policy Period:** | From 12:01 a.m. 10/07/2010     To 12:01 a.m. 10/07/2011<br>(Local time at the address shown in Item 1) |
| Item 3. Limit of Liability (including **Claims Expenses**) | $10,000,000   Each **Claim**<br>$10,000,000   Aggregate Limit<br>$5,000.00   **Disciplinary Proceeding Claims Expenses** Aggregate Limit (in addition to the   Each   **Claim** and Aggregate Limits set forth above) |
| Item 4.   Retention | $500,000 – (Construction Services) Each Claim<br>$250,000 – (All Other Services) Each Claim |
| Item 5.   Premium | $180,000 |
| Item 6.   **Retroactive Date** (if applicable): | 01/25/1993 |
| Item 7.   **Professional Services:** | Solely in the performance of providing professional services as a title insurance agent, title abstractor, escrow agent, construction voucher disbursement services, construction feasibility analysis services, inspection services, SEC 1031 Real Estate Swapping Services and/or notary public services. |

6374-8

Item 8.   Notice to **Company**:

      **A.**    Notice of **Claim** or **Wrongful Act**:

              ACE USA Claims
              P.O. Box 25159
              Lehigh Valley, PA  18002
              Fax Number:  877-518-3493

      **B.**    All other notices:

              Chief Underwriting Officer
              ACE USA – Professional Risk
              140 Broadway, 41st Floor
              New York, New York  10005

Item 9.   Optional **Extended Reporting Period**:
         Additional Premium:   100% of Last Annual Policy Premium
         Additional Period: 12 Months

Item 10.   Endorsements attached upon **Policy** effective date:
1. PF-19871(11/05) - Title Agent Endorsement
2. PF-19139(12/05) - Construction Managers Endorsement
3. PF-19138 (12/05) - Construction Certificate Endorsement
4. CC-1K11e (02/06) - Signature Endorsement
5. PF-17914 (02/05) - U.S. Treasury Department's Office of Foreign Assets
6. PF-23100 (03/06) - Additional Named Insured Endorsement
7. ALL-20887 (10/06) – ACE Producer Compensation Practices & Policies
8. PF-19985 (05/06) - NV Amendatory
9. ALL-21101 (11/06) – Trade or Economic Sanctions Endorsement
10. PF-19861 (11/05) Defense and Settlement Endorsement
11. PF-19061 (10/05) - Spousal Coverage Extension
12. PF-19860 (11/05) - Severability Application (Partial Severability,1-4 Officers)
13. PF-19821 (02/06)-Dishonesty Profit Exclusions A + J Amended (Partial Severability, 1-4 Officers)
14. PF-19272 (12/05)-Territory Amended (Worldwide Coverage)
15. CC-1e15 (10/09) – Damages Definition Amended (Punitive Damages, Most Favorable Jurisdiction)
16. CC-1e15 (10/09) - Notice Amended (CEO, DFO, President, GC, RM) Endorsement
17. CC-1e15 (10/09) –  Amend Definition of Claim Endorsement
18. CC-1e15 (10/09) – Automatic Extended Reporting Period - 90 Days Endorsement
19. PF-19178 (12/05) - Additional Named Insured (Alliance Advisors)

IN WITNESS WHEREOF, the **Company** has caused this **Policy** to be countersigned by a duly authorized representative of the **Company**.

                                          Authorized Representative

DATE: <u>10/20/2010</u>



☒ ACE American Insurance Company
☐ Illinois Union Insurance Company
☐ Westchester Fire Insurance Company
☐ Westchester Surplus Lines Insurance Company

**ACE Advantage®**
**Miscellaneous Professional**
**Liability Policy**

In consideration of the payment of the premium, in reliance upon the **Application**, and subject to the Declarations and the terms and conditions of this **Policy**, the **Insureds** and the **Company** agree as follows:

## INSURING AGREEMENT AND DEFENSE

A. Insuring Agreement

The **Company** will pay on behalf of the **Insured** all sums in excess of the Retention that the **Insured** shall become legally obligated to pay as **Damages** and **Claims Expenses** because of a **Claim** first made against the **Insured** and reported to the **Company** during the **Policy Period** by reason of a **Wrongful Act** committed on or subsequent to the **Retroactive Date** and before the end of the **Policy Period**.

B. Defense

1. The **Company** shall have the right and duty to defend any covered **Claim** brought against the **Insured** even if the **Claim** is groundless, false or fraudulent. The **Insured** shall not admit or assume liability or settle or negotiate to settle any **Claim** or incur any **Claims Expenses** without the prior written consent of the **Company** and the **Company** shall have the right to appoint counsel and to make such investigation and defense of a **Claim** as it deems necessary.

2. The **Company's** duty to defend ends if the **Insured** refuses to consent to a settlement acceptable to the claimant/plaintiff and the **Company**. In such event, the **Company** shall tender a check to the **Insured** for the recommended settlement amount, and shall be relieved of any further duty or obligation, other than for covered **Claims Expenses** incurred until the date of such refusal. The **Insured** thereafter has the duty to defend at its own expense. This paragraph shall not apply to a settlement in which the total incurred **Damages** and **Claims Expenses** do not exceed the Retention.

3. The **Company** shall not be obligated to commence or continue to investigate, defend, pay or settle any **Claim** after the applicable Limit of Liability specified in Item 3 of the Declarations has been exhausted, or after the **Company** has deposited the remaining available Limit of Liability with a court of competent jurisdiction. In such case, the **Company** shall withdraw from investigation, defense, payment or settlement of such **Claim** and shall tender control of such **Claim** to the **Insured**.

4. If the **Insureds** attend hearings, depositions or trials at the request of the **Company**, the **Company** shall reimburse the **Insureds** for actual loss of earnings and reasonable and necessary expenses due to such attendance, up to $250.00 per day and a maximum amount of $5,000 for all **Claims** covered by this **Policy**. Such reimbursement payments by the **Company** to the **Insured** are not subject to the Retention and shall not reduce the Limits of Liability.

## DEFINITIONS

A. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Company** in connection with the **Company** underwriting this **Policy** or any policy of which this **Policy** is a direct or indirect renewal or replacement or which it succeeds in time. All such applications, attachments, information, and materials are deemed attached to and incorporated into this **Policy**.

B. **Bodily Injury** means injury to the body, sickness, or disease, and death. **Bodily Injury** also means mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock, whether or not resulting from injury to the body, sickness, disease or death of any person.

C. **Claim** means:
1. a written demand against any **Insured** for monetary or non-monetary damages;
2. a civil proceeding against any **Insured** for monetary damages, non-monetary damages or injunctive relief, commenced by the service of a complaint or similar pleading;
3. an arbitration proceeding against any **Insured** for monetary damages, non-monetary damages or injunctive relief;
4. a civil, administrative or regulatory investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document;
5. a **Disciplinary Proceeding**;
including any appeal therefrom.

D. **Claims Expenses** means:
1. reasonable and necessary attorneys' fees, expert witness fees and other fees and costs incurred by the **Company**, or by the **Insured** with the **Company's** prior written consent, in the investigation and defense of covered **Claims**; and
2. premiums for any appeal bond, attachment bond or similar bond, provided the **Company** shall have no obligation to apply for or furnish such bond.
**Claims Expenses** shall not include wages, salaries, fees or costs of directors, officers or employees of the **Company** or the **Insured**.

E. **Company** means the insurance company providing this insurance.

F. **Damages** means any compensatory amount which the **Insured** becomes legally obligated to pay on account of a covered **Claim**, including judgments, any award of prejudgment and post-judgment interest on that part of any judgment paid under this **Policy**, awards and settlements. **Damages** shall not include:
1. any amount for which the **Insured** is not financially liable or legally obligated to pay;
2. taxes, fines or penalties;
3. matters uninsurable under the law pursuant to which this **Policy** is construed;
4. disgorgement of profits by an **Insured**; cost of an **Insured's** correction; fees, commissions, expense or costs paid to or charged by an **Insured**;
5. the cost to comply with any injunctive or other non-monetary or declaratory relief, including specific performance, or any agreement to provide such relief; or
6. any amount relating to a **Disciplinary Proceeding**, other than **Claims Expenses**.

**Damages** includes punitive and exemplary damages and the multiplied portion of any multiple damage award, to the extent such damages are insurable under the internal laws of any jurisdiction which has a substantial relationship to the **Insured**, the **Company**, this **Policy** or such **Claim**.

G. **Disciplinary Proceeding** means any proceeding by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct by an **Insured** in the performance of **Professional Services**.

H. **Extended Reporting Period** means the period for the extension of coverage, if elected, described in Section IV, **Extended Reporting Period**.

I. **Insured** means:
1. the **Named Insured**;
2. any **Subsidiary**, but only with respect to **Wrongful Acts** which occur while it is a **Subsidiary**;
3. any past or present principal, partner, officer, director, trustee or employee of the **Named Insured** or **Subsidiary** thereof (and if the **Named Insured** is a partnership, limited liability partnership or limited liability company, then any general or managing partner or principal thereof), but only with respect to **Professional Services** performed on behalf of the **Named Insured** or any **Subsidiary**;
4. the estate, heirs, executors, administrators or legal representatives of any **Insured** described in paragraph 3 above in the event of such **Insured's** death, incapacity, insolvency, or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this **Policy**; and
5. independent contractors who are natural persons, but only with respect to **Professional Services** performed on behalf of the **Named Insured** or **Subsidiary** thereof.

J. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

K. **Named Insured** means the entity or person specified in Item 1 of the Declarations.

L. **Personal Injury Offense** means one or more of the following offenses:
   1. false arrest, detention or imprisonment;
   2. malicious prosecution;
   3. defamation, including libel and slander, and disparagement;
   4. publication or an utterance in violation of an individual's right to privacy; and
   5. invasion of the right to private occupancy, including wrongful entry or eviction.

M. **Policy** means collectively, the Declarations, the **Application**, this policy form and any endorsements.

N. **Policy Period** means the period of time specified in Item 2 of the Declarations, subject to prior termination pursuant to Section VI.E, Termination of the Policy.

O. **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county or municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, silica, or noise.

P. **Professional Services** means only those services specified in Item 7 of the Declarations performed for others by an **Insured** or by any other person or entity for whom the **Insured** is legally liable.

Q. **Property Damage** means:
   1. physical injury to, or loss or destruction of, tangible property, including the loss of use thereof; and
   2. loss of use of tangible property which has not been physically injured, lost, damaged or destroyed.

R. **Retroactive Date** means the date specified in Item 6 of the Declarations.

S. **Subsidiary** means any entity, other than a joint venture, in which the **Named Insured**:

   1. owns interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of the board of directors if such entity is a corporation, the management committee members if such entity is a partnership, the members of the management board if such entity is a limited liability company; or

   2. has the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named Insured** or any **Subsidiary**, to elect, appoint or designate a majority of the board of directors if such entity is a corporation, the management committee members if such entity is a partnership, the members of the management board if such entity is a limited liability company,

   on or before the inception date of the **Policy**, either directly or indirectly, in any combination, by one or more other **Subsidiaries**.

T. **Wrongful Act** means any actual or alleged negligent act, error, omission, misstatement, misleading statement or **Personal Injury Offense** committed by the **Insured** or by any other person or entity for whom the **Insured** is legally liable in the performance of or failure to perform **Professional Services**.

U. **Wrongful Employment Practices** means any actual or alleged:
   1. wrongful dismissal or discharge or termination of employment, whether actual or constructive;
   2. employment-related misrepresentation;
   3. violation of any federal, state, or local laws (whether common or statutory) concerning employment or discrimination in employment;
   4. sexual harassment or other unlawful workplace harassment;
   5. wrongful deprivation of a career opportunity or failure to employ or promote;
   6. wrongful discipline of employees;
   7. retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity;
   8. negligent evaluation of employees;

9.  failure to adopt adequate workplace or employment policies and procedures;
10. employment-related libel, slander, defamation, or invasion of privacy;
11. employment-related wrongful infliction of emotional distress;
12. any actual or alleged discrimination, sexual harassment, or violation of a natural person's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

The foregoing definitions shall apply equally to the singular and plural forms of the respective words.

## III.   EXCLUSIONS

The **Company** shall not be liable for **Damages** or **Claims Expenses** on account of any **Claim**:

A.  alleging, based upon, arising out of, or attributable to any dishonest, fraudulent, criminal or malicious act or omission, or any intentional or knowing violation of the law by an **Insured**, however, this exclusion shall not apply to **Claims Expenses** or the **Company's** duty to defend any such **Claim** unless and until there is an adverse admission by, finding of fact, or final adjudication against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Company** for all **Claims Expenses** incurred;

B.  alleging, based upon, arising out of, or attributable to any **Bodily Injury** or **Property Damage**;

C.  alleging, based upon, arising out of, or attributable to any liability of others assumed by the **Insured** under any express, implied, actual or constructive contract or agreement, unless such liability would have attached to the **Insured** even in the absence of such contract or agreement;

D.  alleging, based upon, arising out of, or attributable to **Professional Services** performed for any entity if at the time the **Professional Services** were performed:
    1.  any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable, was a partner, director, officer or employee of such entity;
    2.  any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable, owned, directly or indirectly, 10% or more of any such entity if it was a publicly held company, or 30% or more of any such entity if it was a privately held or not-for-profit company;

E.  brought or maintained by, on behalf of, or in the right of any **Insured**;
F.  alleging, based upon, arising out of or attributable to any **Wrongful Employment Practice**;

G.  alleging, based upon, arising out of or attributable to any discrimination on any basis, including, but not limited to, race, creed, color, religion, ethnic background, national origin, age, handicap, disability, gender, sexual orientation or pregnancy;

H.  alleging, based upon, arising out of or attributable to any price fixing, restraint of trade, monopolization, unfair trade practices or other violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder, or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

I.  alleging, based upon, arising out or attributable to any violation of:
    1.  the Employee Retirement Income Security Act of 1974;
    2.  the Securities Act of 1933, the Securities Exchange Act of 1934;
    3.  the Racketeering Influenced and Corrupt Organizations Act of 1970;
    and any rules or regulations promulgated thereunder, amendments thereof, or any similar federal, state or common law;

J.  alleging, based upon, arising out of, or attributable to the gaining in fact of any profit or advantage to which the **Insured** is not legally entitled;

K.  alleging, based upon, arising out of, or attributable to any **Wrongful Act** committed prior to the beginning of the **Policy Period**, if, on or before the earlier of the effective date of this **Policy** or the effective date of any **Policy** issued by the **Company** to which this **Policy** is a continuous renewal or replacement, the **Insured** knew or reasonably could have foreseen that such **Wrongful Act** would result in a **Claim**;

L.  alleging, based upon, arising out of, or attributable to:
    1.  any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or
    2.  any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**;

M.  alleging, based upon, arising out of, or attributable to:
    1.  the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or
    2.  any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

N.  alleging, based upon, arising out of, or attributable to any validity, invalidity, infringement, violation or misappropriation of any patent, copyright, service mark, trademark, trade name, trade secret or any other intellectual property right;

## IV.  EXTENDED REPORTING PERIOD

If the **Company** terminates or does not renew this **Policy** (other than for failure to pay a premium when due), or if the **Named Insured** terminates or does not renew this **Policy** and does not obtain replacement coverage as of the effective date of such termination or nonrenewal, the **Named Insured** shall have the right, upon payment of the additional premium described below, to a continuation of the coverage granted by this **Policy** for at least one **Extended Reporting Period** as follows:

A.  Automatic **Extended Reporting Period**

The **Named Insured** shall have continued coverage granted by this **Policy** for a period of 60 days following the effective date of such termination or nonrenewal, but only for **Claims** first made during such 60 days and arising from **Wrongful Acts** taking place prior to the effective date of such termination or nonrenewal. This Automatic **Extended Reporting Period** shall immediately expire upon the purchase of replacement coverage by the **Named Insured**.

B.  Optional **Extended Reporting Period**

1.  The **Named Insured** shall have the right, upon payment of the additional premium set forth in Item 9 of the Declarations, to an Optional **Extended Reporting Period**, for the period set forth in Item 9 of the Declarations following the effective date of such termination or nonrenewal, but only for **Claims** first made during such Optional **Extended Reporting Period** and arising from **Wrongful Acts** taking place prior to the effective date of such termination or nonrenewal.

2.  This right to continue coverage shall lapse unless written notice of such election is given by the **Named Insured** to the **Company**, and the **Company** receives payment of the additional premium, within 60 days following the effective date of termination or nonrenewal.

3.  The 60 days of the Optional **Extended Reporting Period**, if it becomes effective, shall run concurrently with the Automatic **Extended Reporting Period**.

C.  The **Company** shall give the **Named Insured** notice of the premium due for the Optional **Extended Reporting Period** as soon as practicable following the date the **Named Insured** gives such notice of such election, and such premium shall be paid by the **Named Insured** to the **Company** within 10 days following the date of such notice by the **Company** of the premium due. The Optional **Extended Reporting Period** is not cancelable and the entire premium for the Optional **Extended Reporting Period** shall be deemed fully earned and non-refundable upon payment.

D.  The Automatic and Optional **Extended Reporting Periods** shall be part of and not in addition to the Limit of Liability for the immediately preceding **Policy Period**. The Automatic and Optional **Extended Reporting Periods** shall not increase or reinstate the Limit of Liability, which shall be the maximum liability of the **Company** for the **Policy Period** and the Automatic and Optional **Extended Reporting Period**, combined.

E.  A change in **Policy** terms, conditions, exclusions and/or premiums shall not be considered a nonrenewal for purposes of triggering the rights to the Automatic or Optional **Extended Reporting Period**

## V.      LIMITS OF LIABILITY AND RETENTION

### A.  Limits

1. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**. All **Damages** and all **Claims Expenses** resulting from a single **Claim** shall be deemed a single **Damage** and **Claims Expense**.

2. The Each Claim Limit stated in Item 3 of the Declarations shall be the **Company's** maximum aggregate liability for the sum of all **Damages** and **Claims Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

3. The Aggregate Limit stated in Item 3 of the Declarations shall be the maximum aggregate liability of the **Company** for all **Damages** and **Claims Expenses** because of all **Claims**, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

4. The **Disciplinary Proceeding Claims Expenses** Aggregate Limit stated in Item 3 of the Declarations shall be the maximum aggregate liability of the **Company** for **Claims Expenses** for **Disciplinary Proceedings** for each **Policy Period** regardless of the number of **Disciplinary Proceedings** or **Insureds**.   This limit is in addition to and is not part of the Each **Claim** Limit or the Aggregate Limit otherwise stated in Item 3 of the Declarations.

5. **Claims Expenses** shall be part of and not in addition to the Aggregate Limit of Liability shown in Item 3 of the Declarations, and shall reduce such Aggregate Limit of Liability.

6. If the Limit of Liability is exhausted by payment of **Damages** or **Claims Expenses**, the obligations of the **Company** under this **Policy** shall be completely fulfilled and extinguished.

### B.  Retention

1. The liability of the **Company** shall apply only to that part of **Damages** and **Claims Expenses** which are excess of the Retention amount shown in Item 4 of the Declarations.  Such Retention shall be borne uninsured by the **Insureds** and at their own risk.  However, the Retention shall not apply to **Claims Expenses** in a **Disciplinary Proceeding**.

2. A single Retention amount shall apply to **Damages** and **Claims Expenses** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

## VI.      CONDITIONS

### A.  Notice:

1. The **Insured** shall, as a condition precedent to their rights under this **Policy**, give to the **Company** written notice of any **Claim** as soon as practicable, but in no event later than 30 days after: (i) the end of the **Policy Period**, or (ii) with respect to **Claims** first made during any applicable Automatic or Optional **Extended Reporting Period**, the end of such Automatic or Optional **Extended Reporting Period**.

2. If, during the **Policy Period**, any **Insured** becomes aware of any specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds** give written notice to the **Company** during the **Policy Period**, the Automatic **Extended Reporting Period**, or, if elected, the Optional **Extended Reporting Period** of:

    a.  the identity of the potential claimants;

    b.  a description of the anticipated **Wrongful Act** allegations;

    c.  the identity of the **Insureds** allegedly involved;

    d.  the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

    e.  the consequences which have resulted or may result; and

PF-18874 (02/06)                                                                                 Page 6 of 10

    f.   the potential monetary damages;

then any **Claim** which arises out of such **Wrongful Act** shall be deemed to have been first made at the time such written notice was received by the **Company**.  No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3.   All notices under any provision of this **Policy** shall be in writing and given by prepaid express courier, certified mail or facsimile transmission properly addressed to the appropriate party.  Notice to the **Insureds** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations.  Notice to the **Company** of any **Claim** or **Wrongful Act** shall be given to the **Company** at the address set forth in Item 8A of the Declarations.  All other notices to the **Company** under this **Policy** shall be given to the **Company** at the address set forth in Item 8B of the Declarations.  Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee, or one day following the date such notice is sent, whichever is earlier.

## Assistance and Cooperation

The **Insured** shall cooperate with the **Company**, and provide to the **Company** all information and assistance which the **Company** reasonably requests including without limitation attending hearings, depositions and trials and assisting in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting the defense of any **Claim** covered by this **Policy**.  The **Insured** shall immediately forward to the **Company** at the address indicated in Item 8A of the Declarations every demand, notice, summons, or other process or pleadings received by the **Insured** or its representatives.  The **Insured** shall do nothing that may prejudice the **Company's** position.

## Other Insurance

If any **Damages** or **Claims Expenses** covered under this **Policy** are covered under any other valid and collectible insurance, then this **Policy** shall cover such **Damages** or **Claims Expenses**, subject to its terms and conditions, only to the extent that the amount of such **Damages** or **Claims Expenses** are in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**.

## Representations

1.   The **Insureds** represent and acknowledge that the statements and information contained in the **Application** are true and accurate and:
   a.  are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**; and
   b.  shall be deemed material to the acceptance of this risk or the hazard assumed by the **Company** under this **Policy**.
   It is understood and agreed that this **Policy** is issued in reliance upon the truth and accuracy of such representations.

2.   In the event the **Application,** including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive or which materially affects either the acceptance of the risk or hazard assumed by the **Company** under this **Policy**, this **Policy** shall be void ab initio.

E.  Termination

1.   This **Policy** shall terminate at the earliest of the following times:
   a.  the effective date of termination specified in a prior written notice by the **Named Insured** to the **Company**;
   b.  60 days after receipt by the **Named Insured** of a written notice of termination from the **Company**;
   c.  10 days after receipt by the **Named Insured** of a written notice of termination from the **Company** for failure to pay a premium when due, unless the premium is paid within such 10 day period;

d.   upon expiration of the **Policy Period** as set forth in Item 2 of the Declarations; or
e.   at such other time as may be agreed upon by the **Company** and the **Named Insured**.

