UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY, a Nebraska corporation, as successor-in-interest to NEVADA TITLE COMPANY,<br><br>        Plaintiff,<br><br>  vs.<br><br>ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation,<br><br>        Defendant. | Case No.: 2:18-cv-01823-GMN-VCF<br><br>**ORDER** |

Pending before the Court is the Motion for Summary Judgment, (ECF No. 131), filed by Defendant Ace American Insurance Company ("Defendant"). Plaintiff First American Title Company ("First American"), as successor in interest of Nevada Title Company ("NTC"), (collectively, "Plaintiff"), filed a Response, (ECF No. 137), to which Defendant filed a Reply, (ECF No. 141). Also before the Court is Plaintiff's Motion to Seal, (ECF No. 139), to which Defendant filed its Non-Opposition, (ECF No. 140).[1] For the reasons discussed below, the Court **DENIES** Defendant's Motion for Summary Judgment and **GRANTS** Plaintiff's Motion to Seal.

---

[1] The public has a presumptive right to inspect and copy judicial records and documents. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). When a party requests to seal a document in connection with a motion for summary judgment, a court may seal a record only if it finds "compelling reasons" to support such treatment and articulates "the factual basis for its ruling, without relying on hypothesis or conjecture." *Ctr. For Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016); *Kennedy v. Watts*, No. 3:17-cv-0468, 2019 WL 7194563, at *2 (D. Nev. Dec. 23, 2019) (applying compelling reasons standard to sealing request made in connection with motion for summary judgment). The parties agree that the exhibit Plaintiff wishes to file under seal contains sensitive and confidential information subject to the parties' Stipulated Protective Order. (*See* Protective Order, ECF No. 61). For good cause appearing, the Court GRANTS Plaintiff's Motion to Seal.

I.        **BACKGROUND**

This case arises from Defendant's failure to indemnify Plaintiff in two underlying lawsuits. Plaintiff purchased a professional liability insurance policy from Defendant to insure Plaintiff against damages incurred while conducting its business as a title agent. (Mot. Summ. J. ("MSJ") 1:2–3, ECF No. 131-1); (2009-10 Policy at 2, Ex. M-6 to MSJ, ECF No. 132-42). Branch Banking and Trust Company ("BB&T") filed the first lawsuit against Plaintiff and Commonwealth Land Title Insurance Company ("Commonwealth"), and Commonwealth initiated the second lawsuit (collectively, the "underlying lawsuits"). (Am. Compl. ¶¶ 14–15).

A. **The Underlying Lawsuits**

NTC and Commonwealth entered into an agreement under which Commonwealth would underwrite policies issued by NTC. (Sec. Am. Compl., Ex. A to MSJ, ECF No. 132-1). NTC agreed to indemnify Commonwealth for losses caused by its errors or omissions. (*Id.* 2:26–3:2).

In 2005, Colonial Bank, predecessor in interest to BB&T, loaned $29,350,250.00 to R&S St. Rose, LLC ("R&S"), for the acquisition of property in Henderson, Nevada. (Murdock Findings 8:12–18, Ex. D to MSJ, ECF No. 132-4). The Colonial Bank loan was secured by a deed of trust recorded in first-priority lien position against the Henderson Property. (*Id.* 8:2–4). Approximately one month later, R&S acquired an additional $12 million loan from an affiliated entity, R&S St. Rose Lenders, LLC ("R&S Lenders"), secured by a deed of trust recorded in second-priority lien position behind the previous loan ("R&S Lenders Deed of Trust"). (*Id.* 8:2, 9:18–10:3).

Two years later, R&S sought a loan from Colonial Bank for approximately $44 million (the "Construction Loan"). (*Id.* 12:1–3, 13:9–14). The Construction Loan is the transaction at issue in this case. As part of the Construction Loan agreement, Colonial Bank required a first-position deed of trust to secure the Construction Loan. (*Id.* 13:16–19). According to the loan

terms, a portion of the Construction Loan would be used to satisfy the first loan with Colonial Bank. (*Id.* 12:8–13). The initial deed of trust would thereafter be reconveyed, ensuring Colonial Bank maintained a first-priority lien position against the Henderson Property. (*See id.* 12:19–13:8).