2.   If the **Policy** is terminated by the **Named Insured**, the **Company** shall refund the unearned premium computed at the customary short rate. If the **Policy** is terminated by the **Company**, the **Company** shall refund the unearned premium computed *pro rata*. Payment or tender of any unearned premium by the **Company** shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

F.   Territory And Valuation

1.   Coverage under this **Policy** shall extend to **Wrongful Acts** taking place anywhere in the world, provided that the **Claim** is made within the jurisdiction, and subject to the substantive laws of the United States of America, Canada, or their territories or possessions.

2.   All premiums, limits, retentions, **Damages** and other amounts under this **Policy** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated, or another element of **Damages** is stated in a currency other than United States of America dollars, payment under this **Policy** shall be made in United States dollars at the applicable rate of exchange as published in *The Wall Street Journal* as of the date the final judgment is reached, the amount of the settlement is agreed upon, or the other element of **Damages** is due, respectively or if not published on such date, the next date of publication of *The Wall Street Journal*.

G.   Subrogation

In the event of any payment under this **Policy**, the **Company** shall be subrogated to the extent of such payment to all the rights of recovery of the **Insureds**. The **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Company** effectively to bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

H.   Action Against the **Company** and Bankruptcy

No action shall lie against the **Company**. No person or organization shall have any right under this **Policy** to join the **Company** as a party to any action against any **Insured** to determine the liability of the **Insured** nor shall the **Company** be impleaded by any **Insured** or its legal representatives. Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the **Company** of its obligations nor deprive the **Company** of its rights or defenses under this **Policy**.

I.   Authorization

By acceptance of this **Policy**, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the giving of notice of **Claim**, the giving or receiving of notice of termination or non renewal, the payment of premiums, the receiving of any premiums that may become due under this **Policy**, the agreement to and acceptance of endorsements, consenting to any settlement, exercising the right to the **Extended Reporting Period**, and the giving or receiving of any other notice provided for in this **Policy**, and all **Insureds** agree that the **Named Insured** shall so act on their behalf.

J.   Alteration, Assignment and Headings

1.   Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this **Policy** nor prevent the **Company** from asserting any right under the terms of this **Policy**.

2.   No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Company**.

PF-18874 (02/06)                                                                                           Page 8 of 10

3. The titles and headings to the various parts, sections, subsections and endorsements of the **Policy** are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such parts, sections, subsections or endorsements.

K. Interpretation

The terms and conditions of this **Policy** shall be interpreted and construed in an evenhanded fashion as between the parties. If the language of this **Policy** is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms and conditions of this **Policy**, without regard to the authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either any **Insured** or the **Company** and without reference to the reasonable expectations of either the **Insured** or the **Company.**

## VII.   MATERIAL CHANGES IN CONDITIONS

A. Acquisition or Creation of Another Organization

If, during the **Policy Period**, the **Named Insured**:

1. acquires voting securities in another organization or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**; or
2. acquires any organization by merger into or consolidation with the **Named Insured;**

then, subject to the terms and conditions of this **Policy**, such organization shall be covered under this **Policy** but only with respect to **Claims** for **Wrongful Acts** taking place after such acquisition or creation, unless the **Company** agrees to provide coverage by endorsement for **Wrongful Acts** taking place prior to such acquisition or creation.

If the total revenue of such acquired organization, as reflected in the then most recent consolidated financial statements of the organization, exceeds 10% of the total revenue of the **Named Insured** and the **Subsidiaries** as reflected in the then most recent consolidated financial statements of the **Named Insured,** the **Named Insured,** as a condition precedent to coverage with respect to such **Insureds,** shall, no later than 60 days after the effective date of such acquisition or creation:

a. give written notice of such acquisition or creation to the **Company;**
b. pay any additional premium required by the **Company;** and
c. agree to any additional terms and conditions of this **Policy** as required by the **Company.**

B. Acquisition of the **Named Insured**

If, during the **Policy Period**, any of the following events occurs:

1. the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or
2. the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least 50% of i) the directors of the **Named Insured** if a Corporation; ii) the management committee members of the **Named Insured** if a partnership; iii) the management board of the **Named Insured** if a limited liability company;

then coverage under this **Policy** will continue in full force and effect until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** taking place before such event. Coverage under this **Policy** will cease as of the effective date of such event with respect to **Claims** for **Wrongful Acts** taking place after such event.

B.   Termination of a **Subsidiary**

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to the **Subsidiary** and its **Insureds** shall continue until termination of this **Policy**.  Such coverage continuation shall apply only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**.

PF-18874 (02/06)                                                                                       Page 10 of 10



**ace usa**

# U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders

This Policyholder Notice shall not be construed as part of your policy and no coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**ACE Producer Compensation
Practices & Policies**

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our  website  at http://www.aceproducercompensation.com or by calling the  following toll-free  telephone number: 1-866-512-2862.

ALL-20887 (10/06)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>1 |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Title Agent Endorsement

It is agreed that Section III, Exclusions, of the **Policy** is amended by adding the following additional exclusions:

- alleging, based upon, arising out of, or attributable to:
    1. the commingling or improper use of funds or accounts,
    2. sums received by any **Insured** or credited to any **Insured's** account, or
    3. fees, premium, taxes, claims, commissions or brokerage monies;

- alleging, based upon, arising out of, or attributable to the **Insured's** performance of or failure to perform professional services as a lawyer or certified public accountant;

- alleging, based upon, arising out of, or attributable to any loan made by the **Insured**, or the servicing of any loan by the **Insured**;

- alleging, based upon, arising out of, or attributable to a governmental intervention, cease and desist order, insolvency, receivership, bankruptcy, licensing or liquidation of any organization (directly or indirectly) in which the **Insured** has placed or obtained insurance coverage or placed the funds of a client or account;

- alleging, based upon, arising out of, or attributable to any underwriting authority contracts when such **Claim** is made by the authorizing insurance carrier;

- alleging, based upon, arising out of, or attributable to any defect in title not disclosed of public record or of which (defect in title) any **Insured** had actual or constructive knowledge at the date of issuance of insurance of such title;

- alleging, based upon, arising out of, or attributable to a notarized certification or acknowledgment of a signature without the physical appearance at the time of said notarization before such notary public, as **Insured** hereunder, of the person who is or claims to be the person signing said instrument;

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-19871 (11/05)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **NTC Global Holding Group** | | | **2** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **EON** | **G23638344 002** | **10/07/2010  to 10/07/2011** | **10/07/2010** |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

### Construction Managers Endorsement

It is agreed that Section III, Exclusions, is amended by adding the following exclusions:

- alleging, based upon, arising out of, or attributable to faulty construction workmanship performed or failed to have been performed by the **Insured** or the **Insured's** contractors or subcontractors including materials, parts or equipment furnished or supplied by any of the foregoing persons;

- alleging, based upon, arising out of, or attributable to the requiring, maintaining, procuring or providing advice relating to, or the failure to require, maintain, procure, or provide advice relating to any financing or monies for the payment of any portion of any project, or for the services or labor associated with such project;

- alleging, based upon, arising out of, or attributable to construction means, methods, techniques, sequences or procedures or for safety precautions and programs in connection with any projects and construction support activities including, but not limited to, first aid stations, temporary utilities, fencing and signs, scaffolding and barricades and project cleanup;

- alleging, based upon, arising out of, or attributable to the design or change in design of any structure or plan requiring the stamp of an architect or engineer;

- alleging, based upon, arising out of, or attributable to the acquisition of any real estate or the securing of financing for the acquisition of any real estate;

All other terms and conditions of this **Policy** remain unchanged.

_____

Authorized Representative

PF-19139 (12/05)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>**3** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Construction Certificate Endorsement

It is agreed that Section III, Exclusions, is amended by adding the following exclusion:

- alleging, based upon, arising out of, or attributable to the **Insured** making a payment in connection with building construction without prior receipt of an architect's certificate, where such certification is required as a condition of payment;

- alleging, based upon, arising out of, or attributable to making a payment without prior receipt of appropriate waivers or release of a lien from a subcontractor where work or materials have been supplied by such subcontractor;

- alleging, based upon, arising out of, or attributable to making a payment without prior receipt of appropriate waivers or releases of lien from the general contractor.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-19138 (12/05)

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>**4** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Signatures Endorsement

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**BANKERS STANDARD FIRE AND MARINE COMPANY** (A stock company)
**BANKERS STANDARD INSURANCE COMPANY** (A stock company)
**ACE AMERICAN INSURANCE COMPANY** (A stock company)
**ACE PROPERTY AND CASUALTY INSURANCE COMPANY** (A stock company)
**INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**PACIFIC EMPLOYERS INSURANCE COMPANY** (A stock company)
**ACE FIRE UNDERWRITERS INSURANCE COMPANY** (A stock company)

436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**WESTCHESTER FIRE INSURANCE COMPANY** (A stock company)
1133 Avenue of the Americas, New York, NY 10036

CARMINE A. GIGANTI, Secretary

JOHN J. LUPICA, President

Authorized Representative

CC-1K11f  (07/10) Ptd. In U.S.A.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>**5** |
| --- | --- | --- | --- |
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010 to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Additional Insured Endorsement

In consideration of the additional premium of $0, it is agreed that Section II, Definitions, subsection I, the definition of **Insured**, is amended by adding the following:

**Insured** shall also mean the following entity or individual listed below:

NTC Global Holding Company – FEIN 86 0876830
Terrence L. Wright
Nevada Title Company –FEIN 88 0153350
Nevada Construction Services – FEIN 88 0379110
Westcor 1031 Exchange Company – FEIN 88 0249446
Westcor Title Agency of Arizona, LLC. dba:  Westland Title Agency of Arizona – FEIN 88 0492697
Westland Development Agency – FEIN 20 2611421
Westcor Land Title Insurance Company dba: East West Title Company – FEIN 88 0294251
Westland Title Insurance Agency of UT – FEIN 42 1667627
Brentwood Buffalo LLC – FEIN 87 0699719
Brentwood Associates LLC – FEIN 04 3762158
Alliance Construction Advisors LLC – FEIN 88 001311
Union Title Agency, LLC – FEIN 20-5494543
Nevada One Associates, LLC – FEIN 20-5506742

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-23100 (03/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| NTC Global Holding Group | | | 6 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| EON | G23638344 002 | 10/07/2010 to 10/07/2011 | 10/07/2010 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

### Amendatory Endorsement - Nevada

IF THERE IS ANY CONFLICT BETWEEN THE **POLICY**, OTHER ENDORSEMENTS TO THE **POLICY** AND THIS ENDORSEMENT, THE TERMS PROVIDING THE BROADEST COVERAGE INSURABLE UNDER APPLICABLE LAW SHALL PREVAIL.

It is agreed that:

1.  The REPRESENTATIONS section of the **Policy** is amended by deleting subsection 2 and replacing it with the following:

    2.  It is understood and agreed that if such representations or information are not true, accurate and complete, and if:

        a.  the representations or information is fraudulent;

        b   the representations or information is material either to the acceptance of the risk or to the hazard assumed by the **Company**; or

        c.  the **Company**, had it known the true facts as required by the **Application** for the **Policy** or otherwise, in good faith would:

            1)  not have issued the **Policy**;

            2)  not have issued it at the same premium rate;

            3)  not have issued the **Policy** in as large limit of liability; or

            4)  not have provided coverage with respect to the hazard resulting in the **Loss**;

        then this **Policy** shall be void ab initio.

2.  The TERMINATION section of the **Policy** is amended by adding the following:

    *   If this **Policy** has been in effect for 70 days or more, or if this **Policy** is a renewal of a policy the **Company** issued, the **Company** may terminate only for one or more of the following reasons:

        1.  nonpayment of premium;

        2.  conviction of the **Insured** of a crime arising out of acts increasing the hazard insured against;

        3.  discovery of fraud or material misrepresentation in obtaining the **Policy** or in presenting a **Claim** thereunder;

        4.  discovery of an act or omission or a violation of any condition of the **Policy** which occurred after the first effective date of the current **Policy**, and substantially and materially increases the hazard insured against;

        5.  a material change in the nature or extent of the risk, occurring after the first effective date of the current **Policy**, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the **Policy** was issued or last renewed;

        6.  a determination by the Commissioner that continuation of the **Company's** present volume of premiums would jeopardize its solvency or be hazardous to the interests of its policyholders, creditors or the public; or

PF-19985 (05/06) EO                    © 2006                    Page 1 of 2

7. a determination by the Commissioner that the continuation of the **Policy** would violate, or place the **Company** in violation of, any provision of the code.

- Notice of termination from the **Company** will state the effective date of termination and the reason(s) for termination, and will be mailed by certified mail to the **Named Insured**, and by first-class mail to the agent or broker of record, at the last mailing addresses known to the **Company**.  Proof of mailing will be sufficient proof of notice.

3. The following section is added to the **Policy**:

- NONRENEWAL

    1. If the **Company** decides not to renew this **Policy**, it will mail or deliver to the **Named Insured** shown in the Declarations a notice of intention not to renew at least 60 days before the agreed expiration date.

       If notice is mailed, proof of mailing will be sufficient proof of notice.

    2. The **Company** need not provide this notice if:

       a. the **Named Insured** has accepted replacement coverage; or

       b. the **Named Insured** has requested or agreed to nonrenewal.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>NTC Global Holding Group | | | Endorsement Number<br>7 |
|---|---|---|---|
| Policy Symbol<br>EON | Policy Number<br>G23638344 002 | Policy Period<br>10/07/2010  to 10/07/2011 | Effective Date of Endorsement<br>10/07/2010 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

### Trade Or Economic Sanctions Endorsement

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of the policy remain unchanged.

_____
Authorized Agent

ALL-21101 (11/06) Ptd. in U.S.A.                                      Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured NTC Global Holding Group | | | Endorsement Number 8 |
|---|---|---|---|
| Policy Symbol EON | Policy Number G23638344 002 | Policy Period 10/07/2010 to 10/07/2011 | Effective Date of Endorsement 10/07/2010 |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

### Defense and Settlement Endorsement

It is agreed that Section I, Insuring Agreement and Defense, subsection B, Defense is amended by deleting numbered paragraph 2 in its entirety and inserting the following:

5.   If the **Insured** refuses to consent to a settlement or a compromise acceptable to the claimant/plaintiff and the **Company**, then the **Company's** liability to pay **Damages** and **Claims Expenses** under this **Policy** with respect to such **Claim** shall be reduced to (i) the amount of **Damages** for which the **Claim** could have been settled plus all **Claims Expenses** incurred until the date of such refusal, and (ii) 50% of all subsequent covered **Claims Expenses** in excess of such amount, which sum shall not exceed the unexhausted Limit of Liability specified in Item 3 of the Declarations.   The remaining 50% of **Claims Expenses** and all subsequent **Damages** shall be borne by the **Insureds** uninsured and at their own risk.   In such event, the **Company** shall tender a check to the **Insured** for the recommended settlement amount, and shall be relieved of any further duty or obligation, other than for covered **Claims Expenses** referenced above.   This paragraph shall not apply to a settlement in which the total incurred **Damages** and **Claims Expenses** do not exceed the Retention.

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative

PF-19861 (11/05)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| NTC Global Holding Group | | | 9 |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| EON | G23638344 002 | 10/07/2010 to 10/07/2011 | 10/07/2010 |
| Issued By (Name of Insurance Company) | | | |
| ACE American Insurance Company | | | |

### Spousal Coverage Extension Endorsement

It is agreed that Section VI, Conditions, is amended by adding the following subsection:

- **Spouses**

  The spouses and legally recognized domestic partners of **Insureds** shall be considered **Insureds** under this **Policy**, but coverage is afforded only for a **Claim** arising solely out of their status as a spouse or domestic partner where the **Claim** seeks damages from marital community property, jointly held property or property transferred from a natural person **Insured** to such spouse or legally recognized domestic partner. No coverage is provided for any **Wrongful Act** actually or allegedly committed by such spouse or legally recognized domestic partner. All of the terms and conditions of this **Policy** including, without limitation, the Retention applicable to **Damages** and **Claims Expenses** incurred by **Insureds** shown in Item 5 of the Declarations shall also apply to **Damages** and **Claims Expenses** incurred by such spouses and legally recognized domestic partners.

**All other terms and conditions of this Policy remain unchanged.**

_____
Authorized Representative

PF-19061 (10/05) EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>**10** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Notice Amended Endorsement – CEO, CFO, President, General Counsel, Risk Manager

It is agreed that Section VI, Conditions, Subsection A, Notice is amended by deleting the word "**Insured**" from numbered paragraph 1, and from lines one and two of numbered paragraph 2, and inserting the following phrase: "**Named Insured's** Chief Executive Officer, Chief Financial Officer, President, General Counsel, Risk Manager, or organizational equivalent, and personnel who directly report professionally to such individuals" is inserted in its place in each paragraph respectively.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-19860 (11/05)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **NTC Global Holding Group** | | | **11** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **EON** | **G23638344 002** | **10/07/2010  to 10/07/2011** | **10/07/2010** |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

### Dishonest, Fraudulent, Criminal, Malicious Act, Omission, Intentional, Knowing Violation Of The Law, Profit, Advantage Exclusions Amended Endorsement (Partial Severability) Endorsement

It is agreed that Section III, Exclusions, subsections A and J, are amended by adding the following to each subsection respectively:

This exclusion shall apply to any **Insured** who had knowledge of or participated in the aforementioned conduct. For purposes of this exclusion only, the knowledge of the **Named Insured's** Chief Executive Officer, Chief Financial Officer, President, General Counsel, and Risk Manager (or the functional equivalent of such positions for the **Named Insured**) shall be imputed to all **Insureds**. The knowledge of any other **Insured**, other than the aforementioned officers or employees, shall not be imputed to another **Insured**.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-19821 (02/06) EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **NTC Global Holding Group** | | | **12** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **EON** | **G23638344 002** | **10/07/2010 to 10/07/2011** | **10/07/2010** |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

## Territory Amended (Worldwide Coverage) Endorsement

It is agreed that Section VI, Conditions, subsection F, Territory And Valuation, numbered paragraph 1, is deleted in its entirety and the following is inserted:

1.   Coverage under this **Policy** shall extend to **Wrongful Acts** taking place and **Claims** made anywhere in the world.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-19272 (12/05) EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>**13** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Damages Definition Amended (Punitive Damages, Most Favorable Jurisdiction) Endorsement

It is agreed that Section II, Definitions, Subsection F, the definition of **Damages** is amended by deleting the last paragraph and inserting the following:

> **Damages** includes punitive and exemplary damages and the multiplied portion of any multiple damage award to the extent such damages are insurable under the internal laws of the applicable jurisdiction that most favors coverage for such damages.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

CC-1e15 (10/09) EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>14 |
| --- | --- | --- | --- |
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Notice Amended Endorsement – CEO, CFO, President, General Counsel, Risk Manager

It is agreed that Section VI, Conditions, Subsection A, Notice is amended by deleting the word "**Insured**" from numbered paragraph 1, and from lines one and two of numbered paragraph 2, and inserting the following phrase: "**Named Insured's** Chief Executive Officer, Chief Financial Officer, President, General Counsel, Risk Manager, or organizational equivalent, and personnel who directly report professionally to such individuals" is inserted in its place in each paragraph respectively.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

CC-1e15 (10/09) EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>**16** |
| --- | --- | --- | --- |
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Claim Amended Endorsement

It is agreed that Section II, Definitions, subsection C, the definition of **Claim**, is amended by adding the following:

   6.  a written request to toll or waive a statute of limitations relating to a potential **Claim** described in paragraphs 1 through 3 directly above.

All other terms and conditions of this **Policy** remain unchanged.

_____
                            Authorized Representative

CC-1e15 (10/09) EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**NTC Global Holding Group** | | | Endorsement Number<br>**16** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G23638344 002** | Policy Period<br>**10/07/2010  to 10/07/2011** | Effective Date of Endorsement<br>**10/07/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### Extended Reporting Period Amended – (90 Days) Endorsement

It is agreed that the **Policy** is amended at Section IV, **Extended Reporting Period**, by deleting the phrase "60 days" wherever it appears in the following subsections of the **Policy** and inserting the phrase "90 days" in its place:

1. The first and third lines of Subsection A, Automatic **Extended Reporting Period**;

2. The third line of Subsection B.2., Optional **Extended Reporting Period**; and

3. The first line of Subsection B.3., Optional **Extended Reporting Period**.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

CC-1e15 (10/09) EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured NTC Global Holding Group | | | Endorsement Number 17 |
|---|---|---|---|
| Policy Symbol **EON** | Policy Number **G23638344 002** | Policy Period **10/07/2010  to 10/07/2011** | Effective Date of Endorsement **10/07/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | | |

### Additional Insured Endorsement

It is agreed that Section II, Definitions, subsection I, the definition of **Insured**, is amended by adding the following:

The following entity or individual listed below shall be considered an **Insured**, but only with respect to **Damages** and **Claims Expenses** arising out of **Wrongful Acts** committed or allegedly committed by the **Named Insured** in the performance of or failure to perform **Professional Services**.

The policy will not provide any coverage for **Claims** and **Claims Expenses** arising out of any **Wrongful Act** committed by the entity or individual listed below.

Additional **Insured:**      Alliance Advisors, LLC

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-19178 (12/05)  EO

# EXHIBIT "2"

# EXHIBIT "2"

1   J. Stephen Peek, Esq.
    Nevada Bar No. 1759
2   Bryce K. Kunimoto, Esq.
    Nevada Bar No. 7781
3   Bryce C. Alstead, Esq.
    Nevada Bar No. 9954
4   HOLLAND & HART LLP
    3800 Howard Hughes Parkway, 10th Floor
5   Las Vegas, Nevada 89169
    (702) 669-4600
6   (702) 669-4650 – fax
    speek@hollandhart.com
7   bkunimoto@hollandhart.com
    balstead@hollandhart.com
8
    *Attorneys for Plaintiff*
9

                    **UNITED STATES DISTRICT COURT**

10
                        **DISTRICT OF NEVADA**

11
    BRANCH BANKING and TRUST COMPANY,        CASE NO :
12  a North Carolina corporation;

13                          Plaintiff,       **COMPLAINT**

14  v.

    NEVADA TITLE COMPANY, a Nevada
15  corporation, and COMMONWEALTH LAND
    TITLE INSURANCE COMPANY, a
16  Pennsylvania corporation;

17                          Defendants.

18         Plaintiff Branch Banking & Trust Company ("BB&T"), by and through its undersigned

19  counsel, Holland & Hart LLP, for its complaint against Defendants Nevada Title Company

20  ("Nevada Title") and Commonwealth Land Title Insurance Company ("Commonwealth Title")

21  hereby alleges as follows:

22                              **PARTIES**

23         1.     Plaintiff BB&T is a North Carolina corporation duly qualified to do business in

24  Nevada which has its principal place of business in North Carolina.

25         2      BB&T is the successor-in-interest to Colonial Bank, N.A., a national banking

26  association ("Colonial Bank") concerning the 2007 Loan and the Policy (each defined below)

27         3.     Defendant Nevada Title Company is a Nevada corporation which has its principal

28  place of business in Nevada.