Colonial Bank and Commonwealth retained NTC to serve as the escrow agent for the Construction Loan transaction. (*Id.* 15:3–7). Colonial Bank instructed NTC to close the transaction when it could issue a title policy showing only certain exceptions, not including the St. Rose Lenders' $12 million Deed of Trust. (*Id.* 3–17). NTC's escrow agent Brenda Burns oversaw the transaction and insured the deed of trust as instructed, without the St. Rose Lenders' Deed of Trust as an exception. (*Id.* 15:28-16:1). NTC closed the transaction before the R&S Lenders' Deed of Trust was removed or subordinated. (*Id.* 19:19–20:1). Ms. Burns later realized that R&S Lenders never subordinated or reconveyed their deed as allegedly, agreed upon and requested they do so as soon as possible. (July 9 Burns Email at 1, Ex. I-1 to MSJ, ECF No. 132-10); (July 29 Burns Email, Ex. J-4 to MSJ, ECF No. 132-15).

In November 2008, two R&S investors, Mr. Murdock and Mr. Keach, sued R&S and Colonial Bank over the 2007 Construction Loan transaction (the "Murdock Action"). (Murdock Findings, Ex. D to MSJ). NTC was not joined as a defendant. When NTC again sent a letter to R&S Lenders demanding it reconvey the Deed of Trust, R&S Lenders responded that they had never agreed to a reconveyance. (R&S Correspondence, Ex. J-9 to MSJ, ECF No. 132-20). A few days later, NTC President Robbie Graham received an Acknowledgement of Claim under the title policy by Commonwealth. (Claim Email, Ex. J-11 to MSJ, ECF No. 132-22). Around this same time, the Murdock Action plaintiffs served a records subpoena on NTC and sought to depose NTC's "Person Most Knowledgeable." (Dep. Notice, Ex. J-15 to MSJ, ECF No. 132-26).

Ms. Burns was deposed without representation because the lawyer who prepped her had a conflict of interest. (Graham Dep. 132:14–19, Ex. J to MSJ, ECF No.132-11). At the deposition, Ms. Burns was asked questions regarding NTC's failure to remove or reconvey the R&S Lenders' Deed of Trust. (Burns Dep. 82:4–84:25, Ex. J-19 to MSJ, ECF No. 132-30). Ms. Burns later told Ms. Graham and Ms. Lochhead that she felt like she had been harassed at the deposition. (Graham Dep. 133:7–134:15, Ex. J to MSJ). NTC's senior leadership team, including President Graham and CFO Vandenberg discussed the 2007 Construction Loan claim during their regular claims and litigation meeting. (Vandenberg Dep. 35:20–37:4, Ex. L to MSJ, ECF No. 132-25).

**B. ACE's Defense of Plaintiff**

In August 2009, President Graham and CFO Vandenberg signed a Chubb insurance application that was submitted to Defendant. (2009 Application, Ex. M-4 to MSJ, ECF No. 132-40). When asked whether they had knowledge or information about an act, error, or omission that might reasonably be expected to give rise to a claim, they checked "No." (*Id.* at 4). The application also asked whether the applicant was aware of circumstances that could give rise to a claim, and they again checked "None." (*Id.* at 5). The following year, CFO Vandenberg signed a renewal application. (2010 Application, Ex. M-5 to MSJ, ECF No. 132-41).

The Nevada state court issued its findings in the Murdock Action two days later. (*See* Murdock Findings, Ex. D to MSJ). The court concluded that the $12 million R&S Lenders' Deed of trust had priority over the $44 million Construction Loan. (*Id.* 25:13–19). The ruling was, at least partially, based on BB&T's failure to demonstrate that the Construction Loan had been assigned to it. (*Id.*). As for NTC's involvement in the transaction, the court found that NTC insured the 2007 Loan as instructed, without St. Rose Lenders' Deed as an exception. (*Id.* 27:24–15).

On October 21, 2010, BB&T sent a demand letter to NTC threatening litigation based on the Construction Loan transaction. (BB&T Demand Letter, Ex. J-20 to MSJ, ECF No. 132-31). BB&T had purchased Colonial Bank's rights relating to the property. (Murdock Findings 21:26−22:5, Ex. D to MSJ).  On November 10, 2010, BB&T filed a complaint against NTC. (BB&T Compl., Ex. C to MSJ, ECF No. 132-3).  Plaintiff tendered information pertaining to the BB&T lawsuit to Defendant, and on December 21, 2010, Defendant extended a defense through insurer-appointed defense counsel, subject to a formulaic reservation of rights. (Reservation of Rights, Ex. M-1 to MSJ, ECF No. 132-37).  Similarly, after Plaintiff received notice of the Commonwealth lawsuit in March 2011, Plaintiff tendered the information to Defendant. (*See* Continuing Reservation of Rights, Ex. M-2 to MSJ, ECF No. 132-38).