                              Page 1 of 14

    4948614_4 DOC

4.     Defendant Commonwealth Title is a Pennsylvania corporation which has its principal place of business in Florida.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendants and the amount in controversy exceeds $75,000.

6.     Venue is proper in this district pursuant to 28 U.S.C § 1391(a) because a substantial part of the events giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS

7.     On August 26, 2005, Colonial Bank loaned $29,305,250.00 to R&S St Rose LLC (the "Borrower") (the "2005 Loan") in conjunction with the Borrower's acquisition of approximately thirty-eight (38) acres of real property in Henderson, Nevada (the "Property").

8.     The 2005 Loan was secured by a first position deed of trust against the Property (the "2005 DOT").

9.     Approximately one month after the 2005 DOT was recorded, the Borrower obtained a twelve million dollar ($12,000,000.00) loan from R&S St Rose Lenders LLC, which loan was secured – in second position – by a deed of trust recorded against the Property (the "R&S DOT").

10.     Colonial Bank, along with other participating banks, was approached by the Borrower during the spring and summer of 2007 concerning a new, larger loan concerning the Property (the "2007 Loan").

11.     Colonial Bank was not willing to fund the proposed 2007 Loan unless, as was the case with the 2005 Loan from Colonial Bank to the Borrower, the proposed 2007 Loan would be secured in first position against the Property.

12     In connection with the proposed 2007 Loan, Colonial Bank obtained a preliminary title report dated June 20, 2007, from Nevada Title, which was acting as agent for Commonwealth Title ("Title Report").

13.     Exception 37 to the Title Report disclosed the R&S DOT.

4948614_4 DOC

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

14    Colonial Bank was unwilling to fund the proposed 2007 Loan if such loan would be subject to the R&S DOT.

15.    Nevada Title also acted as escrow agent for the closing of the 2007 Loan

16.    On July 27, 2007, Colonial Bank provided its escrow instructions to Nevada Title (the "Escrow Instructions").

17    Paragraph 1 of the Escrow Instructions required Nevada Title to remove the R&S DOT from the title policy to be issued at the closing of the proposed 2007 Loan.

18    Specifically, in the Escrow Instructions, counsel for Colonial Bank provided, *inter alia*, the following instructions to Nevada Title:

> You are hereby authorized and instructed to cause to be recorded the Deed of Trust when you hold for delivery to Lender the executed loan documents, and are in a position to comply with, or warrant, the following:
>
> 1.    Nevada Title Company, as agent for Commonwealth land Title Insurance Company <u>or</u> Old Republic Title Insurance Company, is unconditionally and irrevocably committed to issue an ALTA lender's policy of title insurance in the amount of $43,980,000.00 insuring the Deed of Trust as a lien upon the real property described therein subject only to exceptions 1 through 34 and 38 through 42 as shown in your preliminary title report No 07-02-0978-BB dated June 20, 2007. Real property taxes and assessments may be shown as a lien not yet due and payable  The existing deed of trust shown as exception No. 35 in your preliminary title report will be reconveyed by Lender as to the subject real property
>
> Such title insurance policy shall insure or contain endorsements insuring a legal right of access from a public street properly dedicated and accepted for maintenance, and insure the validity and enforceability of the lien of the Deed of Trust, and attach a copy of the plat of the subject property thereto  Furthermore, the policy shall insure or contain the following ALTA endorsements: ALTA Nos. 100 (as modified for unimproved land), 100.29 (mineral rights, surface damage), 101.3 (mechanics' liens), 103.5 (water rights, surface damage), 103.7 (access), 111 5 (variable rate), 8.1 (environmental protection lien, modified for commercial property), and 116 4.1 (contiguous parcels).
>
> Construction may have been commenced upon the real property to be encumbered by the Deed of Trust  Do not close and do not cause to be issued the ALTA policy referred to above unless you are willing to do so with knowledge that Lender is relying thereon for protection against the claims of mechanics and materialmen to the same degree that it would rely should no work have commenced and your own inspection would have revealed such a fact

Holland & Hart LLP
3900 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

Page 3 of 14

4948614_4 DOC

19.     The Escrow Instructions instructed Nevada Title not to close the 2007 Loan or otherwise disburse any funds to Borrower until Nevada Title was in a position to fully comply with the Escrow Instructions.

20.     Nevada Title accepted the Escrow Instructions and was paid an escrow fee for acting in compliance with the Escrow Instructions.

21.     Nevada Title failed to comply with the Escrow Instructions.

22.     Indeed, in direct contravention of the Escrow Instructions, Nevada Title, acting in its capacity as escrow agent, disbursed the proceeds of the 2007 Loan subject to the prior encumbrance of the R&S DOT.

23.     The principal amount of the 2007 Loan from Colonial Bank to the Borrower was $43,980,000.00, which principal amount was fully disbursed by Nevada Title to the Borrower.

24.     The 2007 Loan was secured by a deed of trust against the Property (the "BB&T DOT").

25.     R&S St Rose Lenders LLC ("R&S Lenders") has taken the position that the BB&T DOT is junior in priority to the R&S DOT.

26.     Based on Nevada Title's acceptance of the Escrow Instructions, Colonial Bank relied on Nevada Title to comply with the Escrow Instructions.

27.     Nevada Title assumed the risk of disbursing the proceeds of the Loan without complying with the Escrow Instructions and obtaining a release or reconveyance of the R&S DOT.

28      Concurrently with the closing of the Loan, on July 31, 2007, Nevada Title, acting as agent for Commonwealth Title, issued an ALTA Loan Policy of Title Insurance (title policy number 562-Z093126) to Colonial Bank (the "Policy").

29.     As successor-in-interest to Colonial Bank, BB&T enjoys all the rights and privileges of Colonial Bank in and to the Policy.

30.     The Policy provides BB&T with insurance in the full amount of the 2007 Loan - $43,980,000.00.

///

4948614_4.DOC

31.     The Policy does not disclose the R&S DOT as an encumbrance against the Property.

32.     The Policy insures BB&T against any defects in or encumbrances on the title of the Property that are not disclosed by the Policy

33.     The R&S DOT constitutes a defect in or encumbrance on the title of the Property that BB&T is insured against by the Policy

34.     The Policy insures BB&T against the priority of the BB&T DOT being subject to any senior lien or encumbrance that is not disclosed by the Policy.

35      The BB&T DOT is purportedly subject to the senior lien of the R&S DOT, which is an encumbrance the Policy insures BB&T against

36      Colonial Bank first became aware of Nevada Title's failure to obtain a release or reconveyance of the R&S DOT in the summer of 2008.

37.     In July of 2008, Nevada Title tried, and failed, to obtain a reconveyance of the R&S DOT.

38.     Following Nevada Title's failure to obtain a post-facto reconveyance of the R&S DOT, Nevada Title tried, and failed, to obtain a subordination of the R&S DOT.

39      On September 5, 2008, Nevada Title took the position that the R&S DOT has priority over the BB&T DOT.

40      The purported priority of the R&S DOT over the BB&T DOT was acknowledged by court order in Eighth Judicial District Court Case No. A574852 on June 24, 2010

41.     Colonial Bank would not have made the Loan but-for Nevada Title's assurances that the 2007 Loan would be in first position against the Property.

42.     BB&T's right to foreclose on the Property has been materially hindered, and is now indefinitely delayed, due to the presence of the R&S DOT.

43.     Even if BB&T is ultimately able to foreclose on the Property, it will take title to the Property subject to the purported senior lien of the R&S DOT.

44      On April 20, 2009, Colonial Bank filed a Notice of Default and Election to Sell concerning the Property.

Page 5 of 14

4948614_4 DOC

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

Case 2:10-cv-01970   Document 1   Filed 11/10/10   Page 6 of 14

1       45.   Colonial Bank's planned foreclosure of the Property was enjoined by R&S

2   Lenders, the beneficiary of the R&S DOT.

3       46.   Subsequent to the injunction of Colonial Bank's attempted foreclosure, the

4   Borrower has been placed into involuntary bankruptcy; no further foreclosure activity may occur

5   until the automatic stay is lifted by the bankruptcy court.

6       47.   The most recent appraisal of the Property, rendered on October 20, 2009, valued

7   the Property at $23,555,000.00.

8       48   To BB&T's detriment, the R&S DOT encumbers over half the appraised value of

9   the Property.

10       49.   Henderson is – since the time of Colonial Bank's attempted foreclosure has been,

11   and since the time of the 2009 appraisal has been – a declining value real estate market.

12       50.   Upon information and belief, the value of the Property is currently far less than its

13   most recently appraised value as well as the value Colonial Bank could have obtained for the

14   Property had the R&S DOT not been in place as a purported senior lien against the Property.

15       51.   The damages BB&T has and will continue to suffer as a result of the purported

16   senior lien of the R&S DOT are insured against by the Policy

17       52   On September 24, 2010, BB&T sent a title insurance tender or demand letter to

18   Commonwealth Title (the "Tender Letter").

19       53   The Tender Letter demanded that Commonwealth Title tender the insured value

20   of the Policy to BB&T by October 8, 2010 because of the damages caused to the Property as a

21   result of the R&S DOT.

22       54.   Commonwealth Title has provided no response to the Tender Letter.

23       55   BB&T has incurred significant legal fees and associated costs related to its

24   attempted foreclosure of the Property, the litigation related to the R&S DOT and the BB&T

25   DOT, and BB&T's pursuit of its rights under the Policy.

26   ///

27   ///

28   ///

Page 6 of 14

4948614_4 DOC

*Holland & Hart LLP*
*3800 Howard Hughes Parkway, 10th Floor*
*Las Vegas, Nevada 89169*

## FIRST CLAIM FOR RELIEF

### (Breach of Contract – Escrow Instructions)

56.   BB&T repeats and realleges each and every allegation set forth above in Paragraphs 1 through 55 as if fully set forth herein

57.   The Escrow Instructions constitute a valid and enforceable contract between BB&T and Nevada Title.

58   Paragraph 1 of the Escrow Instructions prohibited Nevada Title from disbursing the 2007 Loan proceeds unless the R&S DOT was first removed as an encumbrance against the Property.

59   BB&T performed under the contract or was excused from performing under the same.

60.   Nevada Title breached the contract by not removing the R&S DOT from the title to the Property prior to disbursing the 2007 Loan proceeds to the Borrower.

61   Nevada Title's breach of the Escrow Instructions has damaged BB&T in an amount to be proved at trial, but in no event less than seventy five thousand dollars ($75,000.00).

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Title Policy)

62.   BB&T repeats and realleges each and every allegation set forth above in Paragraphs 1 through 61 as if fully set forth herein.

63.   The Policy constitutes a valid and enforceable contract between BB&T and Commonwealth Title

64.   BB&T performed under the contract or was excused from performing under the same.

65   The Policy insures BB&T against non-disclosed senior liens and encumbrances against the Property.

66   The R&S DOT, a purported senior lien, was not disclosed as an exception to the Policy.

///

Page 7 of 14

4948614_4 DOC

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

1    67.    By failing to tender the amount owed under the Policy, Commonwealth Title has

2    breached the Policy

3    68.    Commonwealth Title's breach of the Policy has damaged BB&T in an amount to

4    be proved at trial, but in no event less than seventy five thousand dollars ($75,000 00).

5    69.    The Policy additionally requires Commonwealth Title to pay the costs, attorneys'

6    fees, and expenses incurred in defending BB&T's insured mortgage.

7    **THIRD CLAIM FOR RELIEF**

8    **(Breach of the Implied Covenant of Good Faith and Fair Dealing – Escrow Instructions)**

9    70.    BB&T repeats and realleges each and every allegation set forth above in

10   Paragraphs 1 through 69 as if set forth fully herein.

11   71.    Implied in every contract, including the Escrow Instructions, is the implied

12   covenant of good faith and fair dealing

13   72    Nevada Title owed a duty of good faith to BB&T under the contract.

14   73.    Nevada Title breached the implied covenant of good faith and fair dealing by

15   performing in a manner that is unfaithful to the purpose of the contract

16   74    Nevada Title breached the implied covenant of good faith and fair dealing by,

17   among other things, causing the removal of the R&S DOT from the Policy while not actually

18   causing the removal of the R&S DOT from the title to the Property.

19   75.    Nevada Title breached the implied covenant of good faith and fair dealing by,

20   among other things, failing to notify Colonial Bank that the R&S DOT had not been reconveyed

21   from the Property prior to disbursing the 2007 Loan proceeds to Borrower when Nevada Title

22   knew, or should have known, that Colonial Bank was relying on Nevada Title to ensure that the

23   BB&T DOT would enjoy first position status against the Property.

24   76.    As a result of Nevada Title's breach of the implied covenant of good faith and fair

25   dealing, BB&T has suffered damages in an amount to be determined at trial, but in no event less

26   than seventy five thousand dollars ($75,000 00).

27   ///

28   ///

4948614_4 DOC

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

## FOURTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing – Title Policy)

77    BB&T repeats and realleges each and every allegation set forth above in Paragraphs 1 through 76 as if set forth fully herein.

78.    Implied in every contract, including the Policy, is the implied covenant of good faith and fair dealing

79.    Commonwealth Title owed a duty of good faith to BB&T under the contract

80.    Commonwealth Title breached the implied covenant of good faith and fair dealing by performing in a manner that is unfaithful to the purpose of the contract

81.    Commonwealth Title breached the implied covenant of good faith and fair dealing by, among other things, issuing the Policy in a form that did not reflect the true state of the encumbrances on the Property when Commonwealth Title knew, or should have known, that Colonial Bank was relying on Commonwealth Title to provide an accurate assessment of the state of title of the Property.

82.    As a result of Commonwealth Title's breach of the implied covenant of good faith and fair dealing, BB&T has suffered damages in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00).

## FIFTH CLAIM OF RELIEF

### (Bad Faith Denial of Insurance Claim)

83.    BB&T repeats and realleges each and every allegation set forth above in Paragraphs 1 through 82 as if set forth fully herein

84.    BB&T has suffered losses covered by the Policy.

85    BB&T properly tendered its title insurance claim to Commonwealth Title in accordance with the terms of the Policy.

86.    Commonwealth Title has failed to respond to the Tender Letter.

87    Commonwealth Title's failure to respond to the Tender Letter is effectively a denial of BB&T insurance claim.

88.    Commonwealth Title has refused BB&T's claim without proper purpose.

Page 9 of 14

4948614_4.DOC

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

89.   As a result of Commonwealth Title's bad faith denial of BB&T's title insurance claim, BB&T has suffered damages in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00).

90.   Commonwealth Title's bad faith denial of BB&T's title insurance claim makes Commonwealth Title liable for punitive damages.

### SIXTH CAUSE OF ACTION

**(Detrimental Reliance – Escrow Instructions)**

91.   BB&T repeats and realleges each and every allegation set forth above in Paragraphs 1 through 90 as if set forth fully herein.

92.   Colonial Bank entered into the 2007 Loan in reliance on Nevada's Title acceptance of its duties and responsibilities as set forth in the Escrow Instructions.

93.   Nevada Title should have reasonably expected that its acceptance of the Escrow Instructions would lead Colonial Bank to fund the 2007 Loan under the reasonable assumption that Nevada Title caused the removal of the R&S DOT from the title to the Property.

94.   A justiciable controversy exists between BB&T and Nevada Title regarding BB&T's good faith reliance on the representations of Nevada Title.

95.   The parties' respective claims are adverse to each other.

96.   The controversy between BB&T and Nevada Title is ripe for judicial determination.

97.   BB&T is entitled to a judicial declaration from this Court declaring that BB&T relied in good faith upon the representations of Nevada Title regarding Nevada Title's compliance with the intent of the Escrow Instructions and that BB&T entitled to recoup all funds – including, without limitation, the proceeds of the 2007 Loan – expended in reliance on such representations.

98.   As a result of Nevada Title's actions, BB&T has suffered damages in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00)

///

///

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

4948614_4.DOC

**SEVENTH CLAIM FOR RELIEF**

**(Declaratory Relief – Escrow Instructions)**

99.     BB&T repeats and realleges each and every allegation set forth above in Paragraphs 1 through 98 as if set forth fully herein

100     The Escrow Instructions constitute a valid and enforceable contract between Colonial Bank and Nevada Title.

101     The Escrow Instructions required the removal of the R&S DOT from title to the Property prior to the closing of the 2007 Loan.

102.    The R&S DOT was not removed from the Property prior to the closing of the 2007 Loan.

103.    A justiciable controversy exists between BB&T and Nevada Title regarding Nevada Title's breach of the Escrow Instructions.

104.    The parties' respective claims are adverse to each other

105.    The controversy between BB&T and Nevada Title is ripe for judicial determination.

106     BB&T is entitled to a judicial declaration from this Court declaring that Nevada Title breached the Escrow Instructions by failing to cause the removal of the R&S DOT from the title of the Property and that BB&T is entitled to recoup all damages caused and accruing as a result of Nevada Title's breach of the Escrow Instructions.

107.    As a result of Nevada Title's actions, BB&T has suffered damages in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00)

**EIGHTH CLAIM FOR RELIEF**

**(Negligence – Nevada Title)**

108.    BB&T repeats and realleges each and every allegation set forth above in Paragraphs 1 through 107 as if set forth fully herein.

109.    Nevada Title owed a duty of care to BB&T in complying with the Escrow Instructions

///

*Holland & Hart LLP*
*3800 Howard Hughes Parkway, 10th Floor*
*Las Vegas, Nevada 89169*

4948614_4 DOC

1    110   Nevada Title is required to conduct its business as a ordinary and reasonable

2    escrow company.

3    111   Nevada Title failed to use reasonable care when it closed the 2007 Loan without

4    ensuring that the R&S DOI was removed from the title to the Property.

5    112   An ordinary and reasonable escrow company would have ensured that the R&S

6    DOT was removed from the title to the Property.

7    113   As a result of Nevada Title's negligence, BB&T has suffered damages in an

8    amount to be determined at trial, but in no event less than seventy five thousand dollars

9    ($75,000.00).

10   **NINTH CLAIM FOR RELIEF**

11   **(Negligence – Commonwealth Title)**

12   114   BB&T repeats and realleges each and every allegation set forth above in

13   Paragraphs 1 through 113 as if set forth fully herein

14   115   Commonwealth Title owed a duty of care to BB&T in issuing the Policy.

15   116   Commonwealth Title is required to conduct its business as a ordinary and

16   reasonable title insurer

17   117   Commonwealth Title failed to use reasonable care when it issued the Policy in a

18   form that did not reflect the true state of title to the Property.

19   118   An ordinary and reasonable title insurer would not have issued the Policy without

20   listing the R&S DOT as an exception

21   119   As a result of Commonwealth Title's negligence, BB&T has suffered damages in

22   an amount to be determined at trial, but in no event less than seventy five thousand dollars

23   ($75,000.00).

24   **PRAYER FOR RELIEF**

25   WHEREFORE, Plaintiff Branch Banking & Trust Company prays for relief on its claims

26   for relief against Defendants Nevada Title Company and Commonwealth Land Title Insurance

27   Company as follows:

28   ///

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

4948614_4 DOC

1. For compensatory damages to BB&T as a result of Nevada Title's breach of the Escrow Instructions and its breach of the implied covenant of good faith and fair dealing, in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00).

2. For compensatory damages to BB&T as a result of Commonwealth Title's breach of the Policy and its breach of the implied covenant of good faith and fair dealing, in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00)

3. For compensatory damages to BB&T as a result of detrimentally relying on Nevada Title acting in accordance with the Escrow Instructions in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00)

4. For compensatory damages to BB&T as a result of Nevada Title's negligence related to the Escrow Instructions in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00).

5. For compensatory damages to BB&T as a result of Commonwealth Title's negligence related to the Policy in an amount to be determined at trial, but in no event less than seventy five thousand dollars ($75,000.00).

6. For punitive damages from Commonwealth Title as a result of Commonwealth Title's bad faith rejection of BB&T's claim under the Policy;

7. For an order of this Court decreeing that Nevada Title breached the Escrow Instructions by failing to cause the removal of the R&S DOT prior to the closing of the 2007 Loan;

8. For BB&T's reasonable attorneys' fees, costs, and other expenses incurred as a result of Nevada Title's breach of the Escrow Instructions and Commonwealth Title's breach of the Policy;

9. That BB&T be awarded its reasonable attorneys' fees and costs incurred in pursuing this action; and

///

///

4948614_4.DOC

Holland & Hart LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

10. That this Court award any and all other relief that it deems necessary and appropriate under the premises.

DATED November 10, 2010

J. Stephen Peek, Esq
Bryce K Kunimoto
Bryce C. Alstead, Esq.
HOLLAND & HART LLP
3800 Howard Hughes Parkway, 10th Floor
Las Vegas, Nevada 89169

*Attorneys for Plaintiff*

4948614_4 DOC

EXHIBIT "3"

EXHIBIT "3"

1  DAN R. WAITE, ESQ. (SBN 4078)
2  JOHN E. BRAGONJE, ESQ. (SBN 9519)
   ADAM P. LAXALT, ESQ. (SBN 12426)
3  LEWIS AND ROCA LLP
   3993 Howard Hughes Parkway, Suite 600
   Las Vegas, Nevada 89169
4  (702) 949-8200

5  *Attorneys for Plaintiff/Counter-Defendant*

6              **UNITED STATES DISTRICT COURT**

7                 **DISTRICT OF NEVADA**

8  COMMONWEALTH LAND TITLE              Case No. 2:11-cv-00380-KJD-CWH
   INSURANCE COMPANY, a Nebraska
9  corporation,                         **SECOND AMENDED COMPLAINT**

10                 Plaintiff,

11      vs.

12 NEVADA TITLE COMPANY, a Nevada
   corporation; NEVADA TITLE INSURANCE
13 COMPANY, a Nevada corporation; Does I
   through X, inclusive,
14
                   Defendants.
15

16      Plaintiff Commonwealth Land Title Insurance Company, for its second amended

17 complaint against Defendants Nevada Title Company and Nevada Title Insurance Company

18 alleges as follows:

19                        **PARTIES**

20      1.      Commonwealth Land Title Insurance Company ("Commonwealth") is a Nebraska

21 corporation having its principle place of business in Jacksonville, Florida, and is a citizen of

22 Nebraska for purposes of diversity.

23      2.      Nevada Title Company ("Nevada Title") is a Nevada corporation having its

24 principal place of business located in Las Vegas, Nevada and is a citizen of Nevada for purposes

25 of diversity.