In June of 2011, Defendant provided an initial detailed coverage determination and reservation of rights regarding the underlying lawsuits, setting forth Defendant's position that the underlying lawsuits concerned a "wrongful act" as defined in the Policy, and that "coverage for this matter appears to be very limited and may be wholly precluded by the Policy's terms." (*Id.* at 1).  The document additionally notified Plaintiff that Defendant reserved its rights to limit or deny coverage entirely or to withdraw the defense, under various exceptions outlined in the Policy. (*Id.* at 9).  First American later purchased NTC stock and the two companies merged. (Merger Plan, Ex. L to Resp., ECF No. 137-1).

On March 2, 2020, NTC informed ACE that it reached a settlement in the underlying litigation. (Settlement Letter, Ex. J-21 to MSJ, ECF No. 132-32).  ACE responded, requesting an analysis on NTC's decision to settle for $4.67 million. (March 3 Letter, Ex. A to Resp., ECF No. 137-1).  NTC provided the analysis but pointed out that ACE's own counsel had previously prepared an evaluation in 2017. (March 6 Letter, Ex. B to Resp., ECF No. 137-1).  ACE replied a couple weeks later that it was still considering NTC's request and invited NTC to participate in mediation. (March 24 Letter, Ex. C to Resp., ECF No. 137-1).  NTC declined, and on April

1, 2020, NTC sent ACE the draft settlement agreement. (Email Draft Settlement, Ex. O to Resp., ECF No. 137-1). On April 15, NTC again told ACE that it could not delay its decision to settle the litigation for the potential of mediation. (April 15 Email, Ex. N to Resp., ECF No 137-1). On or around April 17, 2020, Plaintiff entered into a settlement agreement to fully resolve the claims in the underlying lawsuits for approximately $4.6 million, exclusive of interest. (NTC Email, Ex. J-22 to MSJ, ECF No. 132-33). Defendant denied coverage for the underlying lawsuits. (ACE Denial, Ex. M-3 to MSJ, ECF No. 132-39).

Plaintiff asserts four claims for relief against Defendant: (1) declaratory relief; (2) breach of contract; (3) tortious breach of the duty of good faith and fair dealing; and (4) breach of NRS 686A.310.

## II.  LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.* "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). A principal

purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and citation omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404,

1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III. DISCUSSION

Defendant presents five theories on summary judgment: (1) Plaintiff does not have standing; (2) Plaintiff cannot establish any damages; (3) the "Prior Knowledge" exclusion in the Policy bars coverage; (4) the "Title Defect" exclusion in the Policy bars coverage; and (5) Plaintiff settled the case without Defendant's consent, in contravention of the express language found within the Policy. Plaintiff contends, among other things, that "bedrock insurance [contract] interpretation principles" and Defendant's conduct during the duration of the underlying lawsuits posit denying summary judgment. The Court considers each of Defendant's arguments in turn.

#### A. Plaintiff First American's Standing to Sue

Defendant's first argument is that First American does not have standing to sue because First American did not acquire NTC's rights and liabilities through the stock purchase. (MSJ

17:18–19). Although First American later merged with NTC, Defendant argues that "First American purchased the stock of NTC, not all of its assets. It did not purchase the [Policy], nor did NTC assign any of its rights against [Defendant] to First American," thereby stripping First American of any rights under the Policy. (*Id.* 17:23–25).

Rather than pointing to facts in the record for its contention that Plaintiff lacks standing, Defendant relies on *General Accident Insurance Co. v. Superior Court*, a California Court of Appeals case. (*Id.* 17:26–18:10). But *General Accident Ins.* is materially distinguishable. The *General Accident* court held that successor liability in tort does not entitle the successor to the insurance coverage of its predecessor by operation of law. 64 Cal. Rptr. 2d 781, 788 (Cal. Ct. App. 1997). The Court in that case did not rule on coverage by express assignment or a de facto merger. *Id.* Here, Plaintiff does not request coverage based on previous tort liability. Rather, Plaintiff argues that, through its merger with NTC, First American assumed NTC's liabilities. (Resp. 9:27–12:11).