26      3.      Nevada Title Insurance Company ("NTIC") is a Nevada corporation having its

27 principal place of business located in Las Vegas, Nevada and is a citizen of Nevada for purposes

28 of diversity.

**VENUE**

4.      Venue is properly found in the District of Nevada in that the transactions complained of or a substantial part thereof occurred in Las Vegas, Nevada. 28 U.S.C. § 1391(b). Venue lies in the unofficial Southern Division of this Court.

**JURISDICTION**

5.      This action is one in which this Court has original jurisdiction in that it is a civil action in which there is diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff is a Nebraska corporation having its principle place of business in Jacksonville, Florida; and the Defendants, Nevada Title Company and NTIC, are Nevada corporations having their principal places of business in Las Vegas, Nevada and are citizens of the state of Nevada for purposes of diversity. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      This Court has specific and general personal jurisdiction over Nevada Title and NTIC. Nevada Title and NTIC advertise, market, and distribute their products and services in the State of Nevada. Furthermore, Nevada Title and NTIC are incorporated under the laws of the State of Nevada. The exercise of jurisdiction over Nevada Title and NTIC would be reasonable.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

***Nevada Title, as Commonwealth's Agent, Unlawfully and Negligently Has Potentially Exposed Commonwealth to a $44,000,000.00 Claim***

7.      On or about December 1, 1992, Nevada Title entered into an Agency Agreement with Commonwealth (the "Agency Agreement").

8.      The Agency Agreement was in effect at all times pertinent to this action.

9.      The Agency Agreement permitted Nevada Title to solicit applications for title insurance, collect premiums, and issue and countersign title insurance policies, binders, commitments to insure, and endorsements based on Nevada Title's title examinations—all subject to the conditions of the Agency Agreement. Commonwealth underwrote the policies issued by Nevada Title.

10.      Pursuant to the terms of the Agency Agreement, Nevada Title agreed to indemnify Commonwealth for all loss, costs, or damage (including attorneys' fees and other costs) which

Commonwealth may sustain or become liable for on account of Nevada Title's acts and omissions with respect to the agency relationship.

11. There is a basic wrongful act at the heart of this lawsuit: in violation of both the Agency Agreement as well as independent duties imposed by law, Nevada Title, as Commonwealth's agent, issued a title policy that *may* bind Commonwealth, as principal, to insure against an ultra-hazardous risk not normally assumed by Commonwealth (or any other title insurance company).

12. Nevada Title issued a title policy in Commonwealth's behalf that *may* require Commonwealth to assure its (alleged) insured against an encumbrance that Nevada Title should have explicitly excepted from coverage.

13. The potential exposure to Commonwealth is extraordinary—it ranges in the millions of dollars. Commonwealth has already incurred over a million dollars in legal fees as a result of Nevada Title's negligent and unlawful conduct.

14. Commonwealth brings this lawsuit at this time in order to recover damages already sustained and to recover damages which may accrue in the future, depending on the outcome of the underlying lawsuit, defined and discussed below.

***NTIC is a guarantor of Nevada Title's performance under the Agency Agreement***

15. The parties amended the Agency Agreement a number of times; the first amendment occurred on September 16, 1996.

16. The First Amendment to Agency Agreement ("First Amendment") explains that an entity known as Nevada Title Insurance Company (*i.e.*, defendant NTIC) was a "successor-by-merger" to an entity also known as Nevada Title Company (and incorporated on January 19, 1979) and referred to as "Old NTC" in the First Amendment. The First Amendment further explains that "Old NTC merged into NTIC on September 27, 1995, and therefore no longer exists as a separate entity."

17. The First Amendment clarifies that an entity referred to as "New NTC" (*i.e.*, defendant Nevada Title) and incorporated on September 27, 1995 was substituted in the place of

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

Old NTC.  Specifically the First Amendment provides that "the word 'Agent' as used in the Agency Agreement, shall refer to New NTC instead of Old NTC."

18.    The recitals of the First Amendment also state that "the parties desire to have NTIC guaranty the performance of New NTC's obligations under the Agency Agreement."

19.    The First Amendment contains an express contractual guarantee: "Guarantee: NTIC hereby guarantees the performance of New NTC's [*i.e.*, defendant Nevada Title] obligations under the Agency Agreement."

20.    This guaranty was in effect at all times pertinent to this action.

***The Title Policy in Question Relates to***
            ***the Development of Real Property in Henderson***

21.    This lawsuit relates to a separate Nevada state court action involving three separate commercial loans and related trust deeds made by two different lenders in favor of a borrower for the purpose of purchasing and developing real property in Henderson, Nevada.

22.    On or about August 26, 2005, Colonial Bank, N.A. ("Colonial Bank"), loaned $29,305,250.00 (the "2005 Colonial Bank Loan") to a firm called R&S St. Rose, LLC ("R&S St. Rose") so that R&S St. Rose could acquire approximately 38 acres of real property in Henderson, Nevada (the "Property").

23.    A first-priority trust deed against the Property secured the 2005 Colonial Bank Loan (the "2005 Colonial Bank Trust Deed").

24.    About one month later, another entity named R&S St. Rose *Lenders*, LLC ("R&S St. Rose Lenders")—upon information and belief owned and controlled, at least for a time, by the same persons who owned and controlled R&S St. Rose—loaned R&S St. Rose another $12 million, which loan was secured by a trust deed second in priority to the Colonial Bank 2005 Trust Deed (the "2005 R&S St. Rose Lenders Trust Deed").

25.    In 2007, R&S St. Rose approached Colonial Bank to request additional funds to develop the Property and "take out" the 2005 Colonial Bank Loan.  Ultimately, Colonial Bank loaned R&S St. Rose $43,980,000.00, which Colonial Bank secured through another trust deed against the Property (the "2007 Colonial Bank Trust Deed").

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

613728.1

26.    R&S St. Rose used this second, larger loan (approximately $43 million) from Colonial Bank to fully repay the 2005 Colonial Bank Loan (approximately $29 million).

***A Priority Dispute Arose Between Two Lenders***

27.    A dispute between the beneficiaries of the 2005 R&S St. Rose Lenders Trust Deed and Colonial Bank developed regarding the relative priority of their competing liens against the Property.

28.    On April 3, 2009, two investors who gave hundreds of thousands of dollars to R&S St. Rose Lenders sued for, *inter alia*, a declaratory judgment that the 2005 R&S St. Rose Lenders Trust Deed had priority over the 2007 Colonial Bank Trust Deed under Nevada state court case A574852 (the "Nevada State Court Action").

29.    Colonial Bank, in response, filed a separate action under Nevada state court case number A594512 in which it sought, among other things, a declaratory judgment that its trust deed, *i.e.*, the 2007 Colonial Bank Trust Deed for the $43 million loan, had priority over the 2005 R&S St. Rose Lenders Trust Deed.

***Commonwealth's Potential Insured Lost at Trial***

30.    In the context of the Nevada State Court Action, Colonial Bank advanced a number of claims, including a quiet title claim, equitable subrogation, and equitable subordination—all aimed at securing Colonial Bank in the first position relative to the 2005 R&S St. Rose Lenders Trust Deed.

31.    During the pendency of the Nevada State Court Action, a firm called Branch Banking and Trust Company ("BB&T") alleged that it succeeded to the interests of Colonial Bank after Colonial Bank failed and was put into receivership by the FDIC.

32.    Both Nevada state-court lawsuits were ultimately consolidated for trial before Nevada State Court Eighth Judicial District Court Judge Elizabeth G. Gonzalez.  Judge Gonzalez ultimately ruled that BB&T had failed to adduce evidence demonstrating that it actually purchased the 2007 Colonial Bank Trust Deed and related rights from the FDIC after Colonial Bank failed.

33.    BB&T did not prevail in the Nevada State Court Action, and BB&T filed an appeal to the Nevada Supreme Court on September 24, 2010.

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada  89169

613728.1

*The Nevada State Court Also Made Extensive*
*Findings Regarding the Negligent Conduct of Nevada Title*

34.     In the context of the Nevada State Court Action, Judge Gonzalez made extensive findings of fact and conclusions of law concerning the conduct of Nevada Title in closing the escrow related to the 2007 Colonial Bank Trust Deed.

35.     These findings of fact, and the testimony adduced through Nevada Title witnesses and the evidence taken regarding Nevada Title's conduct, all confirm Nevada Title's unlawful acts and omissions, and are a foundation of liability in this case.

36.     Colonial Bank obtained a preliminary title report dated June 20, 2007, and denominated report number 07-02-0978-BB, from Nevada Title, acting as agent for plaintiff herein, Commonwealth.

37.     The preliminary title report disclosed the 2005 R&S St. Rose Lenders Trust Deed as an encumbrance against the Property.

38.     Nevada Title acted as the escrow agent for the owner-developers of the Property, on the one hand, and for Colonial Bank, on the other hand.

39.     Colonial Bank prepared escrow instructions to Nevada Title dated July 27, 2007 (the "Escrow Contract").

40.     The Escrow Contract provided that Nevada Title, as agent for Commonwealth, would issue an ALTA lenders policy of title insurance in the amount of $43,980,000.00 insuring the 2007 Colonial Bank Trust Deed as a lien upon the Property *not* subject to the 2005 R&S St. Rose Lenders Trust Deed.

41.     In other words, the Policy indemnifies the alleged insured against any damages experienced if the 2007 Colonial Bank Trust Deed is not in the first-priority position—even though Nevada Title knew that the R&S St. Rose Lenders Trust Deed would be in first position following the closing of the transaction.

42.     The Nevada State court also found that the Escrow Contract obligated Nevada Title to close the transaction only if it would deliver a title policy insuring the 2007 Colonia Bank Trust Deed in the first position notwithstanding that the 2005 R&S St. Rose Lenders Trust Deed would

actually be in the first position when the loan closed. (*See* Nevada State Court Action, 06/24/10 Findings of Fact ¶¶ 54-63.)

43.    The Nevada State court likewise found that Colonial Bank was unwilling to fund the approximately $43 million loan associated with the 2007 Colonial Bank Trust Deed if it were subordinate to the then-existing approximately $12 million lien against the Property, *i.e.*, the 2005 R&S St. Rose Lenders Trust Deed. (*Id.* ¶ 55.)

44.    The Nevada State court further found that the Escrow Contract obligated Nevada Title to remove or subordinate the 2005 R&S St. Rose Lenders Trust Deed before distributing the approximately $43 million loan proceeds or closing the subject loan. Specifically:

> 54.    [Colonial Bank's counsel] prepared [the Escrow Contract] to Nevada Title that stated that Nevada Title could close the transaction when it could issue a title policy to [Colonial Bank] showing only certain exceptions and [2005 R&S St. Rose Lenders Trust Deed] was not one of the permitted exceptions.
>
> 55.    Colonial Bank's counsel testified he intended the [Escrow Contract] to mean that [Nevada Title] could not record and close the transaction if it could not issue a title policy subject to allowed exceptions only.
>
> 56.    [Colonial Bank's counsel] further testified that in order for Nevada Title to comply with his escrow instructions, it had to issue a title policy without showing the [2005 R&S St. Rose Lenders] as an exception.
>
> 57.    Although Colonial Bank instructed Nevada Title Company that the title policy could only be subject to certain exceptions, how that was accomplished was left to the discretion of [Nevada Title].
>
> *      *      *
>
> 59.    As long as Colonial Bank was provided with a title policy that did not include the [2005 St. Rose Lenders Trust Deed] as an exception, [Colonial Bank's agent] testified he did not care how it was accomplished.
>
> 60.    [Nevada Title representative] Brenda Burns also agreed Colonial Bank did not specify how Nevada Title was supposed to accomplish or satisfy the requirements.

(*Id.* ¶¶ 54-60.)

45.    Nevada Title failed to remove or subordinate the 2005 R&S St. Rose Lenders Trust Deed prior to closing the 2007 Colonial Bank Trust Deed loan.

46.     On or about July 31, 2007, Nevada Title executed the closing upon the Property. As a result of the closing and the actions of Nevada Title, Commonwealth issued its title policy #562-Z093126 (the "Policy").

47.     The Policy does not except from coverage the 2005 R&S St. Rose Lenders Trust Deed. The Nevada State Court also affirmed this fact. (*Id.* ¶ 62.)

48.     Nevada Title prepared the preliminary report and the Policy and managed the escrow operations without any involvement of Commonwealth.

49.     Nevada Title failed to inform Commonwealth, its principal, of the ultra-hazardous risk and the potential for extraordinary exposure.

50.     Had Commonwealth known the circumstances, it would have refused to issue the Policy without showing the 2005 R&S St. Rose Lenders Trust Deed as excepted from coverage or subordinated by specific written instrument.

51.     Approximately one year following the closing, the Nevada State court found that Nevada Title requested that R&S St. Rose Lenders subordinate its interest, but that R&S St. Rose Lenders refused to do so. (*Id.* ¶¶ 104-17.) This fact demonstrates that Nevada Title knew that it had negligently and in breach of the Agency Agreement closed the 2007 Colonial Bank Trust Deed transaction.

52.     With its fatal omissions having resulted now in litigation between Colonial Bank and R&S St. Rose Lenders, Nevada Title and its agent became critical witnesses in the Nevada State Court Action. To save face, Nevada Title spun its error as best it could. Nevada Title attempted to prove that it had an agreement with the principals of R&S St. Rose Lenders to the effect that they would voluntarily subordinate the 2005 St. Rose Lenders Trust Deed to the 2007 Colonial Bank Trust Deed. However, the Nevada State court ultimately ruled that Nevada Title, and its agent, Brenda Burns, had never reached such an agreement and that no such written agreement existed:

> 73.     Brenda Burns, the Nevada Title escrow officer who closed the loan transaction, never transmitted, communicated or discussed the [Escrow Contract] with [the principals of R&S St. Rose Lenders or R&S or St. Rose Lenders and others].

74.    At no time prior to the closing of [2007 Colonial Bank Trust Deed] did Brenda Burns discuss with [the principles of R&S St. Rose Lenders or R&S St. Rose Lenders] that reconveyance of the [2005 St. Rose Lenders Trust Deed] was a condition to closing of the loan transaction.

*     *     *

78     Brenda Bums testified she could not specifically remember what words either she or [an R&S St. Rose Lenders principal] used to allegedly discuss what was going to happen with the [2005 St. Rose Lenders Trust Deed] prior to closing the [2007 Colonial Bank Trust Deed].

*     *     *

114.    Nevada Title assumed the risk of closing the [2007 Colonial Bank Trust Deed transaction] without a reconveyance with [R&S] St. Rose Lenders.

(*Id.* ¶¶ 73-74; 78; 114.)

53.    Given Nevada Title's conduct, it is no surprise that the Nevada State Court ultimately concluded that the 2005 R&S St. Rose Lender Trust Deed "should retain priority over the 2007 Colonial Bank Deed of Trust."  (Nevada State Court Action, 06/24/10 Conclusions of Law ¶ 29.)

**Commonwealth Has Already Incurred Over a Million Dollars in Fees Because of Nevada Title's Conduct**

54.    Commonwealth accepted Colonial Bank's tender of defense of the Nevada State Court Action pursuant to the Policy.  Commonwealth has already paid attorneys' fees and costs to defend Colonial Bank and BB&T in the Nevada State Court Action, and Commonwealth continues to fund the appeal.  To date, Commonwealth has paid at least $954,315.57 in this regard.

55.    In addition to the Nevada State Court Action, Commonwealth was also required to defend a separate lawsuit related to the 2007 Colonial Bank Trust Deed transaction before this Court, styled *Branch Banking & Trust Company v. Nevada Title Company et al.*, No. 2:10-cv-1970 JCM-RJJ (the "BB&T Policy Action"), which was ultimately dismissed.

56.    Nevada Title is solely responsible for the manner in which the 2007 Colonial Bank Trust Deed transaction occurred.

57.    Commonwealth is entitled to indemnity from Nevada Title for any loss that it may sustain, including all costs, attorneys' fees, and/or judgments which might be rendered against it as

a result of the 2007 Colonial Trust Deed transaction, in that Commonwealth's liability would be based either on its passive or secondary conduct and would arise as a proximate result of the primary and active conduct of Nevada Title as agent for Commonwealth.

58.    To date, Commonwealth has incurred costs, expenses and attorneys' fees of no less than $954,315.57 in the Nevada State Court Action (which expenses continue to accrue as Commonwealth pays for the prosecution of the appeal in that case). Additional costs, expenses, and attorneys' fees that may accrue in relation to the BB&T Policy Action.

59.    Commonwealth may suffer liabilities for the acts or the failures to act of Nevada Title, as aforesaid. Commonwealth prays this Court for leave upon ascertaining additional costs, expenses, and attorneys' fees, and of other such possible liabilities, to amend its complaint to allege the correct amounts, and establish said amounts according to proof.

60.    An actual controversy now exists between Commonwealth and Nevada Title concerning their respective rights and duties. Commonwealth contends that it is entitled to be indemnified by Nevada Title for the full amount of any loss suffered or judgment paid by it and for costs, expenses, attorneys' fees, or other expenses which have been already or will be in the future incurred as a result of Nevada Title's conduct which resulted in Commonwealth's having to defend the Nevada State Court Action and the BB&T Policy Action.

### First Cause of Action

### (Contractual Indemnity)

61.    Commonwealth repeats and re-alleges all of the foregoing claims and incorporates the same by this reference.

62.    Commonwealth and Nevada Title are parties to the Agency Agreement, which is a valid and existing contract.

63.    Commonwealth performed all of its obligations under the Agency Agreement, or was excused from performance of said obligations.

64.    Nevada Title has breached the Agency Agreement, by among other things,

a.    Negligently performing the closing of the 2007 Colonial Bank Trust Deed and causing the Policy to issue.

b.     Failing to investigate the chain of title for the Property in conformance with underwriting guidelines.

c.     Failing to comply with all instructions, manuals, requirements, directives, guidelines, and rules and regulations promulgated, from time to time, by Commonwealth.

d.     Failing to comply with all requirements established by Commonwealth regarding search and examination of title and the clearance of objections or exceptions to title prior to binding Commonwealth under the Policy.

e.     Failing to conduct or participate in the settlement and closing of the 2007 Colonial Bank Trust Deed in accordance with prudent practice, requirements established by Commonwealth, Nevada Title owns guidelines, and/or the escrow instructions of Colonial Bank.

f.     Failing to secure advance express over-limit written approval prior to issuing the Policy binding Commonwealth as required by Commonwealth and potentially causing it to assume an extraordinary risk and undertaking.

g.     Issuing the Policy in a grossly negligent, willful, and/or reckless manner.

h.     Failing to indemnify Commonwealth in accordance with the Agency Agreement's indemnity provisions.

65.     Commonwealth sustained special damages as a result of Nevada Title's breaches in the form of incurring attorneys' fees to defend Colonial Bank and BB&T in the Nevada State Court Action and to defend itself in the BB&T Policy Action. These attorneys' fees constitute an element of damages foreseeable from Nevada Title's breach of the Agency Agreement and are so pleaded pursuant to Rule 9(g) and *Sandy Valley Associates v. Sky Ranch Estate Owners Association*, 35 P.3d 964, 969 (Nev. 2001).

66.     NTIC specifically guarantied Nevada Title's performance pursuant to the First Amendment to the Agency Agreement and is liable to the same extent as Nevada Title.

## **Second Cause of Action**

### **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

67.    Commonwealth repeats and re-alleges all of the foregoing claims and incorporates the same by this reference.

68.    Commonwealth and Nevada Title are parties to the Agency Agreement.

69.    Nevada Title owed a duty of good faith and fair dealing to Commonwealth.

70.    Nevada Title has breached said duty by performing in a manner that was unfaithful to the purpose of the Agency Agreement, by among other things:

a.    Negligently performing the closing of the 2007 Colonial Bank Trust Deed and causing the Policy to issue.

b.    Failing to investigate the chain of title for the Property in conformance with underwriting guidelines.

c.    Failing to comply with all instructions, manuals, requirements, directives, guidelines, and rules and regulations promulgated, from time to time, by Commonwealth.

d.    Failing to comply with all requirements established by Commonwealth regarding search and examination of title and the clearance of objections or exceptions to title prior to binding Commonwealth under the Policy.

e.    Failing to conduct or participate in the settlement and closing of the 2007 Colonial Bank Trust Deed in accordance with prudent practice, requirements established by Commonwealth, Nevada Title owns guidelines, and/or the escrow instructions of Colonial Bank.

f.    Failing to secure advance express over-limit written approval prior to issuing the Policy binding Commonwealth as required by and potentially causing it to assume an extraordinary risk and undertaking.

g.    Issuing the Policy in a grossly negligent, willful, and/or reckless manner.

h.    Failing to indemnify Commonwealth in accordance with the Agency Agreement's indemnity provisions.  Commonwealth's justified expectations were thus denied.

71.     Commonwealth sustained special damages as a result of Nevada Title's breaches in the form of incurring attorneys' fees to defend Colonial Bank and BB&T in the Nevada State Court Action and to defend itself in the BB&T Policy Action.  These attorneys' fees constitute an element of damages foreseeable from Nevada Title's breach of the Agency Agreement and are so pleaded pursuant to Rule 9(g) and *Sandy Valley Associates v. Sky Ranch Estate Owners Association*, 35 P.3d 964, 969 (Nev. 2001).

72.     NTIC specifically guaranteed Nevada Title's performance pursuant to the First Amendment to the Agency Agreement and is liable to the same extent as Nevada Title.

<u>**Third Cause of Action**</u>

**(Implied Contractual Indemnity)**

73.     Commonwealth repeats and re-alleges all of the foregoing claims and incorporates the same by this reference.

74.     Commonwealth avers that all damages alleged herein are covered by the Agency Agreement.  Nevertheless, Commonwealth pleads implied contractual indemnity as an alternative basis of liability.

75.     Commonwealth's right of indemnity implied-in-fact stems from the existence of the Agency Agreement, which is a binding contract between Commonwealth and Nevada Title.

76.     The Agency Agreement necessarily implies a right of indemnity in favor of Commonwealth and the implication is derived from the relationship between the parties and the circumstances of the parties' conduct.

77.     The creation of the indemnitor/indemnitee relationship is derivative of the parties' Agency Agreement.

78.     As a result of Nevada Title's acts and omissions, adverse claims have been raised by Colonial Bank and BB&T in the Nevada State Court Action and in the BB&T Policy Action in an amount yet to be determined.

79.     Commonwealth sustained special damages as a result of Nevada Title's breaches in the form of incurring attorneys' fees to defend Colonial Bank and BB&T in the Nevada State Court Action and to defend itself in the BB&T Policy Action.  These attorneys' fees constitute an

element of damages foreseeable from Nevada Title's breach of the Agency Agreement and are so pleaded pursuant to Rule 9(g) and *Sandy Valley Associates v. Sky Ranch Estate Owners Association*, 35 P.3d 964, 969 (Nev. 2001).