Defendant fails to offer evidence that First American did not acquire NTC's liabilities in the merger, and therefore does not demonstrate the absence of a genuine issue of material fact on the matter of standing. While Defendant correctly notes that First American purchased NTC's stock, it fails to address the fact that First American assumed NTC's liabilities in a merger the same year. (Stock Purchase Agreement, Ex. N-1 to MSJ, ECF 132-45); (Merger Plan, Ex. L to Resp.). Because Defendant does not meet its burden, the Court need not address the nonmoving party's evidence. Accordingly, the Court DENIES Defendant's Motion for Summary Judgment on the issue of standing.

**B.     Damages**

Defendant next argues that "First American has not incurred and cannot incur any damages." (MSJ 18:20–21). Defendant relies on its assertion that First American did not assume NTC's liabilities or pay any portion of NTC's defenses costs or settlement. (*Id.* 18:21–

22).  But given that First American assumed NTC's assets and liabilities in a merger, and First American paid its settlement from the $10 million it placed in escrow during the purchase of NTC, Defendant's argument lacks merit. (*See* Stock Purchase Agreement, Ex. N-1 to MSJ); (Resp. 12:22–13:12).  Apart from conclusory allegations that First American has not sustained any damages, Defendant does not offer any evidence to establish that Plaintiff's damages claim is incorrect or that no dispute exists.  Therefore, Defendant fails to meet its burden, and the Court DENIES Defendant's Motion for Summary Judgment on the issue of damages.

### C.      Prior Knowledge Exclusion

Defendant further argues that Plaintiff is barred from recovering under the Policy's prior-knowledge exclusion.  As the insurer, Defendant bears the burden to show that an exclusion applies. *Zurich American Ins. Co. v. Ironshore Specialty Ins. Co.*, 964 F.3d 804, 810 (9th Cir. 2020).  Thus, as the party moving for summary judgment, Defendant bears the initial burden of establishing the absence of a genuine issue of fact on each issue material to this exclusion. *See C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480.

The Policy includes the following exclusion, barring certain claims:

> The Company shall not be liable for Damages or Claims Expenses on account of any Claim:
>
> **K.**  alleging, based upon, arising out of, or attributable to any Wrongful Act committed prior to the beginning of the Policy Period, if, on or before the earlier of the effective date of this Policy or the effective date of any Policy issued by the Company to which this Policy is a continuous renewal or replacement, the Insured knew or reasonably could have foreseen that such Wrongful Act would result in a Claim.

(2009-10 Policy at 4, Ex. M-6 to MSJ).

Defendant properly notes that the U.S. District of Nevada has applied a "subjective-objective" framework to determine whether a prior-knowledge exclusion should bar coverage in professional liability policies. (MSJ 20:1–9) (citing *Alps Property & Casualty Ins. Co. v. Kalicki Collier LLP*, 526 F.Supp.3d 805, 816 (D. Nev. 2021)).  The exclusion applies "if (1) the

insured had knowledge of the relevant suit, act, error, or omission and (2) the suit, act, error, or omission might reasonably be expected to result in a claim or suit." *Id.*

Plaintiff distinguishes *Kalicki Collier* because "NTC (1) never missed a statute of limitations, and (2) does not concede to any errors as the *Kalicki* defendants did." (Resp. 18:9–12). More importantly, Plaintiff points out that the language in the operative contract in *Kalicki Collier* differs from the language in the Policy here. Defendant's Policy requires that the Insured "knew or reasonably *could* have foreseen that such Wrongful Act *would result in a Claim*." (2009-10 Policy at 4, Ex. M-6 to MSJ) (emphasis added). Conversely, the application language in *Kalicki Collier* requires that the Insured "knew or reasonably *should have known* or foreseen that the Wrongful Act *might be the basis of a Claim*." (Resp. 18:13–18 (citing *Kalicki Collier*, 526 F. Supp. 3d at 813–14) (emphasis added)). In other words, Plaintiff contends that the use of "might" in *Kalicki Collier* and "would" in the operative Policy demonstrates a "higher bar to meet to preclude coverage" in the present case. (*Id.* 19:1–3). The Court finds that applying a subjective-objective framework is appropriate but agrees with Plaintiff that the inquiry must align with the language used in the Policy at issue in this case.