80.     NTIC specifically guaranteed Nevada Title's performance pursuant to the First Amendment to the Agency Agreement and is liable to the same extent as Nevada Title.

## **Fourth Cause of Action**

### **(Negligence)**

81.     Commonwealth repeats and re-alleges all of the foregoing claims and incorporates the same by this reference.

82.     Under the law, Nevada Title owes a non-delegable duty independent from the Agency Agreement to Commonwealth to among other things, use proper care and skill when issuing title policies as Commonwealth's agent.

83.     Nevada Title breached this duty by, among other things, failing to make a full disclosure of all matters concerning the risks and hazards of a prospective insurable interest, failing to issue the Policy in conformity with usual and customary practices and procedures and prudent underwriting principles, and issuing the Policy without exception to or with affirmative coverage of a specific and known lien, *i.e.*, the 2005 R&S St. Rose Lenders Trust Deed.

84.     Nevada Title's breaches are the proximate and legal cause of the damages that Commonwealth has sustained and may yet sustain.

85.     Commonwealth is informed and believes and thereupon alleges that the conduct of Nevada Title was and is oppressive, malicious, or fraudulent and was carried out in bad faith and with conscious disregard for the rights and well being of Commonwealth, thereby warranting the assessment of exemplary and punitive damages against Nevada Title.

86.     NTIC specifically guaranteed Nevada Title's performance pursuant to the First Amendment to the Agency Agreement and is liable to the same extent as Nevada Title.

## Fifth Cause of Action

### (Breach of Fiduciary Duty)

87.     Commonwealth repeats and re-alleges all of the foregoing claims and incorporates the same by this reference.

88.     Nevada Title owed Commonwealth a fiduciary duty.

89.     Nevada Title breached that duty by its acts and omissions described in this complaint, including without limitation:

a.      Failing to make a full disclosure of all matters concerning the risks and hazards of a prospective insurable interest;

b.      Failing to issue the Policy in conformity with usual and customary practices and procedures and prudent underwriting principles;

c.      Issuing the Policy without exception to or with affirmative coverage of a specific and known lien, *i.e.*, the 2005 R&S St. Rose Lenders Trust Deed;

d.      Failing to timely notify Commonwealth of the priority dispute between Colonial Bank and R&S St. Rose Lenders until the time the Nevada State Court Action began notwithstanding Nevada Title had knowledge of the dispute well before this time; and

e.      Failing to cooperate in the defense of the Nevada State Court Action.

90.     Commonwealth sustained damages as a proximate cause of the breach.

91.     Commonwealth is informed and believes and thereupon alleges that the conduct of Nevada Title was and is oppressive, malicious, and/or fraudulent and was carried out in bad faith and with conscious disregard for the rights and well being of Commonwealth, thereby warranting the assessment of exemplary and punitive damages against Nevada Title.

92.     NTIC specifically guaranteed Nevada Title's performance pursuant to the First Amendment to the Agency Agreement and is liable to the same extent as Nevada Title.

WHEREFORE, Commonwealth Land Title Insurance Company demands judgment in its favor and against Nevada Title Company and NTIC as follows:

1.      That Commonwealth have judgment against Nevada Title and NTIC for any sum which may be recovered against Commonwealth in the BB&T Policy Action and its costs and reasonable attorneys' fees.

2.      That Commonwealth have judgment against Nevada Title and NTIC for all sums incurred defending Colonial Bank and BB&T in the Nevada State Court Action, including the $954,315.57 incurred to date.

3.      That Commonwealth have judgment against Nevada Title and NTIC for all sums incurred defending itself in the BB&T Policy Action.

4.      That as to all causes of action Commonwealth have judgment for general damages according to proof; special damages according to proof; punitive and exemplary damages according to proof; pre-judgment interest according to proof; costs of suit incurred herein; and for such other and further relief as the Court may deem proper.

DATED this 15th day of March, 2013.

LEWIS AND ROCA LLP

By _____
    DAN R. WAITE, ESQ. (SBN 4078)
    JOHN E. BRAGONJE, ESQ. (SBN 9519)
    ADAM P. LAXALT, ESQ. (SBN 12426)

*Attorneys for Plaintiff/Counter-Defendant*

1

2                              **CERTIFICATE OF SERVICE**

3            Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that I am an employee of

4    LEWIS AND ROCA LLP and that on this day I caused the document entitled **SECOND AMENDED**

5    **COMPLAINT** to be served as follows:

| ATTORNEYS OF RECORD | PARTIES REPRESENTED | METHOD OF SERVICE |
|---|---|---|
| Sheri M. Thome, Esq.<br>David S. Kahn, Esq.<br>WILSON, ELSER, MOSKOWITZ,<br>     EDELMAN & DICKER LLP<br>300 South Fourth Street, 11th Floor<br>Las Vegas, NV 89101<br>(702) 727-1400<br>sheri.thome@wilsonelser.com<br>david.kahn@wilsonelser.com<br>         and<br>John M. Sacco, Esq.<br>Terry A. Moore, Esq.<br>MARQUIS AURBACH COFFING<br>10001 Park Run Drive<br>Las Vegas, NV 89145<br>(702) 382-0711<br>jsacco@maclaw.com<br>tmoore@maclaw.com | *Counsel for Defendant/Counterclaimant, Nevada Title Company* | □  Personal Service<br>X  Email / E-File<br>□  Facsimile<br>□  Mail<br><br><br>□  Personal Service<br>X  Email / E-File<br>□  Facsimile<br>□  Mail |

17           DATED this 15th day of March, 2012.

18

19

20                                     _/s/ Mary Kay Carlton_____
                                       An employee of LEWIS AND ROCA, LLP

21

22

23

24

25

26

27

28

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

613728.1

# EXHIBIT "4"

# EXHIBIT "4"



**ace usa**

ACE USA
Professional Risk
140 Broadway, 40th Floor
New York, NY 10005

646-458-6915 *tel*
866-635-5687 *fax*

Nathon.Gurto@acegroup.com
www.ace-ina.com

**Nathon Gurto**
*Claims Specialist*

December 21, 2010

Robbie Graham
NTC Global Holdings Group
2500 N Buffalo Dr.
Ste 150
Las Vegas, NV 88128

RE:    **Named Insured:**    **NTC Global Holdings Group**
            **Claimant:**            **Branch Banking**
            **Policy No.:**          **EON G23638344 002**
            **Claim No.:**          **JY10J0591459**

Dear Mrs. Graham:

ACE USA, on behalf of Ace American Insurance Company (the "Company"), acknowledges receipt of the correspondence placing us on notice of this Claim.

The Company's obligations to defend and indemnify are limited to the terms of the policy and endorsements. The purpose of this letter is to advise you of certain policy provisions that may apply or may limit coverage in light of the allegations being made.

## Background Circumstances

You have been named in a Complaint filed in the United States District Court for the District of Nevada by Branch Banking and Trust Company (Plaintiff).

According to information received to date, Branch Banking asserts itself as the successor in interest for Colonial Bank and presents causes of action alleging breach of contract, breach of implied covenant and good faith and fair dealing, detrimental reliance, and negligence.

On August 26, 2005, Colonial Bank loaned R&S St Rose LLC, $29M to acquire real property. Shortly thereafter, R&S secured an additional $12M loan from its subsidiary lender, R&S Lending, which was placed in second deed of trust behind the Colonial loan. In 2007, R&S sought to refinance their Colonial loan for $44M. Colonial Bank hired Nevada Title to act as the title and escrow agent, providing instruction that Nevada Title is not to release the $44M unless the refinanced loan is guaranteed the first position deed of trust ahead of the subsidiary loan. Nevada Title released the escrow money on July 31, 2007 under the belief that R&S would see to the reconveyance. Nevada Title assigned Commonwealth Title to issue the title insurance policy.

In July 2008, Colonial Bank became aware that R&S did not provide a release or obtain a reconveyance moving the refinanced loan into the first position deed of trust and notified Nevada Title. Nevada Title tried to obtain a release from the borrowers with no success.



**ace usa**

On April 20, 2009, Colonial Bank filed a notice of default and R&S entered automatic bankruptcy. Colonial Bank filed a claim with Commonwealth title (at the instruction of Nevada Title) for the $12M R&S title encumbrance. Commonwealth ultimately issued a denial after the courts affirmed the Colonial loan is in the second position behind the subsidiary R&S loan.

On October 21, 2010, Branch Banking issued a demand letter to Nevada Title (tendered to ACE on 11/30/2010) and filed a Complaint on November 10, 2010 (tendered to ACE on December 7, 2010).

## Policy Coverage

The Miscellaneous Professional Liability Insurance policy issued to NTC Global Holding Group is a claims made and reported Policy, with a Policy Period of October 7, 2010 to October 7, 2011. The Retroactive date is January 25, 1993. The Policy provides Limits of Liability of $10,000,000 Each Claim and a $10,000,000 Policy Period Aggregate and a retention in the amount of $250,000 Each Claim (inclusive of Claims Expenses).

ACE USA, on behalf of the Company, has not made any determinations as to the validity of the Claimant's allegations, nor do we assert that any liability exists. With respect to the above allegations, we note the following Policy provisions:

### Insuring Agreement

A.    The **Company** will pay on behalf of the **Insured** all sums in excess of the Retention that the **Insured** shall become legally obligated to pay as **Damages** and **Claims Expenses** because of a **Claim** first made against the **Insured** and reported to the **Company** during the **Policy Period** by reason of a **Wrongful Act** committed on or subsequent to the **Retroactive Date** and before the end of the **Policy Period**.

### Definitions

C.    **Claim** means:
    1.    a written demand against any **Insured** for monetary or non-monetary damages;
    2.    a civil proceeding against any **Insured** for monetary damages, non-monetary damages or injunctive relief, commenced by the service of a complaint or similar pleading;
    3.    an arbitration proceeding against any **Insured** for monetary damages, non-monetary damages or injunctive relief;
    4.    a civil, administrative or regulatory investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document;
    5.    a **Disciplinary Proceeding**;
Including any appeal therefrom.
    6.    a written request to toll or waive a statute of limitations relating to a potential **Claim** described in paragraphs 1 through 3 directly above. (added by Endorsement 15)



**ace usa**

F.      **Damages** means any compensatory amount which the **Insured** becomes legally obligated to pay on account of a covered **Claim**, including judgments, any award of prejudgment and post-judgment interest on that part of any judgment paid under this **Policy**, awards and settlements. **Damages** shall not include:

1.      any amount for which the **Insured** is not financially liable or legally obligated to pay;
2.      taxes, fines or penalties;
3.      matters uninsurable under the law pursuant to which this **Policy** is construed;
4.      disgorgement of profits by an **Insured**; cost of an **Insured's** correction; fees, commissions, expense or costs paid to or charged by an **Insured**;
5.      the cost to comply with any injunctive or other non-monetary or declaratory relief, including specific performance, or any agreement to provide such relief; or
6.      any amount relating to a **Disciplinary Proceeding**, other than **Claims Expenses**.

**Damages** includes punitive and exemplary damages and the multiplied portion of any multiple damage award to the extent such damages are insurable under the internal laws of the applicable jurisdiction that most favors coverage for such damages. (added by Endorsement 13)

I.      **Insured** means:

1.      the **Named Insured**;
2.      any **Subsidiary**, but only with respect to **Wrongful Acts** which occur while it is a **Subsidiary**;
3.      any past or present principal, partner, officer, director, trustee or employee of the **Named Insured** or **Subsidiary** thereof (and if the **Named Insured** is a partnership, limited liability partnership or limited liability company, then any general or managing partner or principal thereof), but only with respect to **Professional Services** performed on behalf of the **Named Insured** or any **Subsidiary**;
4.      the estate, heirs, executors, administrators or legal representatives of any **Insured** described in paragraph 3 above in the event of such **Insured's** death, incapacity, insolvency, or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this **Policy**; and
5.      independent contractors who are natural persons, but only with respect to **Professional Services** performed on behalf of the **Named Insured** or **Subsidiary** thereof.

Insured shall also include Nevada Title Company (as added by Endorsement 5)

The Company reserves its right to deny or limit coverage to the extent the claim was not made in the current Policy Period and for any Damages awarded per the above stated definition.

## Exclusions

The **Company** shall not be liable for **Damages** or **Claims Expenses** on account of any **Claim**:

A.      alleging, based upon, arising out of, or attributable to any dishonest, fraudulent, criminal or malicious act or omission, or any intentional or knowing violation of the law by an



**ace usa**

**Insured,** however, this exclusion shall not apply to **Claims Expenses** or the **Company's** duty to defend any such **Claim** unless and until there is an adverse admission by, finding of fact, or final adjudication against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Company** for all **Claims Expenses** incurred;

This exclusion shall apply to any **Insured** who had knowledge of or participated in the aforementioned conduct. For purposes of this exclusion only, the knowledge of the **Named Insured's** Chief Executive Officer, Chief Financial Officer, President, General Counsel, and Risk Manager (or the functional equivalent of such positions for the **Named Insured**) shall be imputed to all **Insureds**. The knowledge of any other **Insured**, other than the aforementioned officers or employees, shall not be imputed to another **Insured**. (added by Endorsement 11)

C.      alleging, based upon, arising out of, or attributable to any liability of others assumed by the **Insured** under any express, implied, actual or constructive contract or agreement, unless such liability would have attached to the **Insured** even in the absence of such contract or agreement;

J.      alleging, based upon, arising out of, or attributable to the gaining in fact of any profit or advantage to which the **Insured** is not legally entitled;

This exclusion shall apply to any **Insured** who had knowledge of or participated in the aforementioned conduct. For purposes of this exclusion only, the knowledge of the **Named Insured's** Chief Executive Officer, Chief Financial Officer, President, General Counsel, and Risk Manager (or the functional equivalent of such positions for the **Named Insured**) shall be imputed to all **Insureds**. The knowledge of any other **Insured**, other than the aforementioned officers or employees, shall not be imputed to another **Insured**. (added by Endorsement 11)

K.      alleging, based upon, arising out of, or attributable to any **Wrongful Act** committed prior to the beginning of the **Policy Period**, if, on or before the earlier of the effective date of this **Policy** or the effective date of any **Policy** issued by the **Company** to which this **Policy** is a continuous renewal or replacement, the **Insured** knew or reasonably could have foreseen that such **Wrongful Act** would result in a **Claim**;

As added by Endorsement 1
- alleging, based upon, arising out of, or attributable to any defect in title not disclosed of public record or of which (defect in title) any **Insured** had actual or constructive knowledge at the date of issuance of insurance of such title;

In the event it is determined this claim falls within the parameters identified in any of the exclusions cited above, coverage may be barred or limited.

**Conditions**

**Other Insurance**



**ace usa**

If any **Damages** or **Claims Expenses** covered under this **Policy** are covered under any other valid and collectible insurance, then this **Policy** shall cover such **Damages** or **Claims Expenses**, subject to its terms and conditions, only to the extent that the amount of such **Damages** or **Claims Expenses** are in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**.

### Representations

1. The **Insureds** represent and acknowledge that the statements and information contained in the **Application** are true and accurate and:
   a. are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**; and
   b. shall be deemed material to the acceptance of this risk or the hazard assumed by the **Company** under this **Policy**.

   It is understood and agreed that this **Policy** is issued in reliance upon the truth and accuracy of such representations.

2. It is understood and agreed that if such representations or information are not true, accurate and complete, and if:

   a. the representations or information is fraudulent;

   b. the representations or information is material either to the acceptance of the risk or to the hazard assumed by the **Company**; or

   c. the **Company**, had it known the true facts as required by the **Application** for the **Policy** or otherwise, in good faith would:

      1) not have issued the **Policy**;

      2) not have issued it at the same premium rate;

      3) not have issued the **Policy** in as large limit of liability; or

      4) not have provided coverage with respect to the hazard resulting in the **Loss**;

   then this **Policy** shall be void ab initio.  (as amended by Endorsement 6)

## Defense

We have assigned Sheri Thome of Wilson Elser Moskowitz Edelman & Dicker LLP to defend you in this matter.

Sheri Thome
Attorney at Law



**ace usa**

Wilson Elser Moskowitz Edelman & Dicker LLP
300 South 4th Street - 11th Floor
Las Vegas, NV 89101-6014
702-727-1370 (Direct)
702-727-1400 (Main)
702-727-1401 (Fax)
sheri.thome@wilsonelser.com

## Conclusion

At this time, the Company is continuing its coverage investigation, including, but not limited to when the Insured first became aware of this matter and first recognized there was a reasonable chance this matter could develop into a claim. We request copies of all correspondence, documentation, pleadings, and emails exchanged between Nevada Title and Colonial Bank (Branch Banking), R&S, or Commonwealth, from 2008 to the present. Once received, we will complete our coverage evaluation.

The Company reserves the right to deny coverage based upon grounds other than those expressly set forth in this letter and to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all the provisions, terms, conditions, exclusions, endorsements and definitions found in the Policy and additional facts that may come to the Company's attention. By the same token, the Company will take into consideration any additional information that you provide. Nothing stated herein and no further action taken by the Company or on its behalf should be construed as a waiver of any of its rights under the Policy. On the contrary, by providing this or any prior correspondence to the Insured, engaging in any prior or future discussions with the Insured, or paying or agreeing to pay any amount on or behalf of the Insured, the Company does not waive any rights that it has under the Policy.

If you have any questions or concerns, please do not hesitate to contact me directly at (646) 458-6915.

Sincerely,

Nathon Gurto
Claims Specialist
ACE USA

cc:     Cynthia Salsbury
        Willis North America, Inc.
        11201 N. Tatum Blvd.
        Suite 310
        Pheonix, AZ 85028

# EXHIBIT "5"

# EXHIBIT "5"

gregory w. brown
919.719.0854
gregory@brownlawllp.com

June 10, 2011

**via certified mail receipt requested.**

Terry A. Moore
Marquis Aruboch Coffing
10001 Park Run Drive
Las Vegas, Nevada 89145

RECEIVED

JUN 1 3 2011

MARQUIS & AURBACH

re:    **continuing reservation of rights.**

|  |  |
|---|---|
| **insurer:** | **ACE American Insurance Company ("ACE")** |
| **insured:** | **NTC Global Holding Group ("NTC")** |
| **lawsuits:** | *Branch Banking and Trust Company, a North Carolina corporation v. Nevada Title Company, a Nevada corporation, and Commonwealth Land Title Insurance Company, a Pennsylvania corporation,* **United States District Court District of Nevada, Case Number 2:10-cv-01970-JCM RJJ (the "BB&T Lawsuit") and** |
| | *Commonwealth Land Title Insurance Company, a Nebraska corporation v. Nevada Title Company, a Nevada corporation; Does I through X, inclusive,* **United States District Court District of Nevada, Case Number 2:11-cv-00380-KJD-GWF (the "Commonwealth Lawsuit")** |
| **claim #:** | **JY10J0591459** |
| **policy #:** | **EON G23638344 002 (the "Policy")** |
| **policy period:** | **October 7, 2010 through October 7, 2011** |

Dear Mr. Moore:

We write to alert you of certain issues that may affect coverage for this claim. Specifically, coverage for this matter appears to be very limited and may be wholly precluded by the Policy's terms. As a result, we must apprise you of the various Policy provisions that are applicable to the coverage and defense of both the *BB&T* and *Commonwealth* Lawsuits against Nevada Title.

As an initial matter, please understand that nothing about this letter is meant to support or validate the claims or allegations made against Nevada Title in the above-entitled actions. Neither ACE nor we assert that liability exists as a result of those claims. Additionally, nothing about this letter is intended or should be read to modify, limit, or waive any prior coverage position taken by ACE. To be sure, ACE continues to reserve its rights to the maximum extent permitted by the Policy and applicable law.

Presently, we understand that Branch Banking and Trust Company ("BB&T") and Commonwealth Land Title Insurance Company ("Commonwealth") have interposed causes of action against your client, Nevada Title Company ("Nevada Title") in connection with the failure to obtain a release or reconveyance of a $12,000,000 first/senior/priority deed of trust in the closing of a $43,980,000 real estate loan for a residential real estate development near Las Vegas, Nevada (the "Las Vegas Property"). As discussed below, both of these actions constitute <u>one claim</u> under the Policy (the "Claim"). We are unaware of any other claims that have been lodged against Nevada Title. If you or your client are aware of any claims or causes of action relating to the Las Vegas Property please alert us immediately.