### 1. Who Qualifies as the "Insured"

To determine the prior knowledge of the "Insured," the Court must first ascertain who qualifies as the "Insured" under the relevant policy language. The parties do not dispute that the relevant "effective" date of the policy at issue is October 7, 2009. (MSJ 12:2–4); (Resp. 16:14–17). For the purposes of prior-knowledge exclusion, the Holding Company's "Chief Executive Officer, Chief Financial Officer, President, General Counsel or Risk Manager" qualify as the "Insured." (Resp. 16:24–26); (Reply 4:23–27). "The knowledge of any other Insured, other than the aforementioned officers or employees, shall not be imputed to any other Insured." (2009-10 Policy at 4, Ex. M-6 to MSJ).

Plaintiff contends that the only individual who would qualify under this definition is Liz Vandenberg, who was Chief Financial Officer of NTC from January 2007 through December 2010. (Resp. 16:27–17:3). Defendant does not dispute that Ms. Vandenberg, as CFO, qualifies as the "Insured," but Defendant contends that Ms. Graham, acting as risk manager, also qualifies as the "Insured." (Reply 5:3–7:10). On the policy application that NTC submitted to Defendant for the 2009 – 2010 insurance liability policy, Ms. Graham signed the policy and noted she was both "Chief Executive Officer" and "President" of NTC on separate pages. (Insurance Policy Application, Ex. M-4 to MSJ, ECF No. 132-40). Because Ms. Graham signed the application in her capacity as either President or Chief Executive Officer, the Court finds both Ms. Graham and Ms. Vandenberg qualify as the "Insured."

### 2. Objective Likelihood of Claim

Beginning with the objective prong, the relevant inquiry is whether a "reasonable professional in the insured's position" would expect a claim or suit to result. *See Kalicki Collier*, 526 F.Supp.3d at 816. Like in *Kalicki Collier*, this inquiry applies regardless of whether the Insured *actually formed* an expectation that the wrongful act would result in a claim. *See id.*

Defendant claims that a "reasonable escrow agent or title insurance agent should have known that this error could reasonably result in a claim against NTC" because NTC did not ensure that the R&S Lenders' second deed of trust was removed or reconveyed before closing. (MSJ 22:23−23:1). Plaintiff responds that even though it was aware of the ongoing Murdock Action at the time, NTC was not named as a party and did not expect to be found at fault. (Resp. 20:11−13; 3:23−26).

Defendant relies on *Kalicki Collier* to prove that an objective escrow or title insurance agent knew or reasonably could have foreseen that a Claim would result. (*Id.* 20:1−22:22). In *Kalicki Collier*, the defendant lawyers agreed to represent a client on a claim but let the claim's

statute of repose deadline lapse after eight months. 526 F.Supp.3d at 814. Opposing counsel refused to enter into a settlement agreement because the statute of repose barred the client's claim. *Id.* The lawyers pursued the claim anyway, and federal court dismissed the case based on the lapse of the applicable statute of repose. *Id.* After the dismissal, the lawyers' firm applied for insurance with the plaintiff and responded that it was not aware of any wrongful acts that might be the basis of a claim. *Id.* Applying the subjective-objective framework, the court found that the lawyers knew about the statute of repose issue and that it was likely fatal to their client's case before they completed the application. *Id.* at 816. The Court determined that the lawyers knew or could have foreseen that its error in missing the statute of repose deadline was a wrongful act that might turn into a claim because the underlying lawsuit had been dismissed. *Id.* The defendant lawyers argued that the policy exclusion did not apply because legal proceedings had not yet been instituted. *Id.* at 815. But the court rejected that argument and clarified that the plain language of the statute did not require a demand letter or the actual filing of a lawsuit. *Id.* at 815–16.

While *Kalicki Collier* provides an instructive framework, the facts are materially distinguishable from the case here. Unlike *Kalicki Collier*, where the underlying suit was dismissed before they applied for the policy, NTC did not have a resolution in the underlying Murdock litigation. Moreover, NTC was not named as a party or given a demand letter. Importantly, as noted *supra*, the applicable language in *Kalicki Collier* requires that the Insured "knew or reasonably *could* have foreseen that the Wrongful Act *might* be the basis of a Claim." (Resp. 18:13–18 (citing *Kalicki Collier*, 526 F. Supp. 3d at 813–14) (emphasis added)). The operative language in the Policy here replaces "*could*" with "*should*" and "*might*" with "*would*." This language creates a higher bar for Defendant to overcome, and Defendant fails to explain how the facts at hand meet this more stringent standard.