Route to: _AM_
File No.: _10799-1_
Amicus: _____
Calendared by: _____



4130 parklake avenue, suite 130, raleigh, north carolina 27612   tel 919.719.0854   fax 919.719.0858   brownlawllp.com

**materials reviewed.**

In our analysis of these issues, we have reviewed all of the documents received by Defense Counsel Sheri Thome, including all correspondence, documents, and material provided regarding the underlying state action.  Although we reviewed the entire file provided by Ms. Thome, we note the following documents were particularly relevant to our analysis:

| | | |
|---|---|---|
| 1. | 8/25/05 | Nevada Title Buyer/Borrower Statement |
| 2. | 6/20/07 | Email chain between Marty Singer and Brenda Burns regarding R&S St. Rose |
| 3. | 7/27/07 | Letter from Stephen Novacek to Nevada Title regarding Lender Instructions |
| 4. | 7/31/07 | Nevada Title Borrower Statement Final |
| 5. | 7/31/07 | Colonial Bank Loan Policy of Title Insurance issued by Commonwealth Land Title Insurance Company |
| 6. | 5/20/08 – 9/18/08 | Various email chains between Brenda Burns, Michele Eaton, Terry Rube and Darla Millis |
| 7. | 7/9/08 – 7/29/08 | Several emails from Brenda Burns to Teresa Cargill regarding St. Rose (R&S St. Rose Lenders Reconveyance - 07-02-0978-BB) |
| 8. | 7/9/08 – 7/28/08 | Email form Brenda Burns to Teresa Cargill regarding R&S St. Rose Lenders Reconveyance - 07-02-0978-BB |
| 9. | 9/5/08 – 3/7/09 | Various email chains between Brenda Burns, Michele Eaton, Terry Rube and Darla Millis |
| 10. | 9/5/08 – 3/7/09 | Email from Brenda Burns to Saiid Rad forwarding the Grant, Bargain, and Sale Deed |
| 11. | 9/8/08 | Email from Brenda Burns to investrs@aol.com (Phillip Nourafchan) forwarding the Grant, Bargain, and Sale Deed |
| 12. | 9/25/08 – 5/20/08 | Various email chains between Brenda Burns, Elliot Nassib, Terry Rube, Addie Pearson |
| 13. | 2/4/09 | Notice of Lis Pendens |
| 14. | 2/29/09 | Amended Notice of Lis Pendens |
| 15. | 6/3/09 | Letter from Nevada Title to RPN, LLC and Forouzan, Inc. regarding their refusal to honor to their commitment regarding the reconveyance |
| 16. | 6/9/09 | Email from Stephen Novacek to Robbie Graham regarding R&S St. Rose with Note Guarantee attached |
| 17. | 6/10/09 | Letter from Richard F. Holley to Robbie Graham regarding the Reconveyance of Deed of Trust in Favor of R&S notifying Nevada Title that RPN and Forouzan, Inc. deny to execute the same |
| 18. | 6/11/09 | Email from Stephen Novacek to Robbie Graham - Acknowledgment of Claim Notice |
| 19. | 6/11/09 | Statement of Brenda Burns |
| 20. | 6/11/09 | Email chain between Troy Lochhead and Brenda Burns regarding R&S's denial of executing a reconveyance |
| 21. | 6/15/09 | Letter from Robbie Graham to Doug Gerrard forwarding copies of the Title and Escrow File |
| 22. | 6/17/09 | Email chain between Troy Lochhead and Brenda Burns - R&S St. Rose |
| 23. | 6/24/09 | Letter from Robbie Graham to Doug Gerrard forwarding an updated preliminary title report and letter |
| 24. | 6/24/09 | Letter from Stephen Novacek to Commonwealth regarding a Notice of Claim (Robbie Graham copied) |
| 25. | 6/26/09 | Email from Brenda Burns to Robbie Graham regarding a notice of default on the property |

| 26. | 7/6/09 | Email cover letter forwarding the Colonial Bank Complaint and Notice of Lis Pendens to Robbie Graham |
| 27. | 7/23/09 | Letter from Stephen Novacek to Constance Presher at Fidelity National Title Group regarding the Notice of Default and Election to Sell Under Deed of Trust |
| 28. | 7/23/09 – 7/29/09 | Email chain between Gay Groves, Constance Presher and Doug Gerrard - R&S St Rose (Robbie Graham copied) |
| 29. | 7/28/09 | Notice of Taking Deposition of Person(s) Most Knowledgeable of Nevada Title Company |
| 30. | 7/29/09 | Declaration of David J. Merrill In Support of Application for Order of Shortening Time |
| 31. | 7/30/09 | R&S St. Rose Lenders Application of Temporary Restraining Order (TRO) on Shortened Time, and Motion for Preliminary Injunction |
| 32. | 8/5/09 | Colonial Bank's Opposition to R&S St. Rose's Application for TRO on Shortened Time and Motion for Preliminary Injunction |
| 33. | 8/12/09 | Emails between Brenda Burns and Troy Lochhead regarding the Declaration of Phillip Forouzan and Saiid Rad |
| 34. | 8/12/09 | Various emails from Brenda Burns regarding the Declaration of Saiid Rad |
| 35. | 8/14/09 | Email chain between Brenda Burns and Aaron Shumway regarding Brenda Burns' Declaration |
| 36. | 8/26/09 | Plaintiffs' Friend of the Court Brief Regarding TRO and Preliminary Injunction Motions |
| 37. | 9/1/09 | R&S St. Rose's Reply in Support of Application of Temporary Restraining Order (TRO) on Shortened Time, and Motion for Preliminary Injunction |
| 38. | 9/21/09 | Transcript of Brenda Burns Deposition |
| 39. | 9/22/09 | Brenda Burns Conversation Log |
| 40. | 9/22/09 | Email from Brenda Burns to Doug Gerrard regarding entries in her phone log |
| 41. | 10/1/09 | Amended Complaint |
| 42. | 10/5/09 | Letter from Robert Murdock to Brenda Burns - Murdock and Keach v. Rad, et al. and Ms. Burns failure to provide documents at her deposition |
| 43. | 11/5/09 | Colonial Bank's Pretrial Disclosures |
| 44. | 11/5/09 | R&S St. Rose's List of witnesses and exhibits |
| 45. | 11/10/09 | Letter from Michael Mohn to David Merrill - Ms. Burns Testimony |
| 46. | 11/12/09 | Plaintiffs' Motion to Vacate or in the Alternative Continue "Trial on the Merits" on Order Shortening Time |
| 47. | 11/19/09 | Plaintiffs' Notice of Questions of Fact and Request for Sua Sponte Addition of Nevada Title as a Party Pursuant to MRCP 19(a), MRCP 17(a), and NRCS 30.130 |
| 48. | 11/20/09 | BB&T's Response to Plaintiffs; Notice of Questions of Fact and Request for Sua Sponte Addition of Nevada Title as a Party |
| 49. | 11/25/09 | Colonial Bank's Motion for Preliminary Injunction on Order Shortening Time |
| 50. | 12/1/09 | Brief regarding Whether the Negligence of Actions of an Escrow Agent can be Imputed to a Lender as a Defense to and Replacement/Equitable Subrogation Case |
| 51. | 12/3/09 | BB&T's Second Supplemental Pretrial Disclosures |
| 52. | 12/8/09 | Plaintiffs' Reply Brief regarding Whether the Negligence of Actions of an Escrow Agent can be Imputed to a Lender as a Defense to and Replacement/Equitable Subrogation Case |
| 53. | 12/8/09 | Defendants R&S St. Rose's Response to BB&T's Brief regarding Whether the Negligence of Actions of an Escrow Agent can be Imputed to a Lender as a Defense to and Replacement/Equitable Subrogation Case |
| 54. | 12/14/09 | Reply to Response re: BB&T's Brief re: Whether the Negligence of Actions of an Escrow Agent can be Imputed to a Lender as a Defense to and Replacement/Equitable Subrogation Case |

| 55. | 1/8/10 | Transcript of Proceedings – Evidentiary Proceedings Day 1 (Robert Murdock v. Saiid Rad et al.) |
| 56. | 1/12/10 | Transcript of Proceedings – Evidentiary Proceedings Day 3 (Robert Murdock v. Saiid Rad et al.) |
| 57. | 1/15/10 | Transcript of Proceedings – Evidentiary Proceedings Day 4 (Robert Murdock v. Saiid Rad et al.) |
| 58. | 3/30/10 | Transcript of Proceedings – Portion of Evidentiary Proceedings Day 6 (Robert Murdock v. Saiid Rad et al.) |
| 59. | 4/16/10 | BB&T's Trial Brief |
| 60. | 6/23/10 | Findings of Fact and Conclusions of Law |
| 61. | 7/8/10 | BB&T's Motion for New Trial, or in the Alternative, Motion to Alter or Amend Judgment |
| 62. | 10/21/10 | Letter from J. Stephen Peekto Nevada Title - Breach of Escrow Instructions (Demand Letter) |
| 63. | 10/25/10 – 10/28/10 | Email chain between Brenda Burns, Mary Drury, and Robbie Graham re: I Just received this claim/demand |
| 64. | Various | All pleadings, motions, and materials in the *BB&T* Lawsuit and *Commonwealth* Lawsuit |

As noted above, our review was limited to the documents provided by Ms. Thome. Importantly, Nevada Title has repeatedly been asked to provide copies of all correspondence, documentation, pleadings, and emails exchanged between Nevada Title and Colonial Bank ("BB&T"), R&S, or Commonwealth, from 2008 to present. First, on behalf of ACE, Claims Specialist Nathon Gurto requested that information on December 21, 2010. After receiving no documentation from Nevada Title, we reiterated that request on April 7, 2011. It is our understanding that Ms. Thome's defense file represents the universe of documents possessed by Nevada Title in connection with this Claim. If we are mistaken, please let us know and forward all applicable documents as soon as possible. We would also like to remind you that this request is continuing in nature and we expect your cooperation in providing any additional documentation that is received or located.

To that end, should you feel that additional materials or information would be relevant to our analysis, we invite you to supply them to us. Please note, however, that our willingness to review additional materials or consider additional arguments should not be considered as a waiver, modification, or amendment of ACE's rights under the Policy or a revision of ACE's coverage position. Indeed, by providing this or any correspondence or engaging in any discussions, ACE does not waive any rights that it has under the Policy.

### relevant factual background.

#### overview of the nature of the underlying dispute.

This Claim arises out of Nevada Title's alleged failure to subordinate or remove a pre-existing Deed of Trust prior to closing an approximately $43 million dollar loan as called for in the escrow instructions issued by the lender. As a result of this single act, two separate underlying lawsuits ensued – both of which relate to priority issues arising from Nevada Title's alleged failures. The two underlying lawsuits were consolidated and resolved in a bench trial in 2010, where the judge ultimately ruled that the reconveyance was never obtained by Nevada Title and the $43 million dollar loan did not have priority. After the resolution of the underlying lawsuit the pending litigation that gave rise to Nevada Title's request for coverage ensued.

#### summary of facts pertaining to this coverage analysis.

On July 31, 2007, Nevada Title released $43,980,000 in loan proceeds from Colonial Bank, N.A. ("Colonial Bank") without obtaining a first position priority for that loan's deed of trust, as required by Colonial Bank's written escrow instructions. In the summer of 2008, Nevada Title became actually aware that

the required release and reconveyance had not been obtained and would not be obtained. As early as November 3, 2008, litigation ensued regarding the failed real estate deal and specifically the issue of priority of deeds of trust, which necessarily revolved around Nevada Title's acts and omissions.

On June 3, 2009, Nevada Title corresponded with the holders of the notes in an attempt to obtain the release and reconveyance, threatening legal action. On June 10, 2009, the note holders responded, through legal counsel, denying that they had ever agreed to provide the release or reconveyance of the now-senior $12,000,000 deed of trust. On June 11, 2009, Colonial Bank/BB&T tendered notice of a claim to Commonwealth under the title policy issued by Nevada Title. The notice was transmitted to and received by Nevada Title. It is difficult to conceive how a title claim could arise or be made by Colonial Bank/BB&T under these circumstances without an actionable error or omission on the part of Nevada Title. Not surprisingly, on the same day, Senior Vice President Troy Lochhead informed Brenda Burns, the Escrow Officer who handled the transaction, that Nevada Title President Robbie D. Graham had "heard from their [the borrowers'] Lawyer," and instructed Ms. Burns to "chronicle any conversations you had with them [the borrowers]." Several days later, Ms. Burns advised her colleagues that "we may have some litigation" regarding the Colonial Bank/BB&T loan.

On September 21, 2009, Ms. Burns was deposed regarding her acts and omissions in the funding of the Colonial Bank/BB&T loan without obtaining the necessary release or reconveyance. On or before November 10, 2009, or perhaps even earlier, Nevada Title and Ms. Burns obtained counsel. During the pending state court actions, which were consolidated, at least one of the parties attempted to add Nevada Title as a party to the litigation. Although we are still investigating the circumstances regarding this attempt, the pleadings undoubtedly demonstrate that the question of Nevada Title's negligence and its impact on the outcome of the state court action was raised by the parties and was squarely before the court during the pre-trial proceedings.

In the Spring of 2010, Ms. Burns testified in the underlying bench trial of the consolidated state court matters. Ms. Burns' testified about her role in the loan closing, Nevada Title's duties as an escrow agent, and Nevada Title's release of the loan proceeds without the deed of trust being confirmed and recorded in the first priority position as required by the escrow instructions. On June 18, 2010, the District Court for Clark County, Nevada ruled against Colonial Bank/BB&T, holding that the $12,000,000 deed of trust retained priority over the Colonial Bank/BB&T deed of trust.

On June 22, 2010, four days after the ruling, Liz Vanderberg, NTC Global Holding Group's Chief Financial Officer, executed the ACE Advantage Miscellaneous Professional Liability Renewal Application. In response to question number 12, "Do any principles, directors, officers, partners, professional employees or independent contractors of the Applicant have knowledge or information of any act or omission that might reasonably be expected to give rise to a claim that has not been reported during the past year?" Ms. Vanderberg checked "No." Based upon the Insured's representations and warranties in the Application, ACE bound coverage under the Policy beginning at 12:01AM on October 7, 2010 and ending at 12:01AM on October 7, 2011.

**<ins>claim.</ins>**

Two weeks after the Policy incepted, on October 21, 2010, BB&T, as the successor in interest to Colonial Bank, formally demanded, in writing through counsel, that Nevada Title either obtain the reconveyance of the senior deed of trust or purchase BB&T's $43,980,000 promissory note and deed of trust. On November 10, 2010, BB&T initiated the *BB&T Lawsuit*. Nevada Title tendered the *BB&T* demand letter to ACE on November 30, 2010 and tendered the *BB&T Lawsuit* to ACE for coverage on December 7, 2010.

On December 21, 2010, pursuant to a reservation of rights, ACE acknowledged receipt of the *BB&T* Lawsuit and extended a defense, assigning Sheri Thome of the Las Vegas office of Wilson Elser, Moskowitz, Edelman & Dicker to defend Nevada Title. On March 10, 2011, Commonwealth initiated the *Commonwealth* Lawsuit and ACE continued to extend a defense for this action under the same reservation of rights, as both Lawsuits constitute one Claim under the Policy.

**procedural history.**

BB&T filed a Complaint against Nevada Title and Commonwealth on November 10, 2010 alleging Breach of Contact (Escrow Instructions), Breach of Contract (Title Policy), Breach of the Implied Covenant of Good Faith and Fair Dealing (Escrow Instructions), Bad Faith Denial of Insurance Claim, Detrimental Reliance (Escrow Instructions), Declaratory Relief (Escrow Instructions), and Negligence. On December 6, 2010, Nevada Title filed a Motion to Dismiss or in the Alternative to Stay Action and Commonwealth filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction on December 17, 2010. Both motions revolve around the same central issue: since the appeal in the underlying lawsuit is pending, and therefore it is uncertain what rights, if any, BB&T has regarding the $43 million dollar loan at issue, both Nevada Title's and Commonwealth's liability, if any, is totally uncertain at this point and therefore the action is fatally unripe. Both Motions were granted on April 13, 2011, and BB&T's Complaint was dismissed without prejudice.

On March 10, 2011, Commonwealth filed a separate action against Nevada Title alleging Contractual Indemnity, Breach of Implied Covenant of Good Faith and Fair Dealing, Implied Contractual Indemnity, and Declaratory Relief. Nevada Title accepted service of the Commonwealth Complaint on April 8, 2011.

<u>**coverage analysis.**</u>

There are a number of policy provisions and defenses that arise by operation of law that may serve to limit or preclude coverage for this Claim. We reiterate that this is not meant to be an exhaustive analysis or treatise of all applicable provisions. To be sure, ACE is not waiving the right to assert the applicability of any policy provisions simply by not including it in this letter as a defense.

**the policy.**

Based, and in reliance upon the representations made by NTC in the Commercial Insurance Application, ACE bound coverage on October 7, 2010. This Miscellaneous Professional Liability Policy is a "claims made and reported policy" with a $10,000,000 limit of liability for each claim and a $10,000,000 aggregate limit.

The Policy was a renewal to Policy No. G23638344 001 ("Policy 001"), which had a policy period of October 7, 2009 through October 7, 2010. Importantly, Nevada Title did not have a policy with ACE immediately preceding the 2009-2010 policy but rather obtained insurance coverage from Chubb Group of Insurance Companies for the period of October 7, 2008 through October 7, 2009.

The Policy's Insuring Agreement Section I(A), found on page 1 of the Policy, provides that ACE will pay "all sums in excess of the Retention that the **Insured** shall become legally obligated to pay as **Damages** and **Claims Expenses** because of a **Claim** first made against the **Insured** and reported to the **Company** during the **Policy Period** by reason of a **Wrongful Act** committed on or subsequent to the **Retroactive Date** and before the end of the **Policy Period**."

6

the lawsuits constitute one claim under the Policy.

As stated above, the *BB&T* and *Commonwealth* Lawsuits constitute <u>one claim</u> under the Policy.  To be sure, the Policy's Limits of Liability and Retention Section V(A) provides:

> All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.  All **Damages** and all **Claims Expenses** resulting from a single **Claim** shall be deemed a single **Damage** and **Claims Expense**.

The Definitions Section II(T), found on page 3 of the Policy, and Section II(J), found on page 2 of the Policy, defines Wrongful Act and Interrelated Wrongful Acts as follows:

> **Wrongful Act** means any actual or alleged negligent act, error, omission, misstatement, misleading statement or **Personal Injury Offense** committed by the **Insured** or by any other person or entity for whom the **Insured** is legally liable in the performance of or failure to perform **Professional Services**.

> **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

Complementing Section T is Section II(P), which defines **Professional Services** as "only those services specified in Item 7 of the Declarations performed for others by an Insured or by any other person or entity for whom the Insured is legally liable."  Item 7 further defines Professional Services as "[s]olely in the performance of providing professional services as a title insurance agent, title abstractor, escrow agent, construction voucher disbursement services, construction feasibility analysis services, inspection services, SEC 1031 Real Estate Swapping Services and/or notary public services."

It is apparent that the *BB&T* and *Commonwealth* Lawsuits surround the same services provided by an escrow agent at Nevada Title for a single transaction.  The allegations assert in both lawsuits, essentially, that Nevada Title should have obtained the reconveyance of the $12,000,000 deed of trust prior to releasing the funds for the $43 million loan.  This action, or inaction for that matter, was within the title escrow agent's duties, and constitutes a single wrongful act as defined by the Policy.  In addition, the various consequences, such as issuing a title policy without the $12,000,000 deed of trust as an exception, all necessarily revolve around Nevada Title's failure to obtain the reconveyance of the $12,000,000 deed of trust and therefore constitute interrelated wrongful acts as defined by the Policy.  As such, coverage for the *BB&T* and *Commonwealth* Lawsuits, to the extent that it is available, is restricted to the single Claim limit of liability under the Policy since both Lawsuits constitute a single Claim.

**exclusion III(K) precludes coverage for this claim.**

It is clear that Brenda Burns and Nevada Title's other officers, directors, managers, and supervisor employees had actual knowledge of the underlying lawsuits that directly revolved around the actions of Nevada Title prior to October 7, 2010.  With that in mind, Policy Section III(K), found on page 4 of the Policy, provides:

> The **Company** shall not be liable for **Damages** or **Claims Expenses** on account of any **Claim** alleging, based upon, arising out of, or attributable to any **Wrongful Act** committed prior to the beginning of the **Policy Period**, if, on or before the earlier of the effective date

of this **Policy** or the effective date of any **Policy** issued by the **Company** to which this **Policy** is a continuous renewal or replacement, the **Insured** knew or reasonably could have foreseen that such **Wrongful Act** would result in a **Claim**.

Based on the documentation we have received thus far, it is undeniable that Brenda Burns and her colleagues, including Troy Lochhead and Robbie Graham, fully knew before October 7, 2010, that Nevada Title's actions surrounding the reconveyance of the $12,000,000 Deed of Trust not only could, but likely would, give rise to a claim. To be sure, Brenda Burns was actually deposed and testified in court on behalf of herself and Nevada Title regarding her actions as an escrow agent in the release of the $43 million Colonial loan. In addition, we have received and reviewed multiple emails and other correspondence between Brenda Burns, Robbie Graham, and Troy Lochhead regarding Brenda Burns' failure to obtain a reconveyance, the reality that they would *never* obtain the reconveyance, and their responses and reactions to said failure. Even if we consider the policy period for Policy 001, beginning October 7, 2009, it will have no affect on our analysis. The majority, if not all, of the operative facts occurred prior to October 7, 2009. Most notably, prior to the inception of Policy 001, Nevada Title released the loan proceeds with obtaining a reconveyance, Nevada Title learned they would never obtain the reconveyance, two separate lawsuits were filed where the underlying issue directly revolved, and Brenda Burns was deposed in regards to her actions in connection with the Wrongful Act. Indeed, on October 7, 2009, litigation in the underlying state action was not only well underway, but only months from trial.

Accordingly, ACE expressly reserves its right to limit or deny coverage entirely and to withdraw the defense for this Claim based upon the Policy provisions reference above.

**the Title Agent Endorsement excludes coverage for this claim.**

In addition, the Title Agent Endorsement eliminates coverage for the *Commonwealth* Lawsuit and likely for the *BB&T* Lawsuit as well. The Title Agent Endorsement precludes coverage for Claims "alleging, based upon, arising out of, or attributable to any defect in title not disclosed of public record or of which (defect in title) any **Insured** had actual or constructive knowledge at the date of issuance of insurance of such title." It is clear that Nevada Title, as agent for Commonwealth, issued a title insurance policy *knowing* that the insurance policy did not list the $12,000,000 senior deed of trust, although it was actually aware that the $12,000,000 deed of trust had not been reconveyed as called for in the escrow instructions.

To be sure, in addition to the coverage implications regarding the *BB&T* Lawsuit, ACE believes this particular exclusion serves to completely bar coverage for Commonwealth's indemnity claims regarding Nevada Title's issuance of the title insurance policy as Commonwealth's agent. Given the procedural posture of both Lawsuits, it is unclear whether and to what extent Commonwealth actually possesses or will possess viable claims against Nevada Title. In any event, it appears that those claims are not covered based on the Title Agent Exclusion.

Accordingly, ACE expressly reserves its right to limit or deny coverage entirely and to withdraw the defense for this Claim based upon the Policy provisions reference above.

**this claim is <u>not</u> a "claim first made."**

As you know, the ACE Advantage Miscellaneous Professional Liability Policy is a "claims made and reported" policy, meaning that it only covers "claims first made against the Insureds and reported to the company during the policy period." In that connection, the applicable Policy Period is October 7, 2010, through October 7, 2011. Accordingly, claims made before October 7, 2010, are not covered by the Policy.

The Insuring Agreement and Defense Section of the Policy, found at Section I(A) on page 1 of the Policy, provides:

> The **Company** will pay on behalf of the **Insured** all sums in excess of the Retention that the **Insured** shall become legally obligated to pay as **Damages** and **Claims Expenses** because of a **Claim** first made against the **Insured** and reported to the **Company** during the **Policy Period** by reason of a **Wrongful Act** committed on or subsequent to the **Retroactive Date** and before the end of the **Policy Period.**

As described above, the allegations in the *BB&T* and *Commonwealth* Lawsuits surrounding the services provided by an escrow agent at Nevada Title constitute a wrongful act as defined by the Policy. Presently, we are extremely skeptical that Nevada Title did not receive a Professional Services Claim prior to October 7, 2010 regarding this wrongful act. The Policy defines **Claim** as:

1. a written demand against any Insured for monetary or non-monetary damages;
2. a civil proceeding against any **Insured** for monetary damages, non-monetary damages or injunctive relief, commenced by the service of a complaint or similar pleading;
3. an arbitration proceeding against any **Insured** for monetary damages, non-monetary damages or injunctive relief;
4. a civil, administrative or regulatory investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document;
5. a **Disciplinary Proceeding;**
6. a written request to toll or waive a statute of limitations relating to a potential **Claim** described in paragraphs 1 through 3 directly above.