Defendant cites a District of New Mexico case that provides another application of the subjective-objective framework to the lower "might" standard. (*See* MSJ 25:5–16) (citing *Aztec Abstract & Title Ins., Inc. v. Maxum Specialty Group*, 302 F. Supp. 3d 1274 (D. N.M. 2018). In *Aztec Abstract*, the insured title and escrow services provider filed a mortgage with an incorrect legal description. *Id.* at 1277. The insured knew the error could result in the loss of collateral at the time it applied for professional liability insurance with the defendant insurer and admitted it had committed a negligent act. *Id.* The court, noting that the standard was a wrongful act which *may* result in a claim, found that a reasonable jury could find that the insured had knowledge of a negligent act that *may* result in a claim. *Id.* at 1285 (emphasis added). The court further explained that the insured does not have to "determine the validity of the claim beforehand," because the claim does not have to be valid; nor does the insured have to know a claim *will* result. *Id.* (emphasis added). Therefore, the court found that the prior knowledge exclusion applied. *Id*. at 1286.

Applying those principles to the case at hand, the Court is not persuaded to arrive at the same conclusion. First, the policy language in *Aztec Abstract*, like that in *Kalicki Collier*, sets the lower standard of "might" or "may" result in a claim. As already discussed, the Policy in this case contains more insured-friendly language. Second, unlike the insured in *Aztec Abstract* who knew and admitted he had made a negligent act that could result in loss of collateral, Ms. Vandenberg and Ms. Graham did not expect the 2007 loan transaction to result in litigation against NTC itself because they believed Ms. Burns was following industry standards. (*See* Vandenberg Depo., Ex. L to MSJ, ECF No. 132-35); (Graham Depo., Ex. J to MSJ). While Defendant is correct that NTC is not required to concede it made a mistake, (*see* Reply 8:10–20), industry standard practices are relevant in the Court's objective determination of whether a reasonable professional in NTC's position would expect a claim to result.

Defendant does not offer its own evidence to rebut Plaintiff's expert reports and leadership depositions stating that NTC's escrow agent followed typical industry practices at the time. The Court therefore finds that Defendant has not met its burden of proving that a reasonable professional in the position of the Insured knew or reasonably should have known that a claim would result. And even if it had, Plaintiff's Response sets forth facts demonstrating a genuine issue for trial.[2] Because the objective prong of the subjective-objective analysis is not met, the Court need not evaluate the Insured's subjective knowledge. Accordingly, the Court DENIES Defendant's Motion for Summary Judgment under the prior-knowledge exclusion.

### D. Title Defect Exclusion

Defendant next argues that the Policy's Title Defect Exclusion applies and therefore bars Plaintiff's recovery. The Policy precludes coverage for any claim "alleging, based upon, arising out of or attributable to any defect in title not disclosed of public record or of which (defect in title) any insured had actual or constructive knowledge at the date of issuance of insurance of such title." (2009-10 Policy, Ex. M-6 to MSJ).

Defendant cites a title insurance treatise that defines a title defect as any "interest, right, or title in the property that is superior to the estate or interest that has been insured [by the Title Insurer], but whose absence of superiority remains undisclosed at the date of the policy's

---

[2] Plaintiff's proffered expert testimony supports its contention that NTC was not expecting the *Murdock* court's outcome in favor of R&S because it was following industry standards by closing the 2007 Construction Loan based on oral instructions. Plaintiff first cites testimony from Mr. Walker, an expert at the *Murdock* trial, who testified that in his forty years of experience, the deed of reconveyance is received before the close of escrow less than one percent of the time. (Resp. 21:4–21). Defendant objects to the admission of this testimony and argues that Mr. Walker's testimony suggests Plaintiff took a risk by issuing the title insurance policy without securing Colonial Bank's first-position deed of trust. (Reply 9:11–23). While NTC arguably took a risk by accepting an oral instruction to close escrow, that alone is not enough to demonstrate that a reasonable professional would expect a claim to result. Further, NTC had a long-standing relationship with R&S Lenders and their leadership team had no reason to believe it wouldn't get the reconveyance from R&S. (Graham Dep., Ex. J to MSJ). Until the *Murdock* litigation's findings were made public, **Ms. Graham and Ms. Vandenberg did not expect the court to rule against BB&T because they did not know about the lack of documentary evidence to support Ms. Burn's statements that R&S agreed to reconvey.** (Sagalow Decl., Ex. 3 to Resp., ECF No. 137-3) (emphasis added). To that end, Plaintiff's expert opines that the *Murdock* parties themselves may not have expected the outcome because BB&T's chose not to send a conditional demand to NTC in the event that BB&T lost in court. (*Id.* at 10 n. 8).