Although we are still investigating whether any written demand or "civil proceeding" was commenced against Nevada Title, we do know that prior to the inception of the Policy, Nevada Title received a copy of the demand made to Commonwealth in connection with this transaction and immediately recognized that litigation would likely ensue. Similarly, there were underlying state proceedings that centered around Nevada Title's actions including an attempt to bring Nevada Title in as a necessary party to the litigation. Additionally, we have a great deal of correspondence between Nevada Title's officers and employees in which the failure to obtain the reconveyance of the $12,000,000 deed of trust is discussed.

We have reservations about Nevada Title's representations that it did not receive a direct demand based on the timetable of events. On June 18, 2010, a judge ruled that the $12,000,000 deed of trust had priority over the $43,980,000 Colonial construction loan. Four days later, NTC submitted its application for an insurance policy provided by ACE, asserting that it was unaware of any potential claims that could currently exist. Coverage began on that policy on October 7, 2010, and BB&T tendered a demand to Nevada Title fourteen days later.

Accordingly, ACE expressly reserves its right to limit or deny coverage entirely and to withdraw the defense for this Claim based upon the Policy provisions reference above.

**material misrepresentations in NTC's application entitles ACE to recission.**

In the application for insurance for NTC & Other Named Insureds, including Nevada Title, Liz Vandenberg, Chief Financial Officer for NTC, signed the application, representing the no "principals, directors, officers, partners, professional employees or independent contactors of the Applicant have knowledge or information of any act or omission that might reasonably be expected to give rise to a claim that has not been reported during the past year." In addition, the Notice to Applicant Section provides:

BY SIGNING THIS APPLICATION, THE APPLICANT WARRANTS TO THE COMPANY THAT ALL STATEMENTS MADE IN THIS APPLICATION AND ATTACHMENTS HERETO ABOUT THE APPLICANT AND ITS OPERATIONS ARE TRUE AND COMPLETE, AND THAT NO MATERIAL FACTS HAVE BEEN MISSTATED OR MISREPRESENTED IN THIS APPLICATION, SUPPRESSED OR CONCEALED.  THE UNDERSIGNED AGREES, THAT IF AFTER THE DATE OF THIS APPLICATION AND PRIOR TO THE EFFECTIVE DATE OF ANY POLICY BASED ON THIS APPLICATION, ANY OCCURRENCE, EVENT OR OTHER CIRCUMSTANCE SHOULD RENDER ANY OF THE INFORMATION CONTAINED IN THIS APPLICATION INACCURATE OR INCOMPLETE, THEN THE UNDERSIGNED SHALL NOTIFY THE COMPANY OF SUCH OCCURRENCE, EVENT OR CIRCUMSTANCE AND SHALL PROVIDE THE COMPANY WITH INFORMATION THAT WOULD COMPLETE, UPDATE, OR CORRECT SUCH INFORMATION.  ANY OUTSTANDING QUOTATIONS MAY BE MODIFIED OR WITHDRAWN AT THE SOLE DISCRETION OF THE COMPANY.

The "Representations" section of the Policy, in conjunction with Endorsement 6 of the Policy entitled "Amendatory Endorsement – Nevada," which also mirrors Nevada General Statute 687B.110, provides:

Representations

1.  The **Insureds** represent and acknowledge that the statements and information contained in the **Application** are true and accurate and:
    a.  are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**; and
    b.  shall be deemed material to the acceptance of this risk or the hazard assumed by the **Company** under this **Policy**.

It is understood and agreed that this **Policy** is issued in reliance upon the truth and accuracy of such representations.

2.  It is understood and agreed that if such representations or information are not true, accurate and complete, and if:
    a.  the representations or information is fraudulent;
    b.  the representations or information is material either to the acceptance of the risk or to the hazard assumed by the **Company**; or
    c.  the **Company**, had it known the true facts as required by the **Application** for the **Policy** or otherwise, in good faith would:
        1)  not have issued the **Policy**;
        2)  not have issued it at the same premium rate;
        3)  not have issued the **Policy** in as large limit of liability; or
        4)  not have provided coverage with respect to the hazard resulting in the **Loss**;

then this **Policy** shall be void ab initio.

In this instance, there is no doubt that the issues and allegations surrounding Nevada Title's release of approximately $43 million in connection with specific escrow instructions received from the lender would be material to ACE's acceptance of the risk.  Nevada Title was aware, among other things, that the reconveyance was not obtained and the reconveyance would *never* be obtained.  In addition, Nevada Title was aware of the underlying state action, indeed, a representative of Nevada Title was deposed and gave trial testimony in that action.  Nevada Title was also aware that a demand had already been made to Commonwealth.  There is no doubt that NTC's representation that they were unaware of any act or omission

that might reasonably be expected to give rise to an unreported claim, when there was extensive correspondence and litigation surrounding the acts or omissions of Nevada Title, was material to the acceptance of risk assumed by ACE.  Indeed, had ACE known of the litigation surrounding Nevada Title's failure to obtain a reconveyance in connection with a $43 million transaction, the premium, limit of liability, and issuance of the Policy would have, without a doubt, been affected.

Accordingly, ACE expressly reserves its right to limit or deny coverage entirely and to withdraw the defense for this Claim based upon the Policy provisions referenced above.  In addition, based on this particular policy provision, ACE may be entitled to seek rescission of the Policy and hereby reserves its right to do so.

### defense of the *BB&T* and *Commonwealth* Lawsuits.

As we have indicated above, we have identified facts, issues, and circumstances and corresponding Policy provisions that may serve to preclude coverage entirely for the *BB&T* and *Commonwealth* Lawsuits, this Claim, and all related claims, if any.  At this time, ACE has decided to continue to extend a defense to Nevada Title for claims asserted against it in the *BB&T* and *Commonwealth* Lawsuits.  The Policy provides ACE with the "right and duty to defend" the insured and, as you know, ACE has appointed Sheri Thorne of the Las Vegas office of Wilson Elser, Moskowitz, Edelman & Dicker to represent Nevada Title in connection with the defense of the claims lodged against it in the *BB&T* and *Commonwealth* Lawsuits.

Pursuant to Section VI, paragraph (B), found on page 6 of the Policy, Nevada Title is obligated to "cooperate with [ACE], and provide [ACE] all information and assistance which [ACE] reasonably requests including without limitation . . . assisting in effecting settlements, securing and giving evidence, . . . and conducting the defense of any **Claim** covered by this **Policy**."  Likewise, Section I(B)(1), found on page 1 of the Policy, provides that Nevada Title shall not "settle or negotiate to settle any **Claim**" without ACE's consent.

Finally, please be aware and understand that pursuant to Section I(B)(3), found on page 1 of the Policy, ACE's duty to defend ends when it has exhausted the Policy's limit of liability in the payment of judgments or settlements.

### conclusion.

As outlined above, ACE has substantial grounds to deny coverage outright, seek rescission of the Policy, or both.  Nevertheless, due to the current unique posture of the *BB&T* Lawsuit and the *Commonwealth* Lawsuit, ACE has decided to continue extending a defense for this Claim, subject to a full and complete reservation of rights.  Naturally, since neither the *BB&T* Lawsuit nor the *Commonwealth* Lawsuit has ripened into full-blown litigation, discovery has not commenced and information may become available to either ACE or Nevada Title that could have an impact on this coverage analysis.  Likewise, since the *BB&T* Lawsuit has been dismissed and the *Commonwealth* Lawsuit will likely be stayed and may be dismissed, it is entirely possible that we may not be forced to confront the coverage issues identified above.  However, please understand that the fact that ACE has presently elected not to immediately withdraw the defense, deny coverage, seek rescission, or pursue all of those options, should not create an inference or be interpreted as a commentary or suggestion that NTC's failure to be forthcoming in its application was not material to ACE's risk or underwriting decisions or that these coverage matters are not important to ACE.  To the contrary, these are serious matters, and in the event that the *BB&T* Lawsuit or the *Commonwealth* Lawsuit becomes active, ACE reserves the right to immediately pursue the remedies discussed above.

Again, since coverage for this matter appears to be very limited and may be wholly precluded by the Policy's terms, we encourage Nevada Title to tender this matter for coverage to all of its other insurers, if any, and we would ask that you supply us with their correspondence regarding coverage.

Finally, we must also caution you and your client that this letter is not meant to serve as an exhaustive recitation of every policy provision or tenet of applicable law that might apply to coverage for this matter or ACE's rights under the Policy. Indeed, ACE must reserve all of its rights, including its right to deny coverage for this matter based on Policy provisions and legal provisions not specifically discussed in this letter.

If you have any questions about this correspondence or wish to supply us with any additional information that you believe might be helpful to our coverage analysis, we encourage you to contact us. Please understand, though, that our willingness to review additional information should not be viewed as a waiver of any of ACE's rights under the Policy or applicable law.

We remain,

Cordially,

Gregory W. Brown
Amanda L. Dixson

EXHIBIT "6"

EXHIBIT "6"

## TOLLING AGREEMENT

This Tolling Agreement (hereinafter the "Agreement") is made and entered into by and among ACE American Insurance Company (hereinafter "ACE") and NIC Global Holding Group (hereinafter "NIC") When referred to collectively, ACE and NIC will be referred to as "the Parties."

**WHEREAS,** based upon NIC's representations and warranties in an initial application for insurance (hereinafter the "2009 Initial Application"), ACE bound coverage beginning at 12:01AM on October 7, 2009 and ending at 12:01AM on October 7, 2010, bearing policy number EON G23638344 001 (hereinafter the "2009-2010 Policy"); and

**WHEREAS,** on October 14, 2009, Robbie D Graham, President of NIC, submitted a "Limits Warranty and Representation" Letter to ACE (hereinafter the "2009 Representations Letter"), representing and warranting, among other things, that there were no pending claims, suits, or actions against any entities covered under the 2009-2010 Policy and that no person or entity proposed for insurance under the 2009-2010 Policy had any knowledge or information of any act, error, or omission that might reasonably give rise to a claim; and

**WHEREAS,** on June 22, 2010, Liz Vanderberg, NIC's Chief Financial Officer, executed an ACE Advantage Miscellaneous Professional Liability Renewal Application (hereinafter the "2010 Renewal Application"); and

**WHEREAS,** based upon the Insured's representations and warranties in the 2010 Renewal Application, ACE bound coverage beginning at 12:01AM on October 7, 2010 and ending at 12:01AM on October 7, 2011, bearing policy number EON G23638344 002 (hereinafter the "2010-2011 Policy"); and

**WHEREAS,** both the 2009-2010 Policy and the 2010-2011 Policy (collectively referred to as the "Policies") contain Exclusion (K), which provides:

> The **Company** shall not be liable for **Damages** or **Claims Expenses** on account of any **Claim** alleging, based upon, arising out of, or attributable to any **Wrongful Act** committed prior to the beginning of the **Policy Period**, if, on or before the earlier of the effective date of this **Policy** or the effective date of any **Policy** issued by the **Company** to which this **Policy** is a continuous renewal or replacement, the **Insured** knew or reasonably could have foreseen that such **Wrongful Act** would result in a **Claim**

**WHEREAS,** on October 21, 2010, Branch Banking and Trust Company (hereinafter "BB&T"), as the alleged successor in interest to Colonial Bank, N.A., formally demanded, in writing through counsel, that Nevada Title Company (hereinafter "Nevada Title"), an insured under NIC's Policy, either obtain a reconveyance of a senior deed of trust or purchase a $43,980,000 promissory note and deed of trust held by BB&T in connection with a 2007 loan closed by Nevada Title (hereinafter the "BB&T Demand Letter"); and

**WHEREAS,** on November 10, 2010, BB&T initiated a civil action styled as *Branch Banking and Trust Company, a North Carolina corporation v. Nevada Title Company, a Nevada corporation, and Commonwealth Land Title Insurance Company, a Pennsylvania corporation* in the United States District Court District of Nevada, civil action number 2:10-cv-01970-JCM-RJJ (hereinafter the "BB&T Lawsuit"); and

**WHEREAS,** on November 30, 2010, Nevada Title tendered the *BB&T* Demand Letter to ACE; and

**WHEREAS,** on December 7, 2010, Nevada Title tendered the *BB&T* Lawsuit to ACE for defense and coverage; and

1

**WHEREAS,** on December 21, 2010, ACE acknowledged receipt of the *BB&T* Lawsuit and timely extended a defense subject to a full reservation of rights, assigning Sheri Thome of the Las Vegas office of Wilson, Elser, Moskowitz, Edelman & Dicker to defend Nevada Title; and

**WHEREAS,** on March 10, 2011, Commonwealth Land Title Insurance Company initiated a civil action styled as *Commonwealth Land Title Insurance Company, a Nebraska corporation v Nevada Title Company, a Nevada corporation, Does I through X, inclusive,* in the United States District Court District of Nevada, civil action number 2:11-cv-00380-KJD-GWF (hereinafter the "*Commonwealth* Lawsuit"); and

**WHEREAS,** Nevada Title tendered the *Commonwealth* Lawsuit to ACE, and ACE timely extended a defense subject to a full reservation of rights, assigning Sheri Thome of the Las Vegas office of Wilson, Elser, Moskowitz, Edelman & Dicker to defend Nevada Title; and

**WHEREAS,** ACE contends and NTC disputes that both the *BB&T* Lawsuit and *Commonwealth* Lawsuit arise out of the same wrongful act or interrelated wrongful acts and constitute one claim under the 2010-2011 Policy (hereinafter the "Claim"); and

**WHEREAS,** on June 10, 2011 ACE asserted a number of defenses to coverage in a Continuing Reservation of Rights letter, including but not limited to material misrepresentations that ACE contends NTC made in its 2009 Initial Application, 2009 Representations Letter, and 2010 Renewal Application and NTC expressly disputes these assertions; and

**WHEREAS,** ACE continues to believe that it possesses substantial and compelling grounds to deny coverage for the Claim or rescind the Policies in their entirety and would be justified in commencing an appropriate action seeking such a declaration and NTC expressly disputes this belief; and

**WHEREAS,** NTC disagrees that it made any material misrepresentations in the 2009 Initial Application, 2009 Representations Letter, or the 2010 Renewal Application, and disagrees with ACE's coverage position, and vigorously contends that it acted appropriately, reasonably, and competently at all times; and

**WHEREAS,** a genuine dispute and controversy exists between and among the Parties; and

**WHEREAS,** the Parties deem it to be in their mutual benefit that ACE's alleged grounds for a denial of the Claim or rescission of the Policies not be asserted in litigation at the present time; and

**WHEREAS,** ACE and NTC desire to seek resolution and avoid the expense and uncertainty of litigation surrounding ACE's grounds to deny the Claim or rescind the Policies if at all possible and are willing to make the stipulations, covenants, and agreements hereinafter set forth in order to defer and postpone the commencement of litigation; and

**WHEREAS,** the Parties desire that for the period of this Agreement they should be able to consider issues relating to the possibility of settling disputes without regard to the time constraints that exist because of any future expiration of any applicable statute of limitations or other time-based bars; and

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged by the Parties and evidenced by the signatures of each party set forth below, the Parties confirm their obligations to one another and agree, promise, and bind themselves as follows:

1.    **DEFINITIONS**

    a.   "Tolling Period" shall mean the period from and including the Effective Date of this Agreement until and including the Expiration Date (as defined below) of this Agreement.

    b.   "Expiration Date" shall mean 30 days from the date that written notice of termination of this Agreement has been served by either of the Parties on the other in accordance with Paragraph 7 of this Agreement.

    c.   "Timing Defenses" shall mean and include any affirmative or other defense to any action brought by either party that the defending party may have based upon (1) any statute of limitations (2) laches, and/or (3) any failure of either party to institute or commence litigation or other legal proceedings within some specified period, before a specified date, or before the happening of a specified event. Timing Defenses specifically include, but are not limited to, any assertion by NIC that NIC's representations in the 2009 Initial Application, 2009 Representations Letter, and the 2010 Renewal Application were not material to ACE's risk based on ACE's decision to enter into this Agreement rather than pursue a rescission action, declaratory judgment action, or denial based on Exclusion (K). Timing Defenses shall include claims, if any, that NIC has against ACE.

2.    The Parties stipulate, covenant, and agree that Timing Defenses applicable to any action brought by either Party shall be tolled during the Tolling Period.

3.    It is the intent of the Parties to preserve the status quo as of the moment of execution of this Agreement and further preserve any claims, defenses, or potential remedies the Parties possess prior to the Effective Date.

4.    ACE agrees to continue to extend a defense to NIC for the *BB&T* Lawsuit and the *Commonwealth* Lawsuit and forebear filing a Declaratory Judgment action or initiating any lawsuit or other legal proceeding against NIC until on or after the last day of the Tolling Period that is not a Saturday, Sunday, or legal holiday.

5.    NIC agrees to forebear filing or initiating any lawsuit or other legal proceeding against ACE until on or after the last day of the Tolling Period that is not a Saturday, Sunday, or legal holiday.

6.    This Agreement shall terminate on the Expiration Date as provided in Paragraph 1(b) above, unless extended in writing by the Parties to be bound.

7.    Either Party may terminate this Agreement, effective 30 days after the date of serving a written notice of termination, by serving notice of termination by letter to the other party.  Such notice letter shall be served by electronic mail followed by the delivery of an original of the notice letter by United States certified mail, return receipt requested, to the following persons at the following addresses:

| If to ACE: | If to NIC: |
|---|---|
| Gregory W. Brown | Terry A. Moore |
| Amanda L. Dixson | MARQUIS AURBACH COFFING |
| BROWN LAW LLP | 10001 Park Run Drive |
| 1430 Parklake Avenue, Suite 130 | Las Vegas, Nevada 89145 |
| Raleigh, North Carolina 27612 | tmoore@maclaw.com |
| gregory@brownlawllp.com | |
| amanda@brownlawllp.com | |

3

8    On or after the Expiration Date of this Agreement, either Party shall have the right to seek any and all legal remedies against the other Party that may be available, if any, and the defending Party shall be entitled to assert any Timing Defenses, or other defenses, if any, subject to the terms of this Agreement

9    The passage of time during the Tolling Period shall not be used against either Party in any claim or defense

10    Nothing in this Agreement shall be construed as an admission or denial by any of the Parties as to the merits of any Party's claims or defenses

11    The Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, representatives, successors, assigns, and its and their respective officers, directors, shareholders, owners, partners, members, divisions, subsidiaries, parent companies, related entities, employees, agents and attorneys, and the predecessors, heirs, executors, administrators, and successors

12    This document sets forth the entire consideration of and for the Agreement, which consideration is contractual and not a mere recital  All agreements and understandings among the Parties are embodied and expressed herein  The Parties expressly warrant that no promise or inducement has been offered except as set forth herein  The Agreement is not executed in reliance upon any statement or representation of any person or party, or their representative   The Agreement embodies, merges, and integrates all prior and current agreements and understandings of the Parties  The terms of this Agreement may not be clarified, altered, amended, modified, or otherwise changed in any respect whatsoever except in writing signed by each of the Parties hereto

13    The Agreement shall be construed without regard to the identity of the drafter and therefore shall not be construed against the drafting Party  The paragraph headings in the Agreement shall not bear independent meaning, and shall be disregarded in the construction of any provision, term, or condition of the Agreement

14    The Parties stipulate, covenant, and agree that the facts recited in this Agreement shall be inadmissible by any party for any purpose whatsoever in any subsequent lawsuit or legal proceeding pursuant to NRS 48 105 and further expressly stipulate, covenant and agree that NRS 47 240(2) shall not be applicable to any recited fact set forth herein

15    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which shall, when collated together, constitute one and the same Agreement  Any Party may execute the Agreement by execution of a signature page transmitted by facsimile or electronic image of a signature page transmitted by email, and each signature transmitted by facsimile or electronic image transmitted by email shall be deemed to be an original signature   Each person signing the Agreement represents hereby that they have the authority to execute the Agreement for the Party for whom they sign

16    The Parties agree that they will execute any and all additional documents necessary to effectuate the intent and purpose of this Agreement

17    Each Party represents that it has read and reviewed this Agreement and enters into this Agreement voluntarily, upon advice of counsel, and on their own accord, and represents and warrants that they are under no duress or coercion in entering into this Agreement  The persons who have signed this Agreement on behalf of the Parties are authorized by such party to do so, and, by signing this Agreement, personally represent and warrant that they are authorized to bind the party to its terms.

4

THE UNDERSIGNED REPRESENT AND ACKNOWLEDGE THAT THEY HAVE CAREFULLY READ THE ENTIRE AGREEMENT, HAVE SECURED THE ADVICE OF COUNSEL, UNDERSTAND THE AGREEMENT AND ITS CONSEQUENCES, AND KNOWINGLY AND VOLUNTARILY ENTER INTO IT.

[SIGNATURE PAGES TO FOLLOW]

ACE American Insurance Company

by: _Justin Rose_ (Signature)
Signature

its: _Assistant Vice President_
Title

_Justin Rose_
Printed Name

State of _New York_
County of _New York_

I, _Frank Kirk Staiano_ a Notary Public of the County and State aforesaid, do hereby certify that _Justin Rose_ personally came before me this day and acknowledged that he/she, being authorized to do so, executed the foregoing on behalf of **ACE American Insurance Company**. Witness my hand and seal this the _6th_ day of _Feb_ 2012.

**FRANK KIRK STAIANO**
Notary Public-State of New York
No.: 02ST6091869
Commission Expires: 5/05/2015

_Frank K My_
Notary Public

_Frank Kirk Staiano_
Handwritten or Typed Name

My Commission Expires: _5/5/2015_

6

**NTC Global Holding Group**

by: _Robbie Graham_
Signature

its: _President_
Title

_Robbie D. Graham_
Printed Name

State of _Nevada_
County of _Clark_

I, _S.J. Herdine_, a Notary Public of the County and State aforesaid, do hereby certify that _Robbie D. Graham_ personally came before me this day and acknowledged that he/she, being authorized to do so, executed the foregoing on behalf of **NTC Global Holding Group**  Witness my hand and seal this the _2_ day of _February 2011 2012_.