issuance." (MSJ 26: 4–8). Because the R&S lenders deed of trust had priority when the title insurance was issued, Defendant reasons that a title defect existed. (*Id.* 26:10–16). Plaintiff's primary argument in response is that the exclusion itself is ambiguous and vague. (Resp. 24:4–21). Even if the Court finds the exclusion unambiguous, Plaintiff argues it is against an insured's reasonable expectations as well as industry custom, practices, and standards. (*Id.* 24:23–27).

Defendant replies that the policy is not ambiguous and should be read as excluding coverage "alleging, based upon, arising out of or attributable to any defect in title" that is either (1) not disclosed of public record, or (2) of which defect any insured had constructive or actual knowledge at the date of issuance. (Reply 11:1–8). That is, Defendant argues that the exclusion precludes coverage for claims attributable to defects in title in two circumstances delineated by the word "or" in the policy. (*Id.* 11:9–17). Applying the exclusion to the facts in this case, Defendant concludes that the exclusion applies because NTC did not disclose its failure to ensure Colonial Bank's first-position deed of trust. (*Id.* 14–24).

Even under Defendant's interpretation of the Title Defect Exclusion, Defendant's sparse claims do not satisfy its initial burden of establishing the absence of a genuine issue of material fact. Defendant's clearest argument is that "[a]lthough NTC knew it had to secure that first-position deed of trust, it failed to get R&S Lenders to subordinate or reconvey its deed of trust before closing the transaction and issuing the title insurance policy." (Reply 10:16–18). But Defendant does not connect the dots regarding how NTC's closure of the transaction is a title defect that the pertinent NTC employee had actual or constructive knowledge of. Defendant does not clarify who at NTC knew of the obligation to secure first-position, when the knowledge arose, whether that knowledge is imputed to the "Insured," and whether their knowledge was actual or constructive. Defendant further neglects to inform the Court whether it is alleging that both exclusionary criteria apply in this case, or only the latter. The Court

accordingly DENIES Defendant's request for summary judgment under the Title Defect Exclusion.

### E. Consent to Settlement

Finally, Defendant argues it is excused from paying Plaintiff's settlement because Plaintiff settled without its consent in violation of the Policy's duty to defend:

> The Company shall have the right and duty to defend any covered Claim brought against the Insured even if the Claim is groundless, false, or fraudulent. The Insured shall not admit or assume liability or settle or negotiate to settle any Claim or incur Claims Expenses without the prior written consent of the Company and the Company shall have the right to appoint counsel and to make such investigation and defense of a Claim as it deems necessary.

(2009-10 Policy, Ex. M-6 to MSJ at 1).

The Court finds that Defendant demonstrates sufficient evidence to negate a claim from NTC that it can clearly recover under the policy per settlement terms. On March 2, 2020, Plaintiff informed Defendant that it had reached a settlement agreement in the underlying litigation with BB&T and Commonwealth, and that "final settlement documents" would be completed in the coming days. (Settlement Letter, Ex. J-21 to MSJ). The letter from Plaintiff notified Defendant that there was "still an opportunity for ACE to participate in funding the settlement," but insisted it was "full-speed ahead in the settlement." *Id.* This language is not inviting Defendant to participate in settlement negotiations; rather, its opportunity to participate is limited to funding the agreement that Plaintiff, BB&T, and Commonwealth had already reached. Neither Defendant, nor its designated counsel Ms. Thome, were involved in the final settlement discussions. (*See* Graham Dep. 169:21–170:3, Ex. J to MSJ); (Vandenberg Dep. 217:7–17, Ex M to MSJ).