_S.J. Herdine_
Notary Public

_SJ Herdine_
Handwritten or Typed Name

My Commission Expires: _4-8-14_

```
┌──────────────────────────────────┐
│   ●    S. J. HERDINE             │
│        Notary Public State of Nevada │
│        No 94-3957-1              │
│        My appt  exp. Apr. 8, 2014 │
└──────────────────────────────────┘
```

7

# EXHIBIT "7"

# EXHIBIT "7"



# BROWN

JANUARY 3ᴿᴰ, 2018

**Via First Class and Electronic Mail**

Terry A. Moore
**Marquis Aurbach Coffing**
10001 Park Run Drive
Las Vegas, Nevada 89415
tmoore@maclaw.com

**RE:     Continued Reservation of Rights**

| | |
|---|---|
| Insurer: | Chubb on behalf of ACE American Insurance Company ("Chubb") |
| Insured: | NTC Global Holding Group ("Nevada Title") |
| Lawsuits: | *Branch Banking and Trust Company, a North Carolina corporation v. Nevada Title Company, a Nevada corporation, and Commonwealth Land Title Insurance Company, a Pennsylvania corporation*, United States District Court District of Nevada, Case Number 2:10-cv-01970-JCM RJJ (the "BB&T Lawsuit") and |
| | *Commonwealth Land Title Insurance Company, a Nebraska corporation v. Nevada Title Company, a Nevada corporation; Does I through X, inclusive*, United States District Court District of Nevada, Case Number 2:11-cv-00380-KJD-GWF (the "Commonwealth Lawsuit") |
| Claim No.: | JY10J0591459 |
| Policy No.: | EON G23638344 001 (the "2009-2010 Policy") |
| | EON G23638344 002 (the "2010-2011 Policy") |
| Our File No.: | 102.056 |

Dear Terry,

We write on behalf of Chubb in anticipation of next week's mediation of the various pending matters attendant to the above-referenced claim. Thank you for participating in our multiple conference calls in preparation for the mediation. We have corresponded extensively over the past several years, and this letter is intended merely to reiterate the previously identified insurance coverage issues and to respectfully remind Nevada Title that successful resolution of this claim may very well require substantial participation on Nevada Title's part in any eventual settlement.

As an initial matter, please understand, as always, that nothing about this letter should be construed as supporting or validating any claims or allegations against Nevada Title in the various pending actions. Neither Chubb nor we assert or agree that liability exists as a result of those claims. Additionally, and importantly, Chubb and we have corresponded at length and in great detail with Nevada Title about the serious reservations and concerns that exist regarding the availability of insurance coverage. With that in mind, while we do not restate those reservations anew here, nothing about this letter is intended or should be read to modify, limit, waive, or abandon any of those prior coverage positions taken by Chubb or the agreements reached between Chubb and Nevada Title. To be sure, Chubb continues to reserve its rights to the maximum extent permitted by the Policy and applicable law.

This matter is scheduled to be voluntarily mediated for at least the second time on January 9-11, 2018, at the JAMS offices in Las Vegas, Nevada. Caroline Kennedy, Assistant Vice President of North American Financial Lines Claims, will personally attend for the carrier, as will my partner Kristi Gavalier. You will recall that two claims representatives from Chubb and I attended the first mediation in Las Vegas several years ago. Chubb and our firm have every intention to work for all three days, and, if reasonable progress can be made, to participate meaningfully in any settlement efforts along with Nevada Title.

We were encouraged by our recent conference calls with Commonwealth Land Title Insurance Company's representatives in which they represented that the constituents who will be attending this mediation for various parties are sufficiently motivated and of reasonable mindset in terms of settlement positions and outcomes. As a result, Commonwealth's representatives expressed optimism that a successful outcome is at least a plausible possibility. With that said, however, the figures posited by Commonwealth as their estimates of what the parties will hear from the various constituents as initial settlement demands were cause for a modicum of concern.

First, irrespective of however reasonable Commonwealth may believe it is being, high seven and even eight figure demands are not consistent with a reasonable analysis of the realities of the litigation as it has proceeded thus far or the likely exposures presented by said litigation. In other words, while we are more than comfortable with the concept that inflation and bluster are the norm rather than the exception at mediation, especially in the opening rounds, we respectfully submit that the damages calculations and demands offered by Commonwealth are not, at least at this stage, calculated to lead to settlement.

Second, as you and I have corresponded and discussed, Chubb and Nevada Title have serious and significant differences regarding the availability of insurance coverage for this matter, particularly when it comes to Nevada Title's procurement of coverage in the face of this claim. To be sure, as we have corresponded previously, Chubb possesses substantial grounds upon which it would be entitled to deny coverage outright or seek the remedies identified in our coverage position letter dated June 10, 2011, or both, and, in any event, coverage appears to be very limited or wholly precluded. Nevertheless, Chubb has been extending a defense subject to a full reservation of rights and we have been working well and in concert with Nevada Title to achieve a favorable outcome that is satisfactory to both of our clients. As we state above, our purpose is not to restate the myriad of Chubb's coverage arguments nor is this the time or the place to engage in hyperbole, invective, or positional bargaining. Rather, while reasonable minds may differ on these subjects, our clients' positions do, in fact, differ. We therefore implore Nevada Title to take our client's coverage positions seriously and come to the mediation prepared to participate meaningfully in the negotiations and settlement.

Finally, this letter is not meant to serve as an exhaustive recitation of every policy provision or tenet of applicable law that might apply to coverage for this matter or Chubb's rights under the Policy. Indeed, Chubb must reserve all of its rights, including its right to deny coverage for this matter, to the maximum extent permitted by applicable law.

We look forward to seeing you in Las Vegas and to working with you once again. We remain,

Cordially,

Gregory W. Brown
Kristi L. Gavalier

# EXHIBIT "8"

# EXHIBIT "8"



STEVEN J. PARSONS

TEL: (702) 384-9900
FAX: (702) 384-5900
Info@SJPlawyer.com

LAW OFFICES OF
STEVEN J. PARSONS
10091 PARK RUN DR STE 200
LAS VEGAS, NV 89145-8868

Tuesday, May 22, 2018

by email: gregory@brownlawllp.com
original by US Priority Mail
Del. Conf. No. 9405511899560394287964

Gregory W. Brown
BROWN LAW LLP
555 Fayetteville St Ste 420
Raleigh, NC 27601-3034

| | | |
|---|---|---|
| Re: | My clients: | Nevada Title Company and NTC Global Holding Group |
| | Your client: | ACE American Insurance Company |
| | ACE Claim No.: | JY10J0591459 |
| | ACE Policy No.: | EON G23638344-002 |

Dear Mr. Brown:

I have been retained to represent Nevada Title Company and NTC Global Holding Group (collectively "NTC" or the "Insureds") in those entities' relationship with their insurer, your client ACE American Insurance Company ("ACE").

My representation of NTC is in conjunction with our clients' counsel, Terry A. Moore of MARQUIS AURBACH & COFFING. Mr. Moore and I represent your client's Insureds regarding the Insureds' claims upon ACE with respect to coverage available to them within the ACE Miscellaneous Professional Liability Policy Number EON G23638344-002 (the "Policy") in the defense of, and liabilities incurred in the claims set out in the two (2) underlying lawsuits.

Initiated years ago by Branch Banking and Trust Company ("BB&T") and Commonwealth Land Title Insurance Company ("Commonwealth Title") these lawsuits against the Insureds are *Branch Banking and Trust Company v. Nevada Title Company, Commonwealth Land Title Insurance Company*, U.S. District Court for the District of Nevada, Case No. 2:10-cv-1970-JCM-(RJJ) (the "BB&T Lawsuit"), and *Commonwealth Land Title Insurance Company v. Nevada Title Company, et al.*, U.S. District Court for the District of Nevada, Case No. 2:11-cv-380-APG-(CWH)(the "Commonwealth Lawsuit"). I recognize that the BB&T Lawsuit was dismissed, and that the Commonwealth Lawsuit is the remaining litigation (simply "the Underlying Lawsuit").

The litigation has been ongoing for nearly eight (8) years. The Underlying Lawsuit – and the BB&T Lawsuit – were timely tendered to ACE for defense and indemnity. Your client long-ago asserted a reservation of rights in accepting the Insureds' tender.

Gregory W. Brown, Brown Law LLP
Re: My clients: Nevada Tile Company and NTC Global Holding Group
Your client: ACE American Insurance Company
ACE Claim No.: JY10J0591459
ACE Policy No.: EON G23638344-002
Tuesday, May 22, 2018
Page 2 of 4

During the pendency of the Underlying Lawsuit there has been correspondence and communications among and between you and Mr. Moore that need not be recounted in any detail here. The Insureds reserve all their rights and continue to do so with respect to those communications.

I hope that you will agree that it is a fair summary that the most recent obvious activity between our clients includes that among many participants, Kristie Gavalier your partner or associate and Mr. Moore participated in a mediation in January, 2018, conducted by Floyd Hale of JAMS in Las Vegas. That mediation failed to resolve the Underlying Lawsuit. My clients' officers and owners' were greatly disappointed.

In the outfall of the failed mediation Mr. Moore received a letter dated April 23, 2018 from David E. Littman, counsel for Commonwealth Land Title Insurance Company.

We know from reviewing a copy of an email from Sheri Thome of Wilson Elser Moskowitz Edelman & Dicker LLP, to you dated May 2, 2018 that Mr. Littman's April 23rd letter was sent to you. Ms. Thome is ACE's assigned counsel defending NTC. However, to make sure you and ACE have a complete copy I have also included a copy of Mr. Littman's April 23rd letter and its enclosures as an enclosure to this letter.

The April 23rd Littman letter is very significant to our clients. On page 2 of Mr. Littman's letter a demand to settle the cases against NTC, your client's Insureds, is set out in a very express and unambiguous manner (the "Demand"). Attachments to the April 23rd letter, include other involved parties' counsel's commitments to the component parts of that proposed compromise settlement.

If the Demand is accepted, Mr. Littman's client's proposal will fully and finally allow NTC, ACE's Insureds, to be free of the threat of further consequences and damages in its exposure to the ongoing costs of litigation and the uncertainty of a final judgment of the Underlying Lawsuit. Settlement of the claims as well as defending those Underlying Lawsuit has been the goal of my clients for many years. Mr. Moore relates to me that he has confirmed with you on many prior occasions that our client's primary goal expressed to you and ACE is settling the adverse claims and ending the litigation of the Underlying Lawsuit. That remains true today.

Unfortunately, despite the Demand having been shared with you as early as May 2, 2018, neither Mr. Moore, our clients nor anyone on their behalf have received any response to the Demand from you or ACE.

I will note that on May 9, 2018 Caroline Kennedy, AVP, North American Financial Lines Claims for Chubb did respond and ask Ms. Thome for "…the pros and cons of filing an MSJ…" and Ms. Thome responded with her comments on May 15, 2018. Upon review of Ms. Thome's analysis of the of a proposed MSJ, Mr. Moore did call Ms. Thome and share with her that our client's officers believe

Gregory W. Brown, BROWN LAW LLP
Re: My clients: Nevada Tile Company and NTC Global Holding Group
Your client: ACE American Insurance Company
ACE Claim No.: JY10J0591459
ACE Policy No.: EON G23638344-002
Tuesday, May 22, 2018
Page 3 of 4

that as Ms. Thome points out, the balance of possibly attaining dispositive relief versus re-engaging BB&T is not a prospect the clients want.

None of that latest interaction, however, was reflective of a claims decision or any action by ACE on the Demand.

A failure to accept this extraordinarily compelling Demand – and settle the Underlying Lawsuit – would be extremely damaging to my clients.  If it is allowed to lapse or if the Demand is otherwise rejected, the consequences to NTC would quite literally adversely alter its long-term fate.  In addition, other assets of NTC and its owners are at an increased and genuine danger and risk in the event the Demand is not accepted.  In truth, as prudent operators of their business, ACE's Insureds always purchased and maintained coverage, such as ACE provided to ameliorate that very risk.

We need to make certain that no matter what your client may have earlier thought of its duties to my clients, ACE would be well informed to timely consider the Demand and render a claims decision upon the Demand.  We believe it is a significant discount of the possible liability and settling the Underlying lawsuit upon the terms of the Demand is an opportunity that should be immediately taken.  Moreover, the Demand would fully extinguish your client's Insureds' obligations in the Underlying Lawsuit well within the Insureds' available coverage with ACE.  We submit that accepting the Demand is in the very best interests of my clients, your client's Insureds.  Please accept this as my clients' demand that ACE accept the Demand in full as to the Insureds and settle the adverse claims.

Though the Demand doesn't presently appear to have a specific deadline the need for ACE to quickly make a claims decision is supported by at least two (2) additional considerations: the Commonwealth lawsuit has an upcoming status report – I believe on June 6th.  Additionally, I've just been informed that the parties in the Bankruptcy action are approaching the Bankruptcy Court to reset a discovery plan and enter a scheduling order.  As those parties again start actively preparing for trial the likelihood of those parties' ongoing participation in a global settlement, as is provided for in the Demand, will be unlikely.  Those parties falling-out of the Demand, or that the Demand is revoked by Mr. Littman or his client are possibilities that my clients cannot risk.

You have asserted that the Insureds' coverage is subject to exclusion and limitation, at least based upon your earlier assertion of a reservation of certain of ACE's rights.  Ms. Gevalier and perhaps even to a greater degree Ms. Kennedy apparently rather adamantly repeated that theme during the mediation.  If you and the Company wish to persist in contending the Insureds' coverage is somehow limited or excluded, even as ACE considers and makes a claims decision in response to the Demand, I am prepared to interact with you and assert NTC's reasonable expectation of its right to coverage of both a defense to the Underlying Lawsuit and indemnity for the Insureds' liability to third-parties.

Please make certain that any contention of an ongoing reservation you wish to assert that

Gregory W. Brown, Brown Law LLP
Re: My clients: Nevada Tile Company and NTC Global Holding Group
Your client: ACE American Insurance Company
ACE Claim No.: JY10J0591459
ACE Policy No.: EON G23638344-002
Tuesday, May 22, 2018
Page 4 of 4

seeks to limit or exclude coverages available within the Policy on behalf of ACE are complete, expressed within the Company's duties to articulate all of the bases of any reservations, and that the bases of the claims decision reflects all that you and ACE have learned from all sources.  Please ask ACE to consider the interests of its Insureds with at least equal regard as it considers it own interests.

I can assure you that upon the Policy provisions, relevant Nevada jurisprudence and the facts of the Claim developed to date, NTC has a credible basis for disputing ACE's reservation of rights, including the alleged misrepresentation in the application process.

I look forward to working with you to secure the promises of the ACE Policy for my clients.  My clients have directed that I cooperate with you and ACE to make sure that every reasonable effort is made by ACE to consider the Demand and render a claims decision.  Please let me know how best that can be done.

Sincerely,

Law Offices of Steven J. Parsons

/s/
STEVEN J. PARSONS

SJP:ms

Enclosures as noted

c:      client
        Mr. Moore

# FIDELITY NATIONAL LAW GROUP
5151 Belt Line Road, Suite 410
Dallas, Texas  75254

**David E. Littman**
**Vice President, Litigation Counsel**
Telephone: (972) 812-6478
Fax: (972) 812-9408
David.Littman@fnf.com

April 23, 2018

**Via E-Mail and CMRRR #7196 9008 9115 5661 6648**
Terry A. Moore, Esq.
Marquis Aurbach Coffing
100001 Park Run Drive
Las Vegas, Nevada  89145

Re: Cause No. 2:11-cv-00380 styled *Commonwealth Land Title Insurance Company v. Nevada Title Company* filed in the United States District Court, District of Nevada (the "Lawsuit")

## CONFIDENTIAL SETTLEMENT COMMUNICATION

Dear Terry:

Pursuant to FRE 408 and Nevada Revised Statutes 48.105, this correspondence is a confidential settlement communication.  As you are aware, Commonwealth Land Title Insurance Company ("Commonwealth") has asserted claims in the Lawsuit against Nevada Title Company ("Nevada Title") in connection with the issuance of a Lenders Title Insurance Policy insuring a $44 million dollar construction loan without exception for a prior recorded $12 million dollar deed of trust that it knew encumbered the insured property.  According to Nevada Title employee Brenda Burns, Nevada Title issued the policy at the request of a "good customer." Ms. Burns and Nevada Title Management also knew the "good customer" managed and controlled the beneficial interest of the $12 million dollar deed of trust.  Even though Nevada Title served as a trustee under the deed of trust, and had a duty to ensure that the $44 million dollar deed of trust was issued in first lien position, Nevada Title failed to obtain a binding written commitment for the reconveyance of the $12 million dollar deed of trust prior to closing the $44 million dollar construction loan.  Such acts and practices of Nevada Title and its agents were, *inter alia*, grossly negligent, breached the terms of the 1992 Agency Agreement between Commonwealth and Nevada Title, and have resulted in extensive exposure to Commonwealth.

Moreover, as previously advised, the indemnification provisions of the 1992 Agency Agreement do not require Commonwealth to prove that Nevada Title "caused" damages to Commonwealth -- instead Paragraph 13(a) provides that Nevada Title agrees to indemnify Commonwealth for all loss, costs, or expenses incurred by Commonwealth *"arising from"* the acts or omissions of Nevada Title.

Nevada Title
April 23, 2018
Page 2

Branch Banking and Trust ("BB&T"), the successor in interest of the $44 million dollar construction loan and deed of trust, has made a written settlement demand upon Commonwealth for a lump sum payment of $8.5 million in exchange for a full release of claims. A true and correct copy of the April 5, 2018, demand by BB&T is attached hereto as Exhibit A. First Southern National Bank ("First Southern") is the successor in interest to the only other claimant, a participating bank to the $44 million dollar construction loan. First Southern has also made demand upon Commonwealth for a lump sum payment of $3 million in exchange for a full release of claims. A true and correct copy of the April 12, 2018, demand by First Southern BB&T is attached hereto as Exhibit B.

In response to the demand(s) of BB&T and First Southern for the total payment of $11.5 million, RSIG, Phillip Nourafchan and the Estate of Saiid Forouzan Rad, along with the liquidating trustee Brian Shapiro (the "Creditor Group") have renewed their settlement offer to pay $2 million dollars to contribute toward the settlement between Commonwealth and BB&T in exchange for a full release and dismissal of all pending litigation and appeals, objections involving the R&S St. Rose, LLC and R&S St. Rose Lenders, LLC bankruptcy estates (the "Bankruptcy Estates"), any creditors, and the full release of BB&T's guarantor judgments against Mr. Nourafchan and Mr. Rad. A true and correct copy of the April 17, 2018, renewed settlement offer from the Creditor Group is attached hereto as Exhibit C.

Also in response to the demand(s) of BB&T and First Southern of $11.5 million, and in addition to the $2 million dollar settlement offer by the Creditor Group, Commonwealth hereby renews its offer to contribute the total amount of $2 million dollars ($1.7 million dollars in cash and an assignment of as much of  its allowed unsecured creditor claim in "Bankruptcy Estates" as necessary to contribute an additional $300,000 in cash) towards the full and final settlement and release of claims between Commonwealth and BB&T.

**Based on the foregoing, demand is hereby made upon Nevada Title to immediately tender or agree in writing to pay to an escrow account for the funding of the settlement upon Bankruptcy Court approval of the settlement, the sum of $7.5 million dollars to fully and finally settle the Lawsuit which in turn would also fully and finally resolve the claim(s) in the Bankruptcy Estates matters.**

The failure to immediately tender or agree in writing to tender the sum of $7.5 million dollars to fully and finally settle the above Litigation, when the liability of Nevada Title is clear, shall only serve to increase the significant exposure to Commonwealth and thereafter, Nevada Title in the Lawsuit.

Nevada Title
April 23, 2018
Page 3


If you have any questions, please do not hesitate to contact me.


Sincerely,


David E. Littman, Esq.


Enclosures

EXHIBIT A

**From:** Steve Peek [mailto:SPeek@hollandhart.com]
**Sent:** Thursday, April 5, 2018 4:19 PM
**To:** Scott Gizer <sgizer@earlysullivan.com>
**Cc:** Joseph Went <JGWent@hollandhart.com>
**Subject:** RE: Rose

Ok I will make it simple.  BB&T will settle all of its individual claims against all of the parties in the R&S St. Rose matters, including Nevada Title, for a lump sum payment of $8.5 million to BB&T and free of any claims by First Southern under the Participation Agreement.  The settlement would be conditioned on all of the parties agreeing to a mutual release of any and all claims that each party may have against BB&T and approved by the bankruptcy court.

EXHIBIT B

**From:** "slockhart@foley.com" <slockhart@foley.com>
**Date:** April 12, 2018 at 6:18:37 AM PDT
**To:** 'Scott Gizer' <sgizer@earlysullivan.com>
**Subject: RE: Rose**

Scott –

To confirm our call last night, settlement between Commonwealth, Nevada Title, the St. Rose-related parties, BB&T and First Southern National Bank (FSNB) is an all or nothing deal meaning that if there is no global settlement between all of those parties, there will be no settlement at all. Based on that representation, FSNB demands payment of $3,000,000.00 to settle its claims relating to the loan to St. Rose.  Please call or e-mail with questions.

Thanks,
Steven C. Lockhart

Foley & Lardner LLP
2021 McKinney Avenue | Suite 1600
Dallas, TX 75201-33340
P 214.999.4668

Visit Foley.com



EXHIBIT C

**Littman, David**

| | |
|---|---|
| **From:** | Ogonna Brown <obrown@nevadafirm.com> |
| **Sent:** | Tuesday, April 17, 2018 5:02 PM |
| **To:** | Littman, David |
| **Cc:** | Nedda Ghandi |
| **Subject:** | R&S - CONFIDENTIAL SETTLEMENT COMMUNICATION |
| | |
| **Importance:** | High |

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

Dear Mr. Littman:

Please be advised that this correspondence is submitted for settlement purposes only. This correspondence, and all discussions, negotiations, and/or statements and acts that relate or pertain to this correspondence, shall be considered in furtherance of settlement and/or an offer to compromise to the fullest extent permitted by law, and shall be inadmissible and shall not be offered into evidence in any proceeding by any party hereto, pursuant to Nevada Revised Statutes 48.105, Federal Rule of Evidence 408, as incorporated by the Bankruptcy Rules, and/or any similarly applicable evidentiary rule in any other state wherein a court of competent jurisdiction is located.

My clients RSIG, Phillip Nourafchan and the Estate of Saiid Forouzan Rad, along with the liquidating trustee Brian Shapiro have authorized me to renew the following settlement offer of a global payment of $2 million to contribute toward the settlement with Commonwealth and BB&T in exchange for a full release and dismissal of all pending litigation and appeals, objections involving the bankruptcy estates, any creditors, and the full release of BB&T's guarantor judgments against Mr. Nourafchan and Mr. Rad.

Please do not hesitate to contact my office with any questions. Thank you.

**Ogonna M. Brown**
Shareholder
Las Vegas Office



| | |
|---|---|
| Tel: 702.791.0308 \| Fax: 702.791.1912 | Tel: 775.851.8700 \| Fax: 775.851.7681 |
| 400 S. 4th Street, Suite 300, Las Vegas NV 89101 | 800 S. Meadows Parkway, Suite 800, Reno NV 89521 |

www.nevadafirm.com

This email message (including any attachments): (a) may include privileged, confidential, proprietary and/or other protected information, (b) is sent based upon a reasonable expectation of privacy, and (c) is not intended for transmission to, or receipt by, unauthorized persons. If you are not the intended recipient, please notify the sender immediately by telephone (702.791.0308) or by replying to this message and then delete the message and all copies or portions from your system. Thank you.