Because Defendant met its burden, Plaintiff must now demonstrate, through specific evidence in the record, that a genuine dispute of material fact exists. Plaintiff, as the insured, bears the burden of establishing their potential for coverage under the applicable policy. *See*

*Zurich American Ins. Co. v. Ironshore Specialty Ins. Co.*, 497 P.3d 625, 630 (Nev. 2021). Plaintiff first alleges that ACE had ample notice of settlement. (Resp. 25:12–26:18). But even if the Court does not find the notice to be timely, Plaintiff argues it did not have to seek Defendant's consent because Defendant acted in bad faith by unreasonably failing to accept a settlement demand within policy limits and inadequately defending Plaintiff throughout its decade of litigation. (Resp. 26:20–29:14). Plaintiff cites California law for its proposition that insurance companies have a duty to make reasonable efforts to settle a lawsuit against its insured. (Resp. 27:7–26) (citing *PPG Indus., Inc. v. TransAmerica Ins. Co.*, 975 P.2d 652 (Cal. 1999)). Because this Court is exercising diversity jurisdiction over this case, state substantive law controls. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Nevada law, not the insurance contract itself, imposes the implied covenant of good faith and fair dealing on insurers. *See Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009). Violations of this covenant lead to tort claims for bad faith, defined as "an actual or implied awareness of the absence of a reasonable basis for denying benefits of the [insurance] policy." *Id.* The insured's right to control settlement discussions "creates the duty of good faith and fair dealing during negotiations," and an insurer must consider the insured's interests and its own equally. *Id.* at 324–25. In addition to the common law duties of good faith and fair dealing, insurers are subject to Nevada's Unfair Claims limitations. Nevada statutes consider an insurer's claims practice to be unfair if it fails to implement reasonable standards for the prompt investigation and proper processing of claims. *See* NRS § 686A.310. Insurers violate the law by "failing to effectuate prompt, fair, and equitable settlement of claims in which liability of the insurer has become reasonably clear." *Id.*

In this case, Plaintiff has raised a dispute of material fact in relation to Defendant's duty to defend and the reasonableness of its settlement actions. Plaintiff's exhibits demonstrate that although Defendant had been defending NTC since 2011, and Defendant's counsel prepared a

pre-mediation evaluation of the case in 2017, Defendant indicated to Plaintiff that they could not evaluate the March 2020 settlement demand. (*See* Resp. 26:3–16) (citing Ex. A-E & N-P).

Plaintiff also cites Exhibit F, documents produced by Defendant, to bolster its argument that a genuine dispute of fact exists around whether Defendant adequately defended NTC prior to the 2020 settlement. These documents indicate that ACE and NTC entered into a tolling agreement, during which time NTC set aside a $2.5 million loss reserve. (ACE Documents at 91–94, Ex. F to Resp., ECF No. 137-1). ACE acknowledged that the suit against NTC could result in a $12 million judgment, which would be over the policy limit. (*Id.* at 99).

According to Plaintiff's expert, these documents demonstrate that Defendant had assigned significant potential exposure and acted in bad faith by not engaging in settlement offers from 2012-2018. (Stempel Rebuttal Report ¶¶ 10–12, Ex. C to Resp., ECF No. 137-2). "As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997) (internal quotation marks and citation omitted). Plaintiff's expert further opines that because NTC ended the tolling agreement in 2018 when it obtained new counsel, Defendant was obligated to provide a coverage decision to NTC at that time; however, it did not do so until 2020. (Stempel Initial Expert Report ¶ 129, Ex. B to Resp., ECF No. 137-2). This expert had never encountered a situation in which an insurer waited almost a dozen years to come to a coverage position. (*Id.* ¶¶ 155–57). When the reasonableness of a course of action comes into question, it is generally left to the trier of fact to determine. *See Lee v. GNLV Corp.*, 22 P.3d 209, 212 (Nev. 2001). Because the Court finds that a genuine issue for trial exists surrounding the reasonableness of Defendant's actions regarding their duty to defend Plaintiff and engage in settlement negotiations in good faith, the Court DENIES Defendant's motion for summary judgment based on Plaintiff's decision to settle.

///

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 131), is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Seal, (ECF No. 139), is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of Court shall strike Exhibit F to Plaintiff's Response, ECF No. 137-1, pp. 27-100.

**IT IS FURTHER ORDERED** that Plaintiff is instructed to refile Exhibit F to Plaintiff's Response, ECF No. 137-1, pp. 27-100, under seal.

**IT IS FURTHER ORDERED** that the parties will have thirty days from the date of this Order to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**DATED** this   29   day of September, 2023.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